# EXHIBIT A



STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. SC-CV-16-275

**U.S. Bank National Association,**
as Trustee, successor-in-interest to
Bank of America, N.A., as Trustee,
successor to Wells Fargo Bank, N.A.,
as Trustee for the registered holders of
Wachovia Bank Commercial Mortgage
Trust, Commercial Mortgage Pass-Through
Certificates, Series 2005-C22,
acting by and through its Special Servicer,
CWCapital Asset Management, LLC

Plaintiff

v.

**Pendleton Westbrook SPE, LLC,**
**ZAK Westbrook SPE, LLC,**
**SRA Westbrook SPE, LLC,**
**SPC Westbrook SPE, LLC and**
**Paris Westbroook SPE, LLC**

Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**VERIFIED COMPLAINT**

NOW COMES U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor to Wells Fargo Bank, N.A., as Trustee for the registered holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2005-C22 ("Plaintiff"), by and through its Special Servicer CWCapital Asset Management, LLC ("CWCapital"), and states as its complaint against Pendleton Westbrook SPE, LLC, ZAK Westbrook SPE, LLC, SRA Westbrook SPE, LLC, SPC Westbrook SPE, LLC and Paris Westbroook SPE, LLC (collectively "Defendants") as follows:

I.    **Parties**

1.    US Bank National Association is a National Banking Association whose main

4822-9599-8002.1

office is in Minneapolis, Minnesota.

2.    Defendant Pendleton Westbrook SPE, LLC is a Delaware limited liability company whose principal place of business is Hackensack, New Jersey.

3.    Defendant ZAK Westbrook SPE, LLC is a Delaware limited liability company whose principal place of business is Hackensack, New Jersey.

4.    Defendant SRA Westbrook SPE, LLC is a Delaware limited liability company whose principal place of business is Hackensack, New Jersey.

5.    Defendant SPC Westbrook SPE, LLC is a Delaware limited liability company whose principal place of business is Hackensack, New Jersey.

6.    Defendant Paris Westbrook SPE, LLC is a Delaware limited liability company whose principal place of business is Hackensack, New Jersey.

## II.    Factual Background

7.    Defendants entered into a Promissory Note dated November 21, 2005 in the original principal amount of $20,000,000 (the "Note") made payable to Wachovia Bank, National Association ("Original Lender").  A true and accurate copy of the Note is attached hereto as Exhibit A.

8.    Plaintiff is currently the Holder of the Note through a series of Allonges as follows:

- ■ an Allonge from Original Lender to Wells Fargo Bank, N.A., ("Wells Fargo") as Trustee for the registered holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2005-C22, a true and accurate copy of which is attached hereto as Exhibit B;

- ■ an Allonge from Wells Fargo to Bank of America, N.A. ("BOA"), as Trustee for the registered holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2005-C22, a true and accurate copy of which is attached hereto as Exhibit C; and,

4822-9599-8002.1                    2

■ an Allonge from BOA to Plaintiff, a true and accurate copy of which is attached hereto as <u>Exhibit D</u>.

9.    The Maturity Date of the Note is December 11, 2015.

10.    The Note is secured by a Fee and Leasehold Mortgage and Security Instrument, dated as of November 21, 2005, executed by Defendants for the benefit of Original Lender, (the "Mortgage" and recorded with the Cumberland County Registry of Deeds (the "Registry"), at Book 23420, Page 232, against title to realty located at One Riverfront Plaza, Westbrook, Maine (the "Property"). A true and accurate copy of the Mortgage is attached hereto as <u>Exhibit E</u>.

11.    Defendants jointly own the Property as tenants in common.

12.    Plaintiff now holds the Mortgage through a series of Assignments as follows:

■ An Assignment of Fee and Leasehold Mortgage and Security Agreement from Original Lender to Wells Fargo, recorded with the Cumberland County Registry of Deeds (the "Registry"), at Book 24152, Page 98, a true and accurate copy of which is attached hereto as <u>Exhibit F</u>;

■ An Assignment of Fee and Leasehold Mortgage and Security Agreement from Wells Fargo to BOA, recorded with the Cumberland County Registry of Deeds (the "Registry"), at Book 27181, Page 140, a true and accurate copy of which is attached hereto as <u>Exhibit G</u>; and,

■ An Assignment of Fee and Leasehold Mortgage and Security Agreement from BOA to Plaintiff, recorded with the Cumberland County Registry of Deeds (the "Registry"), at Book 32876, Page 32, a true and accurate copy of which is attached hereto as <u>Exhibit H</u>.

13.    The Property is a currently vacant Class A, 6-story brick, 134,349 square foot office building, and has been vacant since January 2016 when the Property's single tenant vacated. As a result, there is currently no operating income to fund maintenance or upkeep.

14.    The Property currently has a lease in place for up to 540 parking spaces in an adjacent multi-level garage. Plaintiff is concerned that the loss of that Lease would result in the loss of critical parking for the Property.

15.   The Note is currently in default, as the Maturity Date has passed without Defendants paying all amounts due on the Note.

16.   Defendants failure to make payments on the Note as those payments have come due, including the maturity payment, are Events of Default pursuant to Section 2.1(a) of the Mortgage.

17.   On January 12, 2016, Plaintiff issued to the Defendant a Notice of Default, Acceleration and Demand for Payment (the "Default Notice") based upon Defendants' maturity default.  A true and accurate copy of the Default Notice is attached hereto as <u>Exhibit I</u>.

18.   Pursuant to Section 3.1(d) of the Mortgage, Defendants expressly agreed to the appointment of a Receiver upon an Event of Default:

> If there shall occur an Event of Default under this Mortgage …
> Mortgagee may … exercise any and all of the following rights,
> remedies and recourses, either successively or concurrently: … (d)
> … make application to a court of competent jurisdiction for
> appointment of a receiver for all or any part of the Property, as a
> matter of strict right and without notice to Mortgagor and without
> regard to the adequacy of the Property for the repayment of the
> indebtedness secured hereby …, and Mortgagor does hereby
> irrevocably consent to such appointment, waives any and all
> notices of and defenses to such appointment and agrees not to
> oppose any application therefor by Mortgagee ….

## COUNT I – BREACH OF NOTE AND MORTGAGE

19.   Plaintiff realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 18 above.

20.   The Note and Mortgage constitute valid and enforceable contracts between Plaintiff and Defendants.

21.   Defendants have breached their obligations under the Note and Mortgage by failing to pay all amounts fully due on the Note by the Maturity Date of December 11, 2015.

4

22.     As a direct result of Defendants' breaches, Plaintiff has suffered and continues to suffer damages, including direct, incidental and consequential damages, attorneys' fees and costs and interest accrued from the date of the Defendants' default.

## Prayers for Relief

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Immediately appoint Boulos Property Management as Receiver of the Property for the purpose of conducting all activities normally incident to the operation of the Property, including the collection of rents and profits for the benefit of Plaintiff in accordance with the loan documents, and other property management activities, as detailed in the Proposed Order Appointing Receiver, submitted simultaneously herewith, while Plaintiff seeks to foreclose a Mortgage encumbering the Property under the power of sale reserved by such Mortgage.

B.  Enter judgment in Plaintiff's favor and against Defendants;

C.  Award Plaintiff damages, including all direct, incidental and consequential damages, attorneys' fees, costs, accrued interest, default interest and late charges and fees;

C.  Grant such other and further relief as is just and equitable.

Dated this 11th day of ~~June~~ July, 2016

> Attorneys for U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor to Wells Fargo Bank, N.A., as Trustee for the registered holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2005-C22 acting by and through its Special Servicer CWCapital Asset Management, LLC

> W. Scott O'Connell, Esq., Bar No. 8500   [For]
> NIXON PEABODY LLP
> 900 Elm Street
> Manchester, NH 03101-2031
> Office:  603.628.4000
> Fax:  603.628.4040

## VERIFICATION

I, _Jeremy Zinn_ , _Vice President_ of CWCapital Asset Management LLC, Special Servicer of U.S. Bank National Association, as Trustee, as successor-in-interest to Bank of America, National Association, as Trustee, as successor by merger to LaSalle Bank National Association, as Trustee for the Registered Holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2005-C22, on oath, hereby verify that I have read the foregoing Verified Complaint, and that it is accurate and complete to the best of my knowledge, information and belief.

By: _Jeremy Zinn_
Its: _Vice President_

4822-9599-8002.1

6

# EXHIBIT A

Loan No. 502853479

## PROMISSORY NOTE

$20,000,000.00                                                                          November 21, 2005

FOR VALUE RECEIVED, each of the undersigned, PENDLETON WESTBROOK SPE, LLC, ZAK WESTBROOK SPE, LLC, SRA WESTBROOK SPE, LLC, SPC WESTBROOK SPE, LLC, and PARIS WESTBROOK SPE, LLC, each a Delaware limited liability company, jointly and severally, as tenants-in-common (collectively, "Maker"), each having an address at 235 Moore Street, Suite 300, Hackensack, New Jersey 07601, Attn.: Peter O. Hanson, promises to pay to the order of WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association ("Payee"), at the office of Payee at Commercial Real Estate Services, 8739 Research Drive URP – 4, NC 1075, Charlotte, North Carolina 28262, or at such other place as Payee may designate to Maker in writing from time to time, the principal sum of TWENTY MILLION AND 00/100 DOLLARS ($20,000,000.00), together with interest on so much thereof as is from time to time outstanding and unpaid, from the date of the advance of the principal evidenced hereby, at the rate of five and sixty-five hundredths percent (5.65%) per annum (the "Note Rate"), together with all other amounts due hereunder or under the other Loan Documents (as defined herein), in lawful money of the United States of America, which shall at the time of payment be legal tender in payment of all debts and dues, public and private.

### ARTICLE I - TERMS AND CONDITIONS

1.1 Computation of Interest.  Interest shall be computed hereunder based on a 360-day year and based on the actual number of days elapsed for any period in which interest is being calculated  The first interest accrual period hereunder shall commence on and include the date that principal is advanced hereunder and shall end on and include the next tenth (10th) day of a calendar month, unless principal is advanced on the tenth (10th) day of a month, in which case the first interest accrual period shall consist of only such tenth (10th) day.  Each interest accrual period thereafter shall commence on the eleventh (11th) day of each calendar month during the term of this Note and shall end on and include the tenth (10th) day of the next occurring calendar month.

1.2 Payment of Principal and Interest.  Payments in federal funds immediately available at the place designated for payment received by Payee prior to 2:00 p.m. local time on a day on which Payee is open for business at said place of payment shall be credited prior to close of business, while other payments, at the option of Payee, may not be credited until immediately available to Payee in federal funds at the place designated for payment prior to 2:00 p.m. local time on a day on which Payee is open for business.  Such principal and interest shall be payable in equal consecutive monthly installments of $117,795.83 each, beginning on January 11, 2006 (the "First Payment Date"), and continuing on the eleventh (11th) day of each and every calendar month thereafter through and including November 11, 2015 (each, a "Payment Date"). On December 11, 2015 (the "Maturity Date"), the entire outstanding principal balance hereof, together with all accrued but unpaid interest thereon, shall be due and payable in full.

NY:979564.4

1.3 <u>Application of Payments</u>.   So long as no Event of Default (as hereinafter defined) exists hereunder or under any other Loan Document, each such monthly installment shall be applied first, to any amounts hereafter advanced by Payee hereunder or under any other Loan Document, second, to any late fees and other amounts payable to Payee, third, to the payment of accrued interest and last to reduction of principal.

1.4 <u>Payment of "Short Interest"</u>. If the advance of the principal amount evidenced by this Note is made on a date after the first (1st) day of a calendar month and prior to the eleventh (11th) day of a calendar month, Maker shall pay to Payee contemporaneously with the execution hereof interest at the Note Rate for a period from the date hereof through and including the tenth (10th) of this calendar month. If the advance of the principal amount evidenced by this Note is made on a date after the eleventh (11th) day of a calendar month and prior to the last day of a calendar month, Maker shall pay to Payee contemporaneously with the execution hereof interest at the Note Rate for a period from the date hereof through and including the tenth (10th) of the immediately succeeding calendar month.

1.5 <u>Prepayment; Defeasance</u>.

(a)  This Note may not be prepaid, in whole or in part (except as otherwise specifically provided herein), at any time.  In the event that Maker wishes to have the Security Property (as hereinafter defined) released from the lien of the Security Instrument (as hereinafter defined), Maker's sole option shall be a Defeasance (as hereinafter defined) upon satisfaction of the terms and conditions set forth in Section 1.5(d) hereof.  This Note may be prepaid in whole but not in part without premium or penalty in the last three (3) months occurring immediately prior to the Maturity Date provided (i) written notice of such prepayment is received by Payee not more than ninety (90) days and not less than thirty (30) days prior to the date of such prepayment, and (ii) such prepayment is accompanied by all interest accrued hereunder through and including the date of such prepayment and all other sums due hereunder or under the other Loan Documents. If, upon any such permitted prepayment in the last three (3) months occurring immediately prior to the Maturity Date, the aforesaid prior written notice has not been timely received by Payee, there shall be due a prepayment fee equal to, an amount equal to the lesser of (i) thirty (30) days' interest computed at the Note Rate on the outstanding principal balance of this Note so prepaid and (ii) interest computed at the Note Rate on the outstanding principal balance of this Note so prepaid that would have been payable for the period from, and including, the date of prepayment through the Maturity Date of this Note as though such prepayment had not occurred.

(b)  If, prior to the fourth (4th) anniversary of the First Payment Date (the "Lockout Expiration Date"), the indebtedness evidenced by this Note shall have been declared due and payable by Payee pursuant to Article II hereof or the provisions of any other Loan Document due to a default by Maker, then, in addition to the indebtedness evidenced by this Note being immediately due and payable, there shall also then be immediately due and payable a sum equal to the interest which would have accrued on the principal balance of this Note at the Note Rate from the date of such acceleration to the Lockout Expiration Date, together with a prepayment fee in an amount equal to the Yield Maintenance Premium (as hereinafter defined) based on the entire indebtedness on the date of such acceleration.  If such acceleration is on or following the Lockout Expiration Date, the Yield Maintenance Premium shall also then be

-2-

immediately due and payable as though Maker were prepaying the entire indebtedness on the date of such acceleration. In addition to the amounts described in the two preceding sentences, in the event of any such acceleration or tender of payment of such indebtedness occurs or is made on or prior to the first (1st) anniversary of the date of this Note, there shall also then be immediately due and payable an additional prepayment fee of three percent (3%) of the principal balance of this Note. The term "Yield Maintenance Premium" shall mean an amount equal to the greater of (A) two percent (2.0%) of the principal amount being prepaid, and (B) the present value of a series of payments each equal to the Payment Differential (as hereinafter defined) and payable on each Payment Date over the remaining original term of this Note and on the Maturity Date, discounted at the Reinvestment Yield (as hereinafter defined) for the number of months remaining as of the date of such prepayment to each such Payment Date and the Maturity Date. The term "Payment Differential" shall mean an amount equal to (i) the Note Rate less the Reinvestment Yield, divided by (ii) twelve (12) and multiplied by (iii) the principal sum outstanding under this Note after application of the constant monthly payment due under this Note on the date of such prepayment, provided that the Payment Differential shall in no event be less than zero. The term "Reinvestment Yield" shall mean an amount equal to the lesser of (i) the yield on the U.S. Treasury issue (primary issue) with a maturity date closest to the Maturity Date, or (ii) the yield on the U.S. Treasury issue (primary issue) with a term equal to the remaining average life of the indebtedness evidenced by this Note, with each such yield being based on the bid price for such issue as published in the Wall Street Journal on the date that is fourteen (14) days prior to the date of such prepayment set forth in the notice of prepayment (or, if such bid price is not published on that date, the next preceding date on which such bid price is so published) and converted to a monthly compounded nominal yield. In the event that any prepayment fee is due hereunder, Payee shall deliver to Maker a statement setting forth the amount and determination of the prepayment fee and, provided that Payee shall have in good faith applied the formula described above, Maker shall not have the right to challenge the calculation or the method of calculation set forth in any such statement in the absence of manifest error, which calculation may be made by Payee on any day during the fifteen (15) day period preceding the date of such prepayment. Payee shall not be obligated or required to have actually reinvested the prepaid principal balance at the Reinvestment Yield or otherwise as a condition to receiving the prepayment fee.

(c) Partial prepayments of this Note shall not be permitted, except for partial prepayments resulting from Payee's election to apply insurance or condemnation proceeds to reduce the outstanding principal balance of this Note as provided in the Security Instrument, in which event no prepayment fee or premium shall be due unless, at the time of either Payee's receipt of such proceeds or the application of such proceeds to the outstanding principal balance of this Note, an Event of Default shall have occurred, which Event of Default is unrelated to the applicable casualty or condemnation, in which event the applicable prepayment fee or premium shall be due and payable based upon the amount of the prepayment. No notice of prepayment shall be required under the circumstances specified in the preceding sentence. No principal amount repaid may be reborrowed. Any such partial prepayments of principal shall be applied to the unpaid principal balance evidenced hereby but such application shall not reduce the amount of the fixed monthly installments required to be paid pursuant to Section 1.2 above. Except as otherwise expressly provided in Section 1.5(a) above and this Section 1.5(c), the prepayment fees provided above shall be due, to the extent permitted by applicable law, under any and all circumstances where all or any portion of this Note is paid prior to the Maturity Date,

NY:979564.4



whether such prepayment is voluntary or involuntary, including, without limitation, if such prepayment results from Payee's exercise of its rights upon Maker's default and acceleration of the Maturity Date of this Note (irrespective of whether foreclosure proceedings have been commenced), and shall be in addition to any other sums due hereunder or under any of the other Loan Documents.  No tender of a prepayment of this Note with respect to which a prepayment fee is due shall be effective unless such prepayment is accompanied by the applicable prepayment fee.

(d) (i) On any Payment Date on or after the later to occur of (x) the Lockout Expiration Date, and (y) the day immediately following the date which is two (2) years after the "startup day," within the meaning of Section 860G(a) (9) of the Internal Revenue Code of 1986, as amended from time to time or any successor statue (the "Code"), of a "real estate mortgage investment conduit," within the meaning of Section 860D of the Code (a "REMIC Trust"), that holds this Note, and provided no Event of Default is then outstanding hereunder or under any of the other Loan Documents, at Maker's option, Payee shall cause the release of the Security Property from the lien of the Security Instrument and the other Loan Documents (a "Defeasance") upon the satisfaction of the following conditions:

(A) Maker shall give not more than ninety (90) days' or less than thirty (30) days' prior written notice to Payee specifying the date Maker intends for the Defeasance to be consummated (the "Release Date), which date shall be a Payment Date.

(B) All accrued and unpaid interest and all other sums due under this Note and under the other Loan Documents up to and including the Release Date shall be paid in full on or prior to the Release Date.

(C) Maker shall deliver to Payee on or prior to the Release Date:

(1) a sum of money in immediately available funds (the "Defeasance Deposit") equal to the outstanding principal balance of this Note plus an amount, if any, which together with the outstanding principal balance of this Note, shall be sufficient to enable Payee to purchase, through means and sources customarily employed and available to Payee, for the account of Maker, direct, non-callable obligations of the United States of America that provide for payments prior, but as close as possible, to all successive monthly Payment Dates occurring after the Release Date and to the Maturity Date, with each such payment being equal to or greater than the amount of the corresponding installment of principal and/or interest required to be paid under this Note (including, but not limited to, all amounts due on the Maturity Date) for the balance of the term hereof (the "Defeasance Collateral"), each of which shall be duly endorsed by the holder thereof as directed by Payee or accompanied by a written instrument of transfer in form and substance satisfactory to Payee in its sole discretion (including, without limitation, such instruments as may be required by the depository institution holding such securities or the issuer thereof, as the case may be, to effectuate book-entry transfers and pledges through the book-entry facilities of such institution) in order to perfect upon the delivery of the Defeasance Security Agreement (as hereinafter defined) the first priority security interest in the Defeasance Collateral in favor of Payee in conformity with all applicable state and federal laws governing granting of such security interests;



-4-

(2) a pledge and security agreement, in form and substance satisfactory to a prudent lender, creating a first priority security interest in favor of Payee in the Defeasance Collateral (the "Defeasance Security Agreement"), which shall provide, among other things, that any excess received by Payee from the Defeasance Collateral over the amounts payable by Maker hereunder shall be refunded to Maker promptly after each monthly Payment Date;

(3) a certificate of Maker certifying that all of the requirements set forth in this subsection 1.5(d)(i) have been satisfied;

(4) one or more opinions of counsel for Maker in form and substance and delivered by counsel which would be satisfactory to a prudent lender stating, among other things, that (i) Payee has a perfected first priority security interest in the Defeasance Collateral and that the Defeasance Security Agreement is enforceable against Maker in accordance with its terms, (ii) in the event of a bankruptcy proceeding or similar occurrence with respect to Maker, none of the Defeasance Collateral nor any proceeds thereof will be property of Maker's estate under Section 541 of the U.S. Bankruptcy Code or any similar statute and the grant of security interest therein to Payee shall not constitute an avoidable preference under Section 547 of the U.S. Bankruptcy Code or applicable state law, (iii) the release of the lien of the Security Instrument and the pledge of Defeasance Collateral will not directly or indirectly result in or cause any REMIC Trust that then holds this Note to fail to maintain its status as a REMIC Trust and (iv) the defeasance will not cause any REMIC Trust to be an "investment company" under the Investment Company Act of 1940;

(5) evidence in writing from the applicable rating agencies to the effect that the collateral substitution will not result in a downgrading, withdrawal or qualification of the respective ratings in effect immediately prior to such defeasance event for any securities issued in connection with the securitization which are then outstanding, and, if required by Payee, a nonconsolidation opinion in form and substance satisfactory to Payee and the applicable rating agencies;

(6) a certificate in form and scope acceptable to Payee in its sole discretion from an acceptable accountant certifying that the Defeasance Collateral will generate amounts sufficient to make all payments of principal and interest due under this Note (including the scheduled outstanding principal balance of the Loan due on the Maturity Date);

(7) Maker and any guarantor or indemnitor of Maker's obligations under the Loan Documents for which Maker has personal liability executes and delivers to Payee such documents and agreements as Payee shall reasonably require to evidence and effectuate the ratification of such personal liability and guaranty or indemnity, respectively;

(8) such other certificates, documents or instruments or opinions (including, without limitation, any nonconsolidation opinion) as Payee may reasonably require; and

(9) payment of all fees, costs, expenses and charges incurred by Payee in connection with the Defeasance of the Security Property and the purchase of the

-5-

Defeasance Collateral, including, without limitation, all legal fees and costs and expenses incurred by Payee or its agents in connection with release of the Security Property, review of the proposed Defeasance Collateral and preparation of the Defeasance Security Agreement and related documentation, any revenue, documentary, stamp, intangible or other taxes, charges or fees due in connection with transfer of the Note, assumption of the Note, or substitution of collateral for the Security Property shall be paid on or before the Release Date. Without limiting Maker's obligations with respect thereto, Payee shall be entitled to deduct all such fees, costs, expenses and charges from the Defeasance Deposit to the extent of any portion of the Defeasance Deposit which exceeds the amount necessary to purchase the Defeasance Collateral.

(D) In connection with the Defeasance Deposit, Maker hereby authorizes and directs Payee using the means and sources customarily employed and available to Payee to use the Defeasance Deposit to purchase for the account of Maker the Defeasance Collateral. Furthermore, the Defeasance Collateral shall be arranged such that payments received from such Defeasance Collateral shall be paid directly to Payee to be applied on account of the indebtedness of this Note. Any part of the Defeasance Deposit in excess of the amount necessary to purchase the Defeasance Collateral and to pay the other and related costs Maker is obligated to pay under this Section 1.5 shall be refunded to Maker.

(ii)     Upon compliance with the requirements of subsection 1.5(d)(i), the Security Property shall be released from the lien of the Security Instrument and the other Loan Documents, and the Defeasance Collateral shall constitute collateral which shall secure this Note and all other obligations under the Loan Documents. Payee will, at Maker's expense, execute and deliver any agreements reasonably requested by Maker to release the lien of the Security Instrument from the Security Property.

(iii)     Upon the release of the Security Property in accordance with this Section 1.5(d), Maker shall assign all its obligations and rights under this Note, together with the pledged Defeasance Collateral, to a newly created successor entity which complies with the terms of Section 1.33 of the Security Instrument designated by Maker and approved by Payee in its sole discretion. Such successor entity shall execute an assumption agreement in form and substance satisfactory to Payee in its sole discretion pursuant to which it shall assume Maker's obligations under this Note and the Defeasance Security Agreement. As conditions to such assignment and assumption, Maker shall (x) deliver to Payee an opinion of counsel in form and substance satisfactory to a prudent lender and delivered by counsel satisfactory to a prudent lender stating, among other things, that such assumption agreement is enforceable against Maker and such successor entity in accordance with its terms and that this Note and the Defeasance Security Agreement as so assumed, are enforceable against such successor entity in accordance with their respective terms, and (y) pay all costs and expenses (including, but not limited to, legal fees) incurred by Payee or its agents in connection with such assignment and assumption (including, without limitation, the review of the proposed transferee and the preparation of the assumption agreement and related documentation). Upon such assumption, Maker shall be relieved of its obligations hereunder, under the other Loan Documents other than as specified in Section 1.5(d)(i)(C)(7) above and under the Defeasance Security Agreement.

1.6 Security. The indebtedness evidenced by this Note and the obligations created hereby are secured by, among other things, that certain Fee and Leasehold Mortgage and

Security Agreement (the "Security Instrument") from Maker for the benefit of Payee, dated of even date herewith, covering property located in Cumberland County, Maine. The Security Instrument, together with this Note and all other documents to or of which Payee is a party or beneficiary now or hereafter executed by Maker or any guarantor of Maker, and evidencing, securing, guarantying, modifying or otherwise relating to the indebtedness evidenced hereby, are herein referred to collectively as the "Loan Documents". All of the terms and provisions of the Loan Documents are incorporated herein by reference. Some of the Loan Documents are to be filed for record on or about the date hereof in the appropriate public records.

## ARTICLE II - DEFAULT

2.1 <u>Events of Default</u>.  It is hereby expressly agreed that should any default occur in the payment of principal or interest as stipulated above and such payment is not made on or before the date such payment is due, or should any other default not cured within any applicable grace or notice period occur under any other Loan Document, then an Event of Default (an "Event of Default") shall exist hereunder, and in such event the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Loan Document, and all unpaid interest accrued thereon, shall, at the option of Payee and without notice to Maker, at once become due and payable and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity.

2.2 <u>Late Charges</u>.  In the event that any payment is not received by Payee on the date when due (subject to any applicable grace period), then, in addition to any default interest payments due hereunder, Maker shall also pay to Payee a late charge in an amount equal to five percent (5%) of the amount of such overdue payment.

2.3 <u>Default Interest Rate</u>.  So long as any Event of Default exists hereunder, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby, and at all times after maturity of the indebtedness evidenced hereby (whether by acceleration or otherwise), interest shall accrue on the outstanding principal balance of this Note, from the date due until the date credited, at a rate per annum equal to four percent (4%) in excess of the Note Rate, or, if such increased rate of interest may not be collected under applicable law, then at the maximum rate of interest, if any, which may be collected from Maker under applicable law (the "Default Interest Rate"), and such default interest shall be immediately due and payable.

2.4 <u>Maker's Agreements</u>.  Maker acknowledges that it would be extremely difficult or impracticable to determine Payee's actual damages resulting from any late payment or default, and such late charges and default interest are reasonable estimates of those damages and do not constitute a penalty. The remedies of Payee in this Note or in the Loan Documents, or at law or in equity, shall be cumulative and concurrent, and may be pursued singly, successively or together, in Payee's discretion.

2.5 <u>Maker to Pay Costs</u>.  In the event that this Note, or any part hereof, is collected by or through an attorney-at-law, Maker agrees to pay all costs of collection, including, but not limited to, reasonable attorneys' fees.

-7-

2.6 Exculpation. Notwithstanding anything in this Note or the Loan Documents to the contrary, but subject to the qualifications hereinbelow set forth, Payee agrees that:

(a) Maker shall be liable upon the indebtedness evidenced hereby and for the other obligations arising under the Loan Documents to the full extent (but only to the extent) of the security therefor, the same being all properties (whether real or personal), rights, estates and interests now or at any time hereafter securing the payment of this Note and/or the other obligations of Maker under the Loan Documents (collectively, the "Security Property");

(b) if a default occurs in the timely and proper payment of all or any part of such indebtedness evidenced hereby or in the timely and proper performance of the other obligations of Maker under the Loan Documents, any judicial proceedings brought by Payee against Maker shall be limited to the preservation, enforcement and foreclosure, or any thereof, of the liens, security titles, estates, assignments, rights and security interests now or at any time hereafter securing the payment of this Note and/or the other obligations of Maker under the Loan Documents, and no attachment, execution or other writ of process shall be sought, issued or levied upon any assets, properties or funds of Maker other than the Security Property, except with respect to the liability described below in this section; and

(c) in the event of a foreclosure of such liens, security titles, estates, assignments, rights or security interests securing the payment of this Note and/or the other obligations of Maker under the Loan Documents, no judgment for any deficiency upon the indebtedness evidenced hereby shall be sought or obtained by Payee against Maker, except with respect to the liability described below in this section; provided, however, that, notwithstanding the foregoing provisions of this section, Maker shall be fully and personally liable and subject to legal action (i) for proceeds paid under any insurance policies (or paid as a result of any other claim or cause of action against any person or entity) by reason of damage, loss or destruction to all or any portion of the Security Property, to the full extent of such proceeds not previously delivered to Payee, but which, under the terms of the Loan Documents, should have been delivered to Payee, (ii) for proceeds or awards resulting from the condemnation or other taking in lieu of condemnation of all or any portion of the Security Property, to the full extent of such proceeds or awards not previously delivered to Payee, but which, under the terms of the Loan Documents, should have been delivered to Payee, (iii) for all tenant security deposits or other refundable deposits paid to or held by Maker or any other person or entity in connection with leases of all or any portion of the Security Property which are not applied in accordance with the terms of the applicable lease or other agreement, (iv) for rent and other payments received from tenants under leases of all or any portion of the Security Property paid more than one (1) month in advance, (v) for rents, issues, profits and revenues of all or any portion of the Security Property received by or on behalf of Maker, either after or which are applicable to a period after the occurrence of any Event of Default or any event which, with notice or the passage of time, or both, would constitute an Event of Default, hereunder or under the Loan Documents which are not either applied to the ordinary and necessary expenses of owning and operating the Security Property or paid to Payee, (vi) for waste committed on the Security Property, damage to the Security Property as a result of the intentional misconduct or gross negligence of Maker or any of its principals, officers, general partners or members, any guarantor, any indemnitor, or any agent or employee of any such person, or any removal of all or any portion of the Security Property in violation of the terms of the Loan Documents, to the full extent of the losses or

-8-

damages incurred by Payee on account of such occurrence, (vii) for failure to pay any valid taxes, assessments, mechanic's liens, materialmen's liens or other liens which could create liens on any portion of the Security Property which would be superior to the lien or security title of the Security Instrument or the other Loan Documents, to the full extent of the amount claimed by any such lien claimant except, with respect to any such taxes or assessments, to the extent that funds have been deposited with Payee pursuant to the terms of the Security Instrument specifically for the applicable taxes or assessments and not applied by Payee to pay such taxes and assessments, (viii) for all obligations and indemnities of Maker under the Loan Documents relating to hazardous or toxic substances or radon or compliance with environmental laws and regulations to the full extent of any losses or damages (including, but not limited to, those resulting from diminution in value of any Security Property) incurred by Payee as a result of the existence of such hazardous or toxic substances or radon or failure to comply with environmental laws or regulations, (ix) for fraud, material misrepresentation or failure to disclose a material fact by Maker or any of its principals, officers, general partners or members, any guarantor, any indemnitor or any agent, employee or other person authorized or apparently authorized to make statements, representations or disclosures on behalf of Maker, any principal, officer, general partner or member of Maker, any guarantor or any indemnitor, to the full extent of any losses, damages and expenses of Payee on account thereof and (x) a material breach of the TIC Agreement (as defined in the Security Instrument) which is not cured by one or more of the entities comprising Maker. References herein to particular sections of the Loan Documents shall be deemed references to such sections as affected by other provisions of the Loan Documents relating thereto. Nothing contained in this section shall (1) be deemed to be a release or impairment of the indebtedness evidenced by this Note or the other obligations of Maker under the Loan Documents or the lien of the Loan Documents upon the Security Property, or (2) preclude Payee from foreclosing the Loan Documents in case of any default or from enforcing any of the other rights of Payee except as stated in this section, or (3) limit or impair in any way whatsoever (A) the Indemnity and Guaranty Agreement (the "Indemnity Agreement") or (B) the Hazardous Substances Indemnity Agreement (the "Hazardous Substances Indemnity Agreement"), each of even date herewith executed and delivered in connection with the indebtedness evidenced by this Note or release, relieve, reduce, waive or impair in any way whatsoever, any obligation of any party to the Indemnity Agreement or the Hazardous Substances Indemnity Agreement.

(d)     Notwithstanding the foregoing, the agreement of Payee not to pursue recourse liability as set forth in subsection (c) above SHALL BECOME NULL AND VOID and shall be of no further force and effect in the event of (i) a default by Maker, indemnitor, or guarantor, or any SPC Entity (as defined in the Security Instrument) (if any) of any of the covenants set forth in Section 1.13 or Section 1.33 of the Security Instrument, except Section 1.33(A)(i), or (ii) if the Security Property or any part thereof shall become an asset in (A) a voluntary bankruptcy or insolvency proceeding of Maker, (B) an involuntary bankruptcy or insolvency proceeding of Maker which is not dismissed within ninety (90) days of filing, or (iii) the filing by any of the entities comprising Maker of a partition of the Security Property.

(e)     Notwithstanding anything to the contrary in this Note, the Security Instrument or any of the other Loan Documents, Payee shall not be deemed to have waived any right which Payee may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness evidenced hereby or

-9-

NY:979564.4

secured by the Security Instrument or any of the other Loan Documents or to require that all collateral shall continue to secure all of the indebtedness owing to Payee in accordance with this Note, the Security Instrument and the other Loan Documents.

## ARTICLE III - GENERAL CONDITIONS

3.1 No Waiver; Amendment. No failure to accelerate the indebtedness evidenced hereby by reason of default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (i) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Payee thereafter to insist upon strict compliance with the terms of this Note, or (ii) to prevent the exercise of such right of acceleration or any other right granted hereunder or by any applicable laws; and Maker hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing. No extension of the time for the payment of this Note or any installment due hereunder made by agreement with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Maker under this Note, either in whole or in part, unless Payee agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

3.2 Waivers. Presentment for payment, demand, protest and notice of demand, protest and nonpayment and all other notices no expressly provided for in this Note are hereby waived by Maker. Maker hereby further waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note or the other Loan Documents.

3.3 Limit of Validity. The provisions of this Note and of all agreements between Maker and Payee, whether now  existing or hereafter arising and whether written or oral, including, but not limited to, the Loan Documents, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of demand or acceleration of the maturity of this Note or otherwise, shall the amount contracted for, charged, taken, reserved, paid or agreed to be paid ("Interest") to Payee for the use, forbearance or detention of the money loaned under this Note exceed the maximum amount permissible under applicable law. If, from any circumstance whatsoever, performance or fulfillment of any provision hereof or of any agreement between Maker and Payee shall, at the time performance or fulfillment of such provision shall be due, exceed the limit for Interest prescribed by law or otherwise transcend the limit of validity prescribed by applicable law, then, ipso facto, the obligation to be performed or fulfilled shall be reduced to such limit, and if, from any circumstance whatsoever, Payee shall ever receive anything of value deemed Interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive Interest shall be applied to the reduction of the principal balance owing under this Note in the inverse order of its maturity (whether or not then due) or, at the option of Payee, be paid over to Maker, and not to the payment of Interest. All

-10-



Interest (including any amounts or payments judicially or otherwise under the law deemed to be Interest) contracted for, charged, taken, reserved, paid or agreed to be paid to Payee shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note, including any extensions and renewals hereof until payment in full of the principal balance of this Note so that the Interest thereon for such full term will not exceed at any time the maximum amount permitted by applicable law. To the extent United States federal law permits a greater amount of interest than is permitted under the law of the State in which the Security Property is located, Payee will rely on United States federal law for the purpose of determining the maximum amount permitted by applicable law. Additionally, to the extent permitted by applicable law now or hereafter in effect, Payee may, at its option and from time to time, implement any other method of computing the maximum lawful rate under the law of the State in which the Security Property is located or under other applicable law by giving notice, if required, to Maker as provided by applicable law now or hereafter in effect. This Section 3.3 will control all agreements between Maker and Payee.

3.4 <u>Use of Funds</u>. Maker hereby warrants, represents and covenants that no funds disbursed hereunder shall be used for personal, family or household purposes.

3.5 <u>Unconditional Payment</u>. Maker is and shall be obligated to pay principal, interest and any and all other amounts which become payable hereunder or under the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction and without any reduction for counterclaim or setoff. In the event that at any time any payment received by Payee hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Maker and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

3.6 <u>Governing Law</u>. THIS NOTE SHALL BE INTERPRETED, CONSTRUED AND ENFORCED ACCORDING TO THE LAWS OF THE STATE IN WHICH THE SECURITY PROPERTY IS LOCATED.

3.7 <u>Waiver of Jury Trial</u>. MAKER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THE DEBT EVIDENCED BY THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF PAYEE OR MAKER, OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH PAYEE OR MAKER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

3.8 <u>Secondary Market</u>. Payee may sell, transfer and deliver the Loan Documents to one or more investors in the secondary mortgage market. In connection with such sale, Payee



NY:979564.4

may retain or assign responsibility for servicing the loan evidenced by this Note or may delegate some or all of such responsibility and/or obligations to a servicer, including, but not limited to, any subservicer or master servicer, on behalf of the investors.  All references to Payee herein shall refer to and include, without limitation, any such servicer, to the extent applicable.

3.9 Dissemination of Information.  If Payee determines at any time to sell, transfer or assign this Note, the Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or to grant participations therein (the "Participations") or issue mortgage pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities"), Payee may forward to each purchaser, transferee, assignee, servicer, participant, investor, or their respective successors in such Participations and/or Securities (collectively, the "Investor") or any rating agency rating such Securities, each prospective Investor and each of the foregoing's respective counsel, all documents and information which Payee now has or may hereafter acquire relating to the debt evidenced by this Note and to Maker, any guarantor, any indemnitor and the Security Property, which shall have been furnished by Maker, any guarantor or any indemnitor as Payee determines necessary or desirable.

## ARTICLE IV - MISCELLANEOUS PROVISIONS

4.1 The terms and provisions hereof shall be binding upon and inure to the benefit of Maker and Payee and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law. As used herein, the terms "Maker" and "Payee" shall be deemed to include their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law.  If Maker consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Maker under this Note.  All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.  Titles of articles and sections are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provisions hereof.  Time is of the essence with respect to all provisions of this Note.  This Note and the other Loan Documents contain the entire agreements between the parties hereto relating to the subject matter hereof and thereof and all prior agreements relative hereto and thereto which are not contained herein or therein are terminated.

4.2 Maker's Tax Identification Numbers are: SRA WESTBROOK SPE, ILC::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; PARIS WESTBROOK SPE, LLC: 13-3176821; ZAK WESTBROOK SPE, LLC: 22-3736827; SPC AUGUSTA SPE, LLC: 22-2450368; and PENDLETON WESTBROOK SPE, LLC: 01-0849050

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Maker has executed this Note as of the date first written above.

**MAKER:**

PENDLETON WESTBROOK SPE, LLC,
a Delaware limited liability company

By: Pendleton Maine 2005, LLC,
    a Delaware limited liability company
    Its: Sole Member

    By: Pendleton II L.L.C.
        a New Jersey limited liability company
        Its: Manager

        By: _____
            Name:   Peter O. Hanson
            Title:    Manager

_____
Witness

ZAK WESTBROOK SPE, LLC,
a Delaware limited liability company

By: ZAK REALTY LLC,
    a Delaware limited liability company
    Its: Sole Member

    By: Zak Corporation,
        a Delaware corporation
        Its: Managing Manager

        By: _____
            Name:   Peter O. Hanson
            Title:    President

_____
Witness

SRA WESTBROOK SPE, LLC,
a Delaware limited liability company

By: SRA Maine 2005, LLC,
    a Delaware limited liability company
    Its: Sole Member

    By: SPC Maine 2005 LLC,
        a Maine limited liability company
        Its: Sole Member

        By: Pendleton II L.L.C.,
            a New Jersey limited liability company
            Its: Manager

        By _____
            Name: Peter O. Hanson
            Title:  Manager

_____
Witness

SPC WESTBROOK SPE, LLC,
a Delaware limited liability company

By: Newman Maine 2005, LLC,
    a Delaware limited liability company
    Its: Sole Member

    By: James E. Hanson, Inc. Profit Sharing Plan
    Its: Sole Member

    By: _____
        Name:   Peter O. Hanson
        Title:    Trustee

_____
Witness

NY:979564.4

PARIS WESTBROOK SPE, LLC,
a Delaware limited liability company

By: Paris Maine 2005, LLC,
     a Delaware limited liability company
     Its: Sole Member

    By: Paris Center Associates, Ltd.,
       a New Jersey limited partnership
      Its: Sole Member

      By: Property Investors Associates, Inc.,
         a Delaware corporation
         Its: General Partner

_____
Witness

        By: _____
           Name: Peter O. Hanson
           Title:   President

STATE OF _NEW JERSEY_ )
COUNTY OF _BERGEN_ )                    November 16, 2005

On this day, before me, personally appeared PETER O. HANSON, who being by me duly sworn, did say that he is Manager of Pendleton II L.L.C., a New Jersey limited liability company which limited liability company is the Manager of Pendleton Maine 2005, LLC, a Delaware limited liability company, which limited liability company is the Sole Member of PENDLETON WESTBROOK SPE, LLC, a Delaware limited liability company; and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said limited liability company.

_Beverley Murray_
Notary Public
My commission expires: 11/14/2007

BEVERLEY Y. MURRAY
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 11/14/2007

STATE OF _NEW JERSEY_ )
COUNTY OF _BERGEN_ )                    November 16, 2005

On this day, before me, personally appeared PETER O. HANSON, who being by me duly sworn, did say that he is President of Zak Corporation, which is the Managing Member of Zak Realty LLC, a Delaware limited liability company, which limited liability company is the Sole Member of Zak Westbrook SPE, LLC, a Delaware limited liability company; and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said corporation.

_Beverley Murray_
Notary Public
My commission expires: 11/14/2007

BEVERLEY Y. MURRAY
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 11/14/2007

STATE OF _NEW JERSEY_ )
COUNTY OF _BERGEN_ )                    November 16, 2005

On this day, before me, personally appeared Peter O. Hanson, who being by me duly sworn, did say that he is the Manager of Pendleton II L.L.C., a New Jersey limited liability company, the Manager of SPC Maine 2005 LLC, a Maine limited liability company, which is the Sole Member of SRA Maine 2005, LLC, a Delaware limited liability company, the Sole Member of SRA WESTBROOK SPE, LLC, a Delaware limited liability company, which is the Sole Member of SRA WESTBROOK SPE, LLC, a Delaware limited liability company; and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said limited liability company.

_Beverley Murray_
Notary Public
My commission expires: 11/14/2007

BEVERLEY Y. MURRAY
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 11/14/2007

NY:979564.4

STATE OF NEW JERSEY )

                           )        November 16, 2005

COUNTY OF BERGEN )

      On this day, before me, personally appeared PETER O. HANSON, who being by me duly sworn, did say that he is the Trustee of James E. Hanson, Inc. Profit Sharing Plan, the Sole Member of Newnan Maine 2005, LLC, a Delaware limited liability company, the Sole Member of Paris Maine 2005, LLC, a Delaware limited liability company; and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said limited liability company.

                                               Beverley Murray

                                               Notary Public

                                               My commission expires: 11/14/2007

                                               BEVERLEY Y. MURRAY
                                             NOTARY PUBLIC OF NEW JERSEY
                                             Commission Expires 11/14/2007

STATE OF NEW JERSEY )

                           )        November ___, 2005

COUNTY OF BERGEN )

      On this day, before me, personally appeared PETER O. HANSON, who being by me duly sworn, did say that he is the President of Property Investors Associates, Inc., a Delaware corporation, the General Partner of Paris Center Associates, Ltd., a New Jersey limited partnership, the Sole Member of Paris Maine 2005, LLC, a Delaware limited liability company, the sole member of Paris Westbrook SPE, LLC, a Delaware limited liability company; and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said limited liability company.

                                               Beverley Murray

                                               Notary Public

                                               My commission expires: 11/14/2007

                                               BEVERLEY Y. MURRAY
                                             NOTARY PUBLIC OF NEW JERSEY
                                             Commission Expires 11/14/2007

NY:979564.4

# EXHIBIT B

31

LOAN NO.: 502853479

## ALLONGE

TO PROMISSORY NOTE IN THE PRINCIPAL AMOUNT OF TWENTY MILLION AND 00/100 DOLLARS ($20,000,000.00) DATED NOVEMBER 21, 2005, FROM PENDLETON WESTBROOK SPE, LLC, ZAK WESTBROOK SPE, LLC, SRA WESTBROOK SPE, LLC, SPC WESTBROOK SPE, LLC, AND PARIS WESTBROOK SPE, LLC, EACH A DELAWARE LIMITED LIABILITY COMPANY, JOINTLY AND SEVERALLY, AS TENANTS-IN-COMMON TO WACHOVIA BANK, NATIONAL ASSOCIATION.

PAY TO THE ORDER OF ✳ WITHOUT REPRESENTATION OR RECOURSE.

WACHOVIA BANK, NATIONAL ASSOCIATION

By: _____
Name:
Title:  **Wayne M. Fitzgerald, II**
       **Vice President**

✳  Wells Fargo Bank, N.A., as trustee for the
   registered holders of Wachovia Bank Commercial
   Mortgage Trust, Commercial Mortgage Pass-
   Through Certificates, Series 2005-C22

NY:995404.1

# EXHIBIT C

WACH 31 2005 C 22

## ALLONGE

Loan/File Name: One Riverfront Plaza
AMO ID: 1937.090 (Orig No. 1937.090)
Custodian ID: 312005C22
Loan No.: NONE
Pool: WACHOVIA 2005-C22

Allonge endorsement attached to the Promissory Note in the stated original principal amount of $20,000,000.00, executed by PENDLETON WESTBROOK SPE, LLC, a Delaware limited liability company, ZAK WESTBROOK SPE, LLC, a Delaware limited liability company, SRA WESTBROOK SPE, LLC, a Delaware limited liability company, SPC WESTBROOK SPE, LLC, a Delaware limited liability company, and PARIS WESTBROOK SPE, LLC, a Delaware limited liability company, on November 21, 2005.

Pay to the order of BANK OF AMERICA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22, without recourse, representation or warranty.

WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22

By:   Anderson, McCoy and Orta, a professional corporation, Attorney-in-Fact

By: _____

Name: Vanessa A. Orta
Title:  President

# EXHIBIT D

## ALLONGE

Allonge endorsement attached to the Promissory Note in the stated original principal amount of $20,000,000.00, executed by PENDLETON WESTBROOK SPE, LLC, ZAK WESTBROOK SPE, LLC, SRA WESTBROOK SPE, LLC, SPC WESTBROOK SPE, LLC, and PARIS WESTBROOK SPE, LLC, each a Delaware limited liability company, jointly and severally, as tenants-in-common, on November 21, 2005 to WACHOVIA BANK, NATIONAL ASSOCIATION.

Pay to the order of U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR-IN-INTEREST TO BANK OF AMERICA, N.A., AS TRUSTEE, SUCCESSOR TO WELLS FARGO BANK, N.A., AS TRUSTEE, FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22 without recourse, representation or warranty.

BANK OF AMERICA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22

By: _____

Name: Edward W. Przybvcien Jr.

Title: Assistant Vice President of U.S. Bank National Association, as Trustee, Attorney-in-Fact

Loan/File Name: One Riverfront Plaza
AMO ID: 165.0252
Loan No.: 187-31
Pool: WACH 2005-C22

# EXHIBIT E

Doc#:    86028 Bk:23420 Pg:  232

FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT

PENDLETON WESTBROOK SPE, LLC,
ZAK WESTBROOK SPE, LLC,
SRA WESTBROOK SPE, LLC,
˙˙˙ WESTBROOK SPE, LLC, and
\RIS WESTBROOK SPE, LLC,
, ʌntly and severally, as tenants-in-common

MORTGAGOR

AND

WACHOVIA BANK, NATIONAL ASSOCIATION,

MORTGAGEE

DATED, AS OF NOVEMBER 21, 2005

THIS INSTRUMENT AFFECTS REAL AND PERSONAL PROPERTY SITUATED IN THE STATE
OF MAINE, COUNTY OF CUMBERLAND, CITY OF WESTBROOK.
THIS INSTRUMENT IS TO BE FILED AND INDEXED IN THE REAL ESTATE RECORDS AND IS
ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS UNDER THE NAMES OF
MORTGAGOR, AS "DEBTOR", AND MORTGAGEE, AS "SECURED PARTY".

Record and Return to:
Winston & Strawn LLP
200 Park Avenue, NY, NY 10166
Attention: Corey A. Tessler, Esq.

Loan No. 502853479
One Riverfront Plaza

NY:979574.7

Doc#: 86028 Bk:23420 Ps: 233

THIS FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT (this "Mortgage") is made as of the 21st day of November, 2005, by PENDLETON WESTBROOK SPE, LLC, ZAK WESTBROOK SPE, LLC, SRA WESTBROOK SPE, LLC, SPC WESTBROOK SPE, LLC, and PARIS WESTBROOK SPE, LLC, each a Delaware limited liability company, jointly and severally, as tenants-in-common (collectively, "Mortgagor"), each having an address at 235 Moore Street, Suite 300, Hackensack, New Jersey 07601, Attn.: Peter O. Hanson in favor of WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association ("Mortgagee"), whose address is Commercial Real Estate Services, 8739 Research Drive URP – 4, NC 1075, Charlotte, North Carolina 28262.

## W I T N E S S E T H :

THAT FOR AND IN CONSIDERATION OF THE SUM OF TEN AND NO/100 DOLLARS ($10.00), AND OTHER VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, MORTGAGOR HEREBY IRREVOCABLY MORTGAGES, GRANTS, BARGAINS, SELLS, CONVEYS, TRANSFERS, PLEDGES, SETS OVER AND ASSIGNS, AND GRANTS A SECURITY INTEREST, TO MORTGAGEE, ITS SUCCESSORS AND ASSIGNS, WITH MORTGAGE COVENANTS, in all of Mortgagor's estate, right, title and interest in, to and under any and all of the following described property, whether now owned or hereafter acquired (collectively, the "Property"):

A.     All that certain real property situated at One Riverfront Plaza, City of Westbrook, County of Cumberland, State of Maine, more particularly described on Exhibit A attached hereto and incorporated herein by this reference, together with all of the easements, rights, privileges, franchises, tenements, hereditaments and appurtenances now or hereafter thereunto belonging or in any way appertaining and all of the estate, right, title, interest, claim and demand whatsoever of Mortgagor therein or thereto, either at law or in equity, in possession or in expectancy, now or hereafter acquired (collectively, the "Real Estate") and Mortgagor's rights and interest, as lessee, under that certain Amended and Restated Parking Space Lease Agreement dated as of October 27, 2005 between One Riverfront Plaza, LLC, predecessor-in-interest to Mortgagor, as parking lessee and City of Westbrook, as Parking Spaces Lessor ("Parking Spaces Lessor") and the leasehold estate created thereby (which lease, as same may hereafter be modified, amended, extended, restated, renewed, substituted for or replaced, is hereby referred to as the "Parking Spaces Lease"), and pursuant to which Parking Spaces Lessor demised and leased to Mortgagor certain parking spaces (the "Leasehold Real Estate");

B.     All structures, buildings and improvements of every kind and description now or at any time hereafter located or placed on the Real Estate (the "Improvements");

C.     All furniture, furnishings, fixtures, goods, equipment, inventory or personal property owned by Mortgagor (collectively, the "Equipment") and now or hereafter located on, attached to or used in and about the Improvements, including, but not limited to, all machines, engines, boilers, dynamos, elevators, stokers, tanks, cabinets, awnings, screens, shades, blinds, carpets, draperies, lawn mowers, and all appliances, plumbing, heating, air conditioning, lighting, ventilating, refrigerating, disposal and incinerating equipment, and all fixtures and appurtenances thereto, and such other goods and chattels and personal property

-1-

NY:979574.7

Doc#:   86028 Bk:23420 Pg:  234

owned by Mortgagor as are now or hereafter used or furnished in operating the Improvements, or the activities conducted therein, and all building materials and equipment hereafter situated on or about the Real Estate or Improvements, and all warranties and guaranties relating thereto, and all additions thereto and substitutions and replacements therefor (exclusive of any of the foregoing owned or leased by tenants of space in the Improvements);

     D.    All easements, rights-of-way, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, air rights and other development rights now or hereafter located on the Real Estate or under or above the same or any part or parcel thereof, and all estates, rights, titles, interests, tenements, hereditaments and appurtenances, reversions and remainders whatsoever, in any way belonging, relating or appertaining to the Real Estate and/or Improvements or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Mortgagor;

     E.    All water, ditches, wells, reservoirs and drains and all water, ditch, well, reservoir and drainage rights which are appurtenant to, located on, under or above or used in connection with the Real Estate or the Improvements, or any part thereof, whether now existing or hereafter created or acquired;

     F.    All minerals, crops, timber, trees, shrubs, flowers and landscaping features now or hereafter located on, under or above the Real Estate;

     G.    All cash funds, deposit accounts and other rights and evidence of rights to cash, now or hereafter created or held by Mortgagee pursuant to this Mortgage or any other of the Loan Documents (as hereinafter defined), including, without limitation, all funds now or hereafter on deposit in the Impound Account, the Replacement Reserve and the Leasing Reserve (each as hereafter defined);

     H.    That certain Lease Agreement dated December 21, 2002 between One Riverfront Plaza, LLC, predecessor-in-interest to Mortgagor, as landlord, and Core, Inc. ("Core"), as tenant, as amended by that certain First Lease Amendment, dated March 1, 2003, that certain Second Amendment to Commercial Lease, dated March 31, 2004 and that certain Third Amendment, dated October 27, 2005 (collectively referred to as the "Core Lease"), affecting the Property, together with all leases (including, without limitation, oil, gas and mineral leases), licenses, concessions and occupancy agreements of all or any part the Real Estate, the Leasehold Real Estate or the Improvements (each, a "Lease" and collectively, "Leases"), whether written or oral, now or hereafter entered into and all rents, royalties, issues, profits, revenue, income and other benefits (collectively, the "Rents and Profits") of the Real Estate, the Leasehold Real Estate or the Improvements, now or hereafter arising from the use or enjoyment of all or any portion thereof or from any present or future Lease or other agreement pertaining thereto or arising from any of the Contracts (as hereinafter defined) or any of the General Intangibles (as hereinafter defined) and all cash or securities deposited to secure performance by the tenants, lessees or licensees (each, a "Tenant" and collectively, "Tenants"), as applicable, of their obligations under any such Leases, whether said cash or securities are to be held until the expiration of the terms of said Leases or applied to one or more of the installments of rent coming due prior to the expiration of said terms, subject to, however, the provisions contained in Section 1.11 hereinbelow;

-2-



Doc#: 86028 Bk:23420 Pg: 235

I.      All contracts and agreements now or hereafter entered into covering any part of the Real Estate, the Leasehold Real Estate or the Improvements (collectively, the "Contracts") and all revenue, income and other benefits thereof, including, without limitation, management agreements, service contracts, maintenance contracts, equipment leases, personal property leases and any contracts or documents relating to construction on any part of the Real Estate, the Leasehold Real Estate or the Improvements (including plans, drawings, surveys, tests, reports, bonds and governmental approvals) or to the management or operation of any part of the Real Estate, the Leasehold Real Estate or the Improvements;

J.      All present and future monetary deposits given to any public or private utility with respect to utility services furnished to any part of the Real Estate, the Leasehold Real Estate or the Improvements;

K.      All present and future funds, accounts, instruments, accounts receivable, documents, causes of action, claims, general intangibles (including without limitation, trademarks, trade names, servicemarks and symbols now or hereafter used in connection with any part of the Real Estate, the Leasehold Real Estate or the Improvements, all names by which the Real Estate, the Leasehold Real Estate or the Improvements may be operated or known, all rights to carry on business under such names, and all rights, interest and privileges which Mortgagor has or may have as developer or declarant under any covenants, restrictions or declarations now or hereafter relating to the Real Estate, the Leasehold Real Estate or the Improvements) and all notes or chattel paper now or hereafter arising from or by virtue of any transactions related to the Real Estate, the Leasehold Real Estate or the Improvements (collectively, the "General Intangibles");

L.      All water taps, sewer taps, certificates of occupancy, permits, licenses, franchises, certificates, consents, approvals and other rights and privileges now or hereafter obtained in connection with the Real Estate or the Improvements and all present and future warranties and guaranties relating to the Improvements or to any equipment, fixtures, furniture, furnishings, personal property or components of any of the foregoing now or hereafter located or installed on the Real Estate or the Improvements;

M.      All building materials, supplies and equipment now or hereafter placed on the Real Estate or in the Improvements and all architectural renderings, models, drawings, plans, specifications, studies and data now or hereafter relating to the Real Estate or the Improvements;

N.      All right, title and interest of Mortgagor in any insurance policies or binders now or hereafter relating to the Property including any unearned premiums thereon;

O.      All proceeds, products, substitutions and accessions (including claims and demands therefor) of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards;

P.      All other or greater rights and interests of every nature in the Real Estate, the Leasehold Real Estate or the Improvements and in the possession or use thereof and income therefrom, whether now owned or hereafter acquired by Mortgagor.

-3-

NY:979574.7

Doc#:   86028 Bk:23420 Pg: 236

Q.     All appurtenances in respect of or otherwise relating to the Parking Spaces Lease , including, but not limited to, renewal options and rights to lease additional parking spaces, and all the estate and rights of Mortgagor of, in and to (i) all modifications, extensions and renewals of the Parking Spaces Lease and all rights to renew or extend the term thereof, (ii) all credits to and deposits of Mortgagor under the Parking Spaces Lease, (iii) all other options, privileges and rights granted and demised to Mortgagor under the Parking Spaces Lease, (iv) all the right or privilege of Mortgagor to terminate, cancel, abridge, surrender, merge, modify or amend the Parking Spaces Lease and (v) any and all possessory rights of Mortgagor and other rights and/or privileges of possession, including, without limitation, Mortgagor's right to elect to remain in possession of the applicable Property and the leasehold estate created by the Parking Spaces Lease pursuant to Section 365(h)(1) of the federal bankruptcy code (as amended from time to time and including any successor legislation thereto, the "Bankruptcy Code");

R.     Awards rights, title and interests of each party obligated hereunder as "Mortgagor" as a tenant in common under the TIC Agreement (as hereinafter defined) and all their rights in, to, and under the TIC Agreement and any property management agreements, including any rights of first refusal, options to purchase, and similar rights including any rights of first refusal arising under Section 363(i) of Section 11 of the United States Bankruptcy Code; and

S.     All of Mortgagor's claims and rights to damages and any other remedies in connection with or arising from the rejection of the Parking Spaces Lease by landlord or any trustee, custodian or receiver pursuant to the Bankruptcy Code in the event that there shall be filed by or against landlord any petition, action or proceeding under the Bankruptcy Code or under any other similar federal or state law now or hereafter in effect.

FOR THE PURPOSES OF SECURING:

(1)     The debt evidenced by that certain promissory note (such promissory note, together with any and all renewals, modifications, consolidations and extensions thereof, is hereinafter referred to as the "Note") of even date with this Mortgage, made by Mortgagor to the order of Mortgagee in the original principal amount of TWENTY MILLION AND 00/100 DOLLARS ($20,000,000.00), together with interest as therein provided;

(2)     The full and prompt payment and performance of all of the provisions, agreements, covenants and obligations herein contained and contained in any other agreements, documents or instruments now or hereafter executed by the Mortgagor or its principals evidencing, securing, guarantying or otherwise relating to the indebtedness evidenced by the Note, including, but not limited to, the Hazardous Indemnity Agreement (as hereinafter defined) (the Note, this Mortgage, and such other agreements, documents and instruments, together with any and all renewals, amendments, extensions and modifications thereof, are hereinafter collectively referred to as the "Loan Documents") and the payment of all other sums therein covenanted to be paid;

(3)     Any and all additional advances made by Mortgagee to protect or preserve the Property or the lien or security interest created hereby on the Property, or for taxes, assessments or insurance premiums as hereinafter provided or for performance of any of Mortgagor's obligations hereunder or under the other Loan Documents or for any other purpose

-4-

Doc#:    86028 Bk:23420 Pg:  237

provided herein or in the other Loan Documents (whether or not the original Mortgagor remains the owner of the Property at the time of such advances); and

(4)    Any and all other indebtedness now owing or which may hereafter be owing by Mortgagor to Mortgagee, including, without limitation, all prepayment fees, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, consolidations, replacements and extensions thereof.

(All of the sums referred to in Paragraphs (1) through (4) above are herein sometimes referred to as the "secured indebtedness" or the "indebtedness secured hereby").

TO HAVE AND TO HOLD the Property unto Mortgagee, its successors and assigns forever, for the purposes and uses herein set forth.

PROVIDED, HOWEVER, that if the principal and interest and all other sums due or to become due under the Note or under the other Loan Documents, including, without limitation, any prepayment fees required pursuant to the terms of the Note, shall have been paid at the time and in the manner stipulated therein and all other sums payable hereunder and all other indebtedness secured hereby shall have been paid and all other covenants contained in the Loan Documents shall have been performed, then, in such case, this Mortgage shall be satisfied and the estate, right, title and interest of Mortgagee in the Property shall cease, and upon payment to Mortgagee of all costs and expenses incurred for the preparation of the release hereinafter referenced and all recording costs if allowed by law, Mortgagee shall release this Mortgage and the lien hereof by proper instrument.

## ARTICLE I
## COVENANTS OF MORTGAGOR

For the purpose of further securing the indebtedness secured hereby and for the protection of the security of this Mortgage, for so long as the indebtedness secured hereby or any part thereof remains unpaid, Mortgagor covenants and agrees as follows:

1.1    Warranties of Mortgagor.  Mortgagor, for itself and its successors and assigns, does hereby represent, warrant and covenant to and with Mortgagee, its successors and assigns, that:

(a)    Organization and Existence.  Each entity comprising Mortgagor is duly organized and validly existing as a limited liability company in good standing under the laws of Delaware, Maine and in all other jurisdictions in which Mortgagor is transacting business. Mortgagor has the power and authority to execute, deliver and perform the obligations imposed on it under the Loan Documents and to consummate the transactions contemplated by the Loan Documents.

(b)    Authorization.  Mortgagor has taken all necessary actions for the authorization of the borrowing on account of the loan secured hereby and for the execution and delivery of the Loan Documents, including, without limitation, that those members of Mortgagor

-5-

NY:979574.7

Doc#:    86028  Bk:23420  Pg:   238

whose approval is required by the terms of Mortgagor's organizational documents have duly approved the transactions contemplated by the Loan Documents and have authorized execution and delivery thereof by the respective signatories. To the best of Mortgagor's knowledge, no other consent by any local, state or federal agency is required in connection with the execution and delivery of the Loan Documents.

(c)   Valid Execution and Delivery.   All of the Loan Documents requiring execution by Mortgagor have been duly and validly executed and delivered by Mortgagor.

(d)   Enforceability. All of the Loan Documents constitute valid, legal and binding obligations of Mortgagor and are fully enforceable against Mortgagor in accordance with their terms by Mortgagee and its successors, transferees and assigns, subject only to bankruptcy laws and general principles of equity.

(e)   No Defenses.  The Note, this Mortgage and the other Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense, nor would the operation of any of the terms of the Note, this Mortgage or any of the other Loan Documents, or the exercise of any right thereunder, render this Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury.

(f)   Defense of Usury.   Mortgagor knows of no facts that would support a claim of usury to defeat or avoid its obligation to repay the principal of, interest on, and other sums or amounts due and payable under, the Loan Documents.

(g)   No Conflict/Violation of Law.   The execution, delivery and performance of the Loan Documents by Mortgagor will not cause or constitute a default under or conflict with the organizational documents of Mortgagor, any guarantor or any general partner or managing member of Mortgagor or any guarantor.   The execution, delivery and performance of the obligations imposed on Mortgagor under the Loan Documents will not cause Mortgagor to be in default, including after due notice or lapse of time or both, under the provisions of any agreement, judgment or order to which Mortgagor is a party or by which Mortgagor is bound.

(h)   Compliance with Applicable Laws and Regulations.   All of the Improvements and the use of the Property comply with, and shall remain in compliance with, all applicable statutes, rules, regulations and private covenants now or hereafter relating to the ownership, construction, use or operation of the Property, including all applicable statutes, rules and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, environmental protection, zoning and land use. The Improvements comply with, and shall remain in compliance with, applicable health, fire and building codes. There is no evidence of any illegal activities relating to controlled substances on the Property.  All certifications, permits, licenses and approvals, including, without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property as an office have been obtained and are in full force and effect. All of the Improvements comply with all material requirements of any applicable zoning and subdivision laws and ordinances.

NY:979574.7

(i)    Consents Obtained.   All consents, approvals, authorizations, orders or filings with any court or governmental agency or body, if any, required for the execution, delivery and performance of the Loan Documents by Mortgagor have been obtained or made.

(j)    No Litigation.    There are no pending actions, suits or proceedings, arbitrations or governmental investigations against the Property, an adverse outcome of which would materially affect Mortgagor's performance under the Note, the Mortgage or the other Loan Documents.

(k)    Marketable Title. . Mortgagor has good and marketable fee simple and leasehold title to the Property, subject only to those matters expressly set forth as exceptions to or subordinate matters in the title insurance policy insuring the lien of this Mortgage which Mortgagee has agreed to accept, excepting therefrom all preprinted and/or standard exceptions (the "Permitted Exceptions"), and has full power and lawful authority to grant, bargain, sell, convey, assign, transfer and mortgage its interest in the Property in the manner and form hereby done or intended. Mortgagor will preserve its interest in and title to the Property and will forever warrant and defend the same to Mortgagee against any and all claims whatsoever and will forever w̲a̲r̲r̲a̲n̲t̲ a̲n̲d̲ defend the validity and priority of the lien and security interest created herein against t̲h̲e̲ claims of all persons and parties whomsoever, subject to the Permitted Exceptions. The foregoing warranty of title shall survive the foreclosure of this Mortgage and shall inure to the benefit of and be enforceable by Mortgagee in the event Mortgagee acquires title to the Property pursuant to any foreclosure.

(l)    Permitted Exceptions.   The Permitted Exceptions do not and will not materially and adversely affect (1) the ability of Mortgagor to pay in full the principal and interest on the Note in a timely manner or (2) the use of the Property for the use currently being made thereof, the operation of the Property as currently being operated or the value of the Property.

(m)    First Lien.   Upon the execution by Mortgagor and the recording of this Mortgage, and upon the   filing of UCC-1 financing statements or amendments thereto, the Mortgagee will have a valid first lien on the Property and a valid security interest in the Equipment subject to no liens, charges or encumbrances other than the Permitted Exceptions.

(n)    ERISA.   Mortgagor has made and shall continue to make all required contributions to all employee benefit plans, if any, and Mortgagor has no knowledge of any material liability which has been incurred by Mortgagor which remains unsatisfied for any taxes or penalties with respect to any employee benefit plan or any multi-employer plan, and each such plan has been administered in compliance with its terms and the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and any other federal or state law.

(o)    Contingent Liabilities.   Mortgagor has no known material contingent liabilities.

(p)    No Other Obligations.   Mortgagor has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to

-7-

Doc#:   86028 Bk:23420 Pg:  240



which Mortgagor is a party or by which Mortgagor or the Property is otherwise bound, other than obligations incurred in the ordinary course of the operation of the Property, obligations under the Parking Spaces Lease and other than obligations under this Mortgage, the other Loan Documents and that certain Amended and Restated Parking Space Lease Agreement with the City of Westbrook dated October 27, 2005.

(q)     Fraudulent Conveyance.  Mortgagor (1) has not entered into the loan secured hereby or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (2) received reasonably equivalent value in exchange for its obligations under the Loan Documents.   Giving effect to the loan secured hereby contemplated by the Loan Documents, the fair saleable value of Mortgagor's assets exceed and will, immediately following the execution and delivery of the Loan Documents, exceed Mortgagor's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of Mortgagor's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than Mortgagor's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  Mortgagor's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Mortgagor does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Mortgagor).

(r)     Investment Company Act.  Mortgagor is not (1) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (2) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (3) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(s)     Access/Utilities.  The Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities. All public utilities necessary to the continued use and enjoyment of the Property as presently used and enjoyed are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property.  All roads necessary for the full utilization of the Property for its current purpose have been completed and dedicated to public use and accepted by all governmental authorities or are the subject of access easements for the benefit of the Property.



(t)     Taxes Paid.  Mortgagor has filed all federal, state, county and municipal tax returns required to have been filed by Mortgagor, and has paid all taxes which have become due pursuant to such returns or to any notice of assessment received by Mortgagor, and Mortgagor has no knowledge of any basis for additional assessment with respect to such taxes.

(u)     Single Tax Lot.  The Property consists of a single lot or multiple tax lots; except as disclosed to Mortgagee, no portion of said tax lot(s) covers property other than the

-8-

NY:979574.7

Doc#:   86028 Bk:23420 Ps:  241

Property or a portion of the Property and no portion of the Property lies in any other tax lot. Mortgagor shall diligently prosecute the assessment of the Property as a separate tax lot for the portion of the Property not included as a separate tax lot, and provide any evidence thereof to Mortgagee.

(v)     Special Assessments.  Except as disclosed in the title insurance policy, there are no pending or, to the knowledge of Mortgagor, proposed special or other assessments for public improvements or otherwise affecting the Property, nor, to the knowledge of Mortgagor, are there any contemplated improvements to the Property that may result in such special or other assessments.

(w)     Flood Zone.  The Property is located in a Flood Zone C (areas of minimal flooding).

(x)     Misstatements of Fact.  No statement of fact made in the Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no fact presently known to Mortgagor which has not been disclosed which adversely affects, nor as far as Mortgagor can foresee, might adversely affect the business, operations or condition (financial or otherwise) of the representing party.

(y)     Condition of Improvements.  The Property has not been damaged by fire, water, wind or other cause of loss or any previous damage to the Property has been fully restored.

(z)     No Insolvency or Judgment.  Neither Mortgagor, nor any general partner or member of Mortgagor, nor any guarantor of the Loan secured hereby is currently (a) the subject of or a party to any completed or pending bankruptcy, reorganization or insolvency proceeding; or (b) the subject of any judgment unsatisfied of record or docketed in any court of the state in which the Property is located or in any other court located in the United States.  The loan secured hereby will not render Mortgagor nor any general partner or member of Mortgagor insolvent.  As used herein, the term "insolvent" means that the sum total of all of an entity's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all such entity's non-exempt assets, i.e., all of the assets of the entity that are available to satisfy claims of creditors.

(aa)    No Condemnation.  No part of any property subject to the Mortgage has been taken in condemnation or other like proceeding to an extent which would impair the value of the Property, the Mortgage or the loan secured hereby or the usefulness of such property for the purposes contemplated by the loan application relating to the loan secured hereby (the "**Loan Application**"), nor is any proceeding pending, threatened or known to be contemplated for the partial or total condemnation or taking of the Property.

(bb)    No Labor or Materialmen Claims.  All parties furnishing labor and materials have been paid in full and, except for such liens or claims insured against by the policy of title insurance to be issued in connection with the loan secured hereby, there are no mechanics', laborers' or materialmen's liens or claims outstanding for work, labor or materials affecting the Property, whether prior to, equal with or subordinate to the lien of this Mortgage.

-9-

NY:979574.7

(cc)  <u>No Purchase Options</u>.  No tenant, person, party, firm, corporation or other entity has an option to purchase the Property, any portion thereof or any interest therein.

(dd)  <u>Leases</u>.  The Property is not subject to any Leases other than the Leases described in the rent roll delivered to Mortgagee in connection with this Mortgage.  No person has any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of the Leases.  As of the date hereof, (i) Mortgagor is the owner and holder of the landlord's interest under each Lease; (ii) there are no prior assignments of any Lease or any portion of Rents which are presently outstanding and have priority over the Assignment of Leases and Rents (the "**Assignment of Leases and Rents**"), dated the date hereof, given by Mortgagor to Mortgagee and intended to be duly recorded; (iii) the Leases have not been modified or amended, except as disclosed to Mortgagee in writing on the date hereof; (iv) each Lease is in full force and effect; (v) neither Mortgagor nor any tenant under any Lease is in default under any of the terms, covenants or provisions of the Lease, and Mortgagor knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under any Lease; (vi) there are no offsets or defenses to the payment of any portion of the Rents; and (vii) all Rents due and payable under each Lease have been paid in full and no said Rents have been paid more than one (1) month in advance of the due dates thereof.

(ee)  <u>Boundary Lines</u>.  All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Real Estate encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those which are insured against by title insurance.

(ff)  <u>Survey</u>.  The survey of the Property delivered to Mortgagee in connection with this Mortgage, has been performed by a duly licensed surveyor or registered professional engineer in the jurisdiction in which the Property is situated, is certified to the Mortgagee, its successors and assigns, and the title insurance company, and is in accordance with the most current minimum standards for title surveys as determined by the American Land Title Association, with the signature and seal of a licensed engineer or surveyor affixed thereto, and does not fail to reflect any material matter affecting the Property or the title thereto.

(gg)  <u>Forfeiture</u>.  There has not been and shall never be committed by Mortgagor or any other person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Mortgagor's obligations under any of the Loan Documents.

(hh)  <u>Commercial Leases</u>.  As of the date hereof, (i) Mortgagor has delivered a true, correct and complete schedule (the "Rent Roll") of all Leases affecting the Property as of the date hereof, which accurately and completely sets forth in all material respects for each Lease, the following: the name of the Tenant, the Lease expiration date, extension and renewal provisions, the base rent payable, the security deposit held thereunder; (ii) All work to be performed by Mortgagor under the Leases has been substantially performed, all contributions to be made by Mortgagor to the Tenants thereunder have been made and all other conditions

-10-

Doc#: 8602B Bk:23420 Pg: 243

precedent to each such Tenant's obligations thereunder have been satisfied; (iii) Each Tenant under a Lease has entered into occupancy of the demised premises; (iv) Mortgagor has delivered to Mortgagee true, correct and complete copies of all Leases described in the Rent Roll; (v) To the best of Mortgagor's knowledge and belief, each Tenant is free from bankruptcy, reorganization or arrangement proceedings or a general assignment for the benefit of creditors; and

    (ii)   <u>Section 1445(f)(3)</u>.  Mortgagor is not a "foreign person" within the meaning of §1445(f)(3) of the Internal Revenue Code of 1986, as amended, and the related Treasury Department regulations, including temporary regulations.

    (jj)   As of the date hereof (i) Mortgagor has delivered to Mortgagee true, correct and complete copies of all Contracts and all amendments thereto or modifications thereof; (ii) each Contract constitutes the legal, valid and binding obligation of Mortgagor and, to the best of Mortgagor's knowledge and belief, is enforceable against any other party thereto, and no default exists, or with the passing of time or the giving of notice or both would exist, under any Contract which would, in the aggregate, have a material adverse effect on Mortgagor or the Property; and (iii) no Contract provides any party with the right to obtain a lien or encumbrance upon the Property superior to the lien of this Mortgage.

    (kk)   Compliance with Anti-Terrorism, Embargo and Anti-Money Laundering Laws.  (i) None of Mortgagor, Managing Member, any indemnitor or guarantor, or any Person who owns any direct equity interest in or controls Mortgagor or Managing Member currently is identified on the OFAC.  List or otherwise qualifies as a Prohibited Person, and Mortgagor will implement procedures, approved by Managing Member, to ensure that no Person who now or hereafter owns any direct equity interest in Mortgagor or Managing Member is a Prohibited Person or controlled by a Prohibited Person, and (ii) none of Mortgagor, Managing Member, or any indemnitor or guarantor are in violation of any applicable laws relating to anti-money laundering or anti terrorism, including, without limitation, any applicable laws related to transacting business with Prohibited Persons or the requirements of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, U.S. Public Law107-56, and the related regulations issued thereunder, including temporary regulations, all as amended from time to time.  For purposes hereof: (1) the term "Managing Member" shall mean, if Mortgagor is a partnership, each general partner of Mortgagor and, if Mortgagor is a limited liability company, each manager or managing member of Mortgagor and in each case, if applicable, each general partner or managing member of such general partner or managing member.  In the event that Mortgagor or any Managing Member is a single member limited liability company, the term "Managing Member" shall include such member; (2) the term "Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing; (3) the term "Prohibited Person" shall mean any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America; (4) the term "OFAC List" shall mean the list of specially designated nationals and blocked persons subject to financial sanctions that is

-11-

NY:979574.7

Doc#:   86028 Bk:23420 Pg:  244

maintained by the U.S. Treasury Department, Office of Foreign Assets Control and accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

(ii)   Parking Spaces Lease.

(i)   Mortgagor is authorized to assign its interest in any condemnation award which Mortgagor is entitled to receive, subject to and in accordance with, the terms and conditions set forth in the Parking Spaces Lease.

(ii)   If any default by Mortgagor shall occur under the Parking Spaces Lease, Mortgagee is entitled under the Consent to Fee and Leasehold Mortgage and Security Agreement and Assignment of Leases As Collateral dated as of the date hereof among Parking Spaces Lessor, Mortgagor and Mortgagee (the "Consent") to receive notice of such default from Parking Spaces Lessor and an additional opportunity to cure any such default which is susceptible of cure by Mortgagee, which in the case of any non-monetary default susceptible of cure by Mortgagee, includes the right of Mortgagee or its designee to acquire possession of the applicable Property by means of foreclosure of this Mortgage or by other means and to become the lessee under the Parking Spaces Lease. So long as Mortgagee has agreed to effectuate a cure and is diligently proceeding to cure any such non-monetary default within applicable notice and grace periods and no monetary default remains uncured beyond any applicable notice and grace periods to which Mortgagor and Mortgagee are entitled, Parking Spaces Lessor may not terminate the Parking Spaces Lease.

(iii)   The Consent requires Parking Spaces Lessor to give copies of all notices of default which are given under the Parking Spaces Lease to Mortgagor to Mortgagee.

(iv)   The Parking Spaces Lease is in full force and effect and has not been modified or supplemented, except as previously disclosed to Mortgagee. The Parking Spaces Lease cannot be cancelled solely by Parking Spaces Lessor and requires Mortgagor's consent for all modifications.

(v)   All rents (including additional rents and other charges) reserved for in the Parking Spaces Lease and payable prior to the date hereof have been paid.

(vi)   No party to the Parking Spaces Lease is in default of any obligation such party has thereunder and no event has occurred which, with the giving of notice or the lapse of time, or both, would constitute such a default.

(vii)   No notice or other written or oral communication has been received by Mortgagor or delivered by Mortgagor to Parking Spaces Lessor under the Parking Spaces Lease which alleges that, as of the date hereof, either a default exists or with the passage of time will exist under the provisions of such Parking Spaces Lease.

(viii)   If there shall be a taking of the fee title to the Leasehold Real Estate subject to the Parking Spaces Lease, subject to amounts which are applied to restoration, Mortgagor is entitled in accordance with the terms and conditions of the Consent to receive such portion of the award for such taking as equals the value of Mortgagor's leasehold estate under the

-12-

Doc#: 86028 Bk:23420 Pg: 245

Parking Spaces Lease and any trade fixtures.

(ix)   If the Parking Spaces Lease is terminated by reason of a default by Mortgagor, Mortgagee or its designee is entitled in accordance with the terms of the Parking Spaces Lease to enter into a new lease (the "New Lease") with Parking Spaces Lessor for the remainder of the term of the Parking Spaces Lease upon the same base rent and additional rent and other terms, covenants, conditions and agreements as are contained in the Parking Spaces Lease.

(x)   Provided that no monetary default remains uncured beyond any applicable notice and grace periods to which Mortgagor and Mortgagee are entitled, the Parking Spaces Lease may not be terminated by Parking Spaces Lessor by reason of any default by Mortgagor which is not susceptible of cure by Mortgagee.

(mm)  Seismic Exposure. The Property is not located in Zone 3 or Zone 4 of the Seismic Zone Map of the United States.

1.2   Defense of Title. If, while this Mortgage is in force, the title to the Property or the interest of Mortgagee therein shall be the subject, directly or indirectly, of any action at law or in equity, or be attached directly or indirectly, or endangered, clouded or adversely affected in any manner, Mortgagor, at Mortgagor's expense, shall take all necessary and proper steps for the defense of said title or interest, including the employment of counsel approved by Mortgagee, the prosecution or defense of litigation, and the compromise or discharge of claims made against said title or interest. Notwithstanding the foregoing, in the event that Mortgagee determines that Mortgagor is not adequately performing its obligations under this Section, Mortgagee may, without limiting or waiving any other rights or remedies of Mortgagee hereunder, take such steps, with respect thereto as Mortgagee shall deem necessary or proper and any and all costs and expenses incurred by Mortgagee in connection therewith, together with interest thereon at the Default Interest Rate (as defined in the Note) from the date incurred by Mortgagee until actually paid by Mortgagor, shall be immediately paid by Mortgagor on demand and shall be secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

1.3   Performance of Obligations. Mortgagor shall pay when due the principal of and the interest on the indebtedness evidenced by the Note. Mortgagor shall also pay all charges, fees and other sums required to be paid by Mortgagor as provided in the Loan Documents, and shall observe, perform and discharge all obligations, covenants and agreements to be observed, performed or discharged by Mortgagor set forth in the Loan Documents in accordance with their terms. Further, Mortgagor shall promptly and strictly perform and comply with all conditions, conditions, obligations and prohibitions required of Mortgagor in connection with any other document or instrument affecting title to the Property, or any part thereof, regardless of whether such document or instrument is superior or subordinate to this Mortgage.

1.4   Insurance. Mortgagor shall, at Mortgagor's expense, maintain in force and effect on the Property at all times while this Mortgage continues in effect the following insurance:

-13-

NY:979574.7

Doc#:   86028 Bk:23420 Pg:  246

(a)     Insurance against loss or damage to the Property by fire, windstorm, tornado and hail and against loss and damage by such other, further and additional risks as may be now or hereafter embraced by an "all-risk" or "special form" type of insurance policy. The amount of such insurance shall be not less than one hundred percent (100%) of the full replacement cost (insurable value) of the Improvements (as established by an MAI appraisal), without reduction for depreciation. The determination of the replacement cost amount shall be adjusted annually to comply with the requirements of the insurer issuing such coverage or, at Mortgagee's election, by reference to such indices, appraisals or information as Mortgagee determines in its reasonable discretion in order to reflect increased value due to inflation. Absent such annual adjustment, each policy shall contain inflation guard coverage insuring that the policy limit will be increased over time to reflect the effect of inflation. Full replacement cost, as used herein, means, with respect to the Improvements, the cost of replacing the Improvements without regard to deduction for depreciation, exclusive of the cost of excavations, foundations and footings below the lowest basement floor. Mortgagor shall also maintain insurance against loss or damage to furniture, furnishing, fixtures, equipment and other items (whether personalty or fixtures) included in the Property and owned by Mortgagor from time to time to the extent applicable. Each policy shall contain a replacement cost endorsement and either an agreed amount endorsement (to avoid the operation of any co-insurance provisions) or a waiver of any co-insurance provisions, all subject to Mortgagee's approval. The maximum deductible shall be $10,000.00.

(b)     Commercial General Liability Insurance against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Real Estate or the Improvements in amounts not less than $1,000,000.00 per occurrence and $2,000,000.00 in the aggregate plus umbrella coverage in an amount not less than $10,000,000.00. Mortgagee hereby retains the right to periodically review the amount of said liability insurance being maintained by Mortgagor and to require an increase in the amount of said liability insurance should Mortgagee deem an increase to be reasonably prudent under then existing circumstances.

(c)     Boiler and machinery insurance is required if steam boilers or other pressure-fired vessels are in operation at the Property. Minimum liability coverage per accident must equal the greater of the replacement cost (insurable value) of the Improvements housing such boiler or pressure-fired machinery or $2,000,000.00. If one or more large HVAC units is in operation at the Property, "Systems Breakdowns" coverage shall be required, as determined by Mortgagee. Minimum liability coverage per accident must equal the value of such unit(s).

(d)     If the Improvements or any part thereof is situated in an area designated by the Federal Emergency Management Agency ("FEMA") as a special flood hazard area (Zone A or Zone V), flood insurance in an amount equal to the lesser of: (a) the minimum amount required, under the terms of coverage, to compensate for any damage or loss on a replacement basis (or the unpaid balance of the indebtedness secured hereby if replacement cost coverage is not available for the type of building insured); or (b) the maximum insurance available under the appropriate National Flood Insurance Administration program. The maximum deductible shall be $3,000.00 per building or a higher minimum amount as required by FEMA or other applicable law.

-14-

Doc#:   86028 Bk:23420 Pg: 247

(e) During the period of any construction, renovation or alteration of the existing Improvements which exceeds the lesser of 10% of the principal amount of the Note or $500,000, at Mortgagee's request, a completed value, "All Risk" Builder's Risk form or "Course of Construction" insurance policy in nonreporting form, in an amount approved by Mortgagee, may be required. During the period of any construction of any addition to the existing Improvements, a completed value, "All Risk" Builder's Risk form or "Course of Construction" insurance policy in non-reporting form, in an amount approved by Mortgagee, shall be required.

(f) When required by applicable law, ordinance or other regulation, Worker's Compensation and Employer's Liability Insurance covering all persons subject to the worker's compensation laws of the state in which the Property is located.

(g) Business income (loss of rents) insurance in amounts sufficient to compensate Mortgagor for all Rents and Profits or income during a period of not less than eighteen (18) months. The amount of coverage shall be adjusted annually to reflect the Rents and Profits or income payable during the succeeding eighteen (18) month period.

(h) Insurance against damage resulting from acts of terrorism, or an insurance policy without an exclusion for damages resulting from terrorism, on terms consistent with the commercial property insurance policy required under subsections (a) (b) and (g) above.

(i) Insurance against loss resulting from mold, spores or fungus on or about the Real Estate.

(j) Such other insurance on the Property or on any replacements or substitutions thereof or additions thereto as may from time to time be required by Mortgagee against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated including, without limitation, Sinkhole, Mine Subsidence, Earthquake and Environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

All such insurance shall (i) be with insurers fully licensed and authorized to do business in the state within which the Real Estate is located and who have and maintain a rating of at least AA from Standard & Poor's, or equivalent, (ii) contain the complete address of the Real Estate (or a complete legal description), (iii) be for terms of at least one year, with premium prepaid, and (vi) be subject to the approval of Mortgagee as to insurance companies, amounts, content, forms of policies, method by which premiums are paid and expiration dates, and (v) include a standard, non-contributory, mortgagee clause naming EXACTLY:

> Wachovia Bank, National Association
> its Successors and/or Assigns ATIMA
> c/o Wachovia Bank, National Association, as Servicer
> P.O. Box 563956
> Charlotte, NC 28256-3956

(a) as an additional insured under all liability insurance policies, (b) as the first mortgagee on all property insurance policies and (c) as the loss payee on all loss of rents or loss of business income insurance policies.

-15-

Doc#:    86028 Bk:23420 Pg:  248

Mortgagor shall, as of the date hereof, deliver to Mortgagee evidence that said insurance policies have been prepaid as required above and certified copies of such insurance policies and original certificates of insurance signed by an authorized agent of the applicable insurance companies evidencing such insurance satisfactory to Mortgagee. Mortgagor shall renew all such insurance and deliver to Mortgagee certificates and policies evidencing such renewals at least thirty (30) days before any such insurance shall expire. Mortgagor further agrees that each such insurance policy: (i) shall provide for at least thirty (30) days' prior written notice to Mortgagee prior to any policy reduction or cancellation for any reason other than non-payment of premium and at least ten (10) days' prior written notice to Mortgagee prior to any cancellation due to non-payment of premium; (ii) shall contain an endorsement or agreement by the insurer that any loss shall be payable to Mortgagee in accordance with the terms of such policy notwithstanding any act or negligence of Mortgagor which might otherwise result in forfeiture of such insurance; (iii) shall waive all rights of subrogation against Mortgagee; (iv) in the event that the Real Estate or the Improvements constitutes a legal non-conforming use under applicable building, zoning or land use laws or ordinances, shall include an ordinance or law coverage endorsement which will contain Coverage A: "Loss Due to Operation of Law" (with a minimum liability limit equal to Replacement Cost With Agreed Value Endorsement), Coverage B: "Demolition Cost" and Coverage C: "Increased Cost of Construction" coverages; and (v) may be in the form of a blanket policy provided that, in the event that any such coverage is provided in the form of a blanket policy, Mortgagor hereby acknowledges and agrees that failure to pay any portion of the premium therefor which is not allocable to the Property or by any other action not relating to the Property which would otherwise permit the issuer thereof to cancel the coverage thereof, would require the Property to be insured by a separate, single-property policy. The blanket policy must properly identify and fully protect the Property as if a separate policy were issued for 100% of Replacement Cost at the time of loss and otherwise meet all of Mortgagee's applicable insurance requirements set forth in this Section 1.4. The delivery to Mortgagee of the insurance policies or the certificates of insurance as provided above shall constitute an assignment of all proceeds payable under such insurance policies relating to the Property by Mortgagor to Mortgagee as further security for the indebtedness secured hereby. In the event of foreclosure of this Mortgage, or other transfer of title to the Property in extinguishment in whole or in part of the indebtedness secured hereby, all right, title and interest of Mortgagor in and to all proceeds payable under such policies then in force concerning the Property shall thereupon vest in the purchaser at such foreclosure, or in Mortgagee or other transferee in the event of such other transfer of title. Approval of any insurance by Mortgagee shall not be a representation of the solvency of any insurer or the sufficiency of any amount of insurance. In the event Mortgagor fails to provide, maintain, keep in force or deliver and furnish to Mortgagee the policies of insurance required by this Mortgage or evidence of their renewal as required herein, Mortgagee may, but shall not be obligated to, procure such insurance and Mortgagor shall pay all amounts advanced by Mortgagee therefor, together with interest thereon at the Default Interest Rate from and after the date advanced by Mortgagee until actually repaid by Mortgagor, promptly upon demand by Mortgagee. Any amounts so advanced by Mortgagee, together with interest thereon, shall be secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness secured hereby. Mortgagee shall not be responsible for nor incur any liability for the insolvency of the insurer or other failure of the insurer to perform, even though Mortgagee has caused the insurance to be placed with the insurer after failure of Mortgagor to furnish such insurance. Mortgagor shall not obtain insurance for the

-16-

Doc#:   86028 Bk:23420 Pg:  249

Property in addition to that required by Mortgagee without the prior written consent of Mortgagee, which consent will not be unreasonably withheld provided that (i) Mortgagee is a named insured on such insurance, (ii) Mortgagee receives complete copies of all policies evidencing such insurance, and (iii) such insurance complies with all of the applicable requirements set forth herein.

1.5     Payment of Taxes.  Mortgagor shall pay or cause to be paid, except to the extent provision is actually made therefor pursuant to Section 1.6 of this Mortgage, all taxes and assessments which are or may become a lien on the Property or which are assessed against or imposed upon the Property. Mortgagor shall furnish Mortgagee with receipts (or if receipts are not immediately available, with copies of canceled checks evidencing payment with receipts to follow promptly after they become available) showing payment of such taxes and assessments at least fifteen (15) days prior to the applicable delinquency date therefor. Notwithstanding the foregoing, Mortgagor may in good faith, by appropriate proceedings and upon notice to Mortgagee, contest the validity, applicability or amount of any asserted tax or assessment so long as (a) such contest is diligently pursued and (b) Mortgagee pays or causes to be paid the taxes then due as required by Maine law in order to seek an abatement.

1.6     Tax and Insurance Impound Account.  Mortgagor shall establish and maintain at all times while this Mortgage continues in effect an impound account (the "Impound Account") with Mortgagee for payment of real estate taxes and assessments and insurance on the Property and as additional security for the indebtedness secured hereby.  Simultaneously with the execution hereof, Mortgagor shall deposit in the Impound Account an amount determined by Mortgagee to be necessary to ensure that there will be on deposit with Mortgagee an amount which, when added to the monthly payments subsequently required to be deposited with Mortgagee hereunder on account of real estate taxes, assessments and insurance premiums, will result in there being on deposit with Mortgagee in the Impound Account an amount sufficient to pay the next due installment of real estate taxes and assessment on the Property at least one (1) month prior to the due date thereof and the next due annual insurance premiums with respect to the Property at least one (1) month prior to the due date thereof.  Commencing on the first monthly payment date under the Note and continuing thereafter on each monthly payment date under the Note, Mortgagor shall pay to Mortgagee, concurrently with and in addition to the monthly payment due under the Note and until the Note and all other indebtedness secured hereby is fully paid and performed, deposits in an amount equal to one-twelfth (1/12) of the amount of the annual real estate taxes and assessments that will next become due and payable on the Property, plus one-twelfth (1/12) of the amount of the annual premiums that will next become due and payable on insurance policies which Mortgagor is required to maintain hereunder, each as estimated and determined by Mortgagee.  So long as no Event of Default (as hereinafter defined), or event which with the passage of time, the giving of notice, or both, would constitute an Event of Default (a "Default") hereunder or under the other Loan Documents has occurred and is continuing, all sums in the Impound Account shall be held by Mortgagee in the Impound Account to pay said taxes, assessments and insurance premiums before the same become delinquent. Mortgagor shall be responsible for ensuring the receipt by Mortgagee, at least thirty (30) days prior to the respective due date for payment thereof, of all bills, invoices and statements for all taxes, assessments and insurance premiums to be paid from the Impound Account, and so long as no Default or Event of Default hereunder or under the other Loan Documents has occurred and is continuing, Mortgagee shall pay the governmental authority or other party

-17-

Doc#:   86028 Bk:23420 Pg: 250

entitled thereto directly to the extent funds are available for such purpose in the Impound Account. In making any payment from the Impound Account, Mortgagee shall be entitled to rely on any bill, statement or estimate procured from the appropriate public office or insurance company or agent without any inquiry into the accuracy of such bill, statement or estimate and without any inquiry into the accuracy, validity, enforceability or contestability of any tax, assessment, valuation, sale, forfeiture, tax lien or title or claim thereof. The Impound Account shall not, unless otherwise explicitly required by applicable law, be or be deemed to be escrow or trust funds, but, at Mortgagee's option and in Mortgagee's discretion, may either be held in a separate account or be commingled by Mortgagee with the general funds of Mortgagee. No interest on the funds contained in the Impound Account shall be paid by Mortgagee to Mortgagor. The Impound Account is solely for the protection of Mortgagee and entails no responsibility on Mortgagee's part beyond the payment of taxes, assessments and insurance premiums following receipt of bills, invoices or statements therefor in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received. Upon assignment of this Mortgage by Mortgagee, any funds in the Impound Account shall be turned over to the assignee and any responsibility of Mortgagee, as assignor, with respect thereto shall terminate. If the total funds in the Impound Account shall exceed the amount of payments actually applied by Mortgagee for the purposes of the Impound Account, such excess may be credited by Mortgagee on subsequent payments to be made hereunder or, at the option of Mortgagee, refunded to Mortgagor. If, however, the Impound Account shall not contain sufficient funds to pay the sums required when the same shall become due and payable, Mortgagor shall, within thirty (30) days after receipt of written notice thereof, deposit with Mortgagee the full amount of any such deficiency. If the Mortgagor shall fail to deposit with Mortgagee the full amount of such deficiency as provided above, Mortgagee shall have the option, but not the obligation, to make such deposit and all amounts so deposited by Mortgagee, together with interest thereon at the Default Interest Rate from the date incurred by Mortgagee until actually paid by Mortgagor, shall be immediately paid by Mortgagor on demand and shall be secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. If there is an Event of Default under this Mortgage, Mortgagee may, but shall not be obligated to, apply at any time the balance then remaining in the Impound Account against the indebtedness secured hereby in whatever order Mortgagee shall subjectively determine. No such application of the Impound Account shall be deemed to cure any Default or Event of Default hereunder. Upon full payment of the indebtedness secured hereby in accordance with its terms or at such earlier time as Mortgagee may elect, the balance of the Impound Account then in Mortgagee's possession shall be paid over to Mortgagor and no other party shall have any right or claim thereto.

Notwithstanding anything contained herein or in any other Loan Document to the contrary, and without limiting the Mortgagor's obligations to pay or cause to be paid the taxes and assessments on the Property pursuant to paragraphs 1.5 and 1.6 hereof, Mortgagee hereby defers the requirement for Mortgagor to make the required monthly deposits into the Impound Account for taxes and assessments while the Core Lease which covers the entire Property is in full force and effect so long as (i) the tenant under the Core Lease is not in default in any of its obligations under such Lease pertaining to taxes; and (ii) Mortgagor timely pays (or causes the payment of) the taxes and assessments for the Property and delivers evidence of the payment thereof to Mortgagee. Further, until such time as the Property is re-assessed as a separate tax lot

Doc#:   86028 Bk:23420 Pg:  251

or if the City of Westbrook no longer owns the land adjacent to the Property, in the event that Mortgagor incurs any liability for the payment of any taxes on the adjacent parking garage property, Mortgagor's obligation to make the required monthly deposits into the Impound Account for taxes and assessments with respect to the adjacent garage property shall commence on the immediately succeeding Payment Date under the Note.

1.7     Intentionally Deleted.

1.8     Replacement Reserve; Security Interest Reserves.

(a)     As additional security for the indebtedness secured hereby, Mortgagor shall establish and maintain at all times while this Mortgage continues in effect a repair reserve (the "Replacement Reserve") with Mortgagee for payment of certain non-recurring types of costs and expenses incurred by Mortgagor for interior and exterior work to the Property, including without limitation, performance of work to the roofs, chimneys, gutters, downspouts, paving, curbs, driveways, ramps, balconies, porches, patios, exterior walls, exterior doors and doorways, windows, elevators and mechanical and HVAC equipment (collectively, the "Repairs") provided such costs and expenses are incurred for repairs (i) not incurred for ordinary wear and tear at the Property and (ii) categorized under generally accepted accounting principles as a capital expense and not as an operating expense.  Commencing on the first Payment Date under the Note and continuing thereafter on each monthly Payment Date under the Note, the Mortgagor shall pay to Mortgagee, concurrently with and in addition to the monthly payment due under the Note and until the Note and all other indebtedness secured hereby is fully paid and performed, a deposit to the Replacement Reserve in an amount equal to $1,116.67 per month.  So long as no Default or Event of Default hereunder or under the other Loan Documents has occurred and is continuing, all sums in the Replacement Reserve shall be held by Mortgagee in the Replacement Reserve to pay the costs and expenses of Repairs.  So long as no Default or Event of Default hereunder or under the other Loan Documents has occurred and is continuing, Mortgagee shall, to the extent funds are available for such purpose in the Replacement Reserve, disburse to Mortgagor the amount incurred and paid by Mortgagor in performing such Repairs within ten (10) days following: (a) the receipt by Mortgagee of a written request from Mortgagor for disbursement from the Replacement Reserve and a certification by Mortgagor in the form attached hereto as Exhibit B that the applicable item of Repair has been completed, (b) the delivery to Mortgagee of paid invoices, receipts or other evidence satisfactory to Mortgagee verifying the cost and payment of performing the Repairs; (c) for disbursement requests in excess of $20,000.00, the delivery to Mortgagee of affidavits, lien waivers or other evidence reasonably satisfactory to Mortgagee showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished material or labor to the Property have been paid all amounts due for labor and materials furnished to the Property; (d) for disbursement requests in excess of $20,000.00, delivery to Mortgagee of a certification from an inspecting architect or other third party acceptable to Mortgagee describing the completed Repairs and verifying the completion of the Repairs and the value of the completion of the Repairs and the value of the completed Repairs; (e) for disbursement requests in excess of $20,000.00, delivery to Mortgagee of a new certificate of occupancy for the portion of the Improvements covered by such Repairs, if said new certificate of occupancy is required by law, or a certification by Mortgagor that no new certificate of occupancy is required; and (f) the

-19-

Doc#1     86028 Bk:23420 Pg: 252

receipt by Mortgagee of an administrative fee in the amount of $150.00. Mortgagee shall not be required to make advances from the Replacement Reserve more frequently than once in any thirty (30) day period. In making any payment from the Replacement Reserve, Mortgagee shall be entitled to rely on such request from Mortgagor without any inquiry into the accuracy, validity or contestability of any such amount. Mortgagee may, at Mortgagor's expense, make or cause to be made during the term of this Mortgage an annual inspection at the Property to determine the need, as determined by Mortgagee in its reasonable judgment, for further Repairs of the Property. In the event that such inspection reveals that further Repairs of the Property are required, Mortgagee shall provide Mortgagor with a written description of the required Repairs and Mortgagor shall complete such Repairs to the reasonable satisfaction of Mortgagee within ninety (90) days after the receipt of such description from Mortgagee, or such later date as may be approved by Mortgagee in its sole discretion.   The Replacement Reserve shall not, unless otherwise explicitly required by applicable law, be or be deemed to be escrow or trust funds, but, at Mortgagee's option and in Mortgagee's discretion, may either be held in a separate account or be commingled by Mortgagee with the general funds of Mortgagee.   Interest on the funds contained in the Replacement Reserve shall be credited to Mortgagor as provided in Section 4.31 hereof.   The Replacement Reserve is solely for the protection of Mortgagee and entails no responsibility on Mortgagee's part beyond the payment of the costs and expenses described in this Section in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received. In the event that the amounts on deposit or available in the Replacement Reserve are inadequate to pay the cost of the Repairs, Mortgagor shall pay the amount of such deficiency.   Upon assignment of this Mortgage by Mortgagee, any funds in the Replacement Reserve shall be turned over to the assignee and any responsibility of Mortgagee, as assignor, with respect thereto shall terminate. If there is an Event of Default under this Mortgage, Mortgagee may, but shall not be obligated to, apply at any time the balance then remaining in the Replacement Reserve against the indebtedness secured hereby in whatever order Mortgagee shall subjectively determine. No such application of the Replacement Reserve shall be deemed to cure any Default or Event of Default hereunder.   Upon full payment of the indebtedness secured hereby in accordance with its terms or at such earlier time as Mortgagee may elect, the balance of the Replacement Reserve then in Mortgagee's possession shall be paid over to Mortgagor and no other party shall have any right or claim thereto.

(b)     As additional security for the payment and performance by Mortgagor of all duties, responsibilities and obligations under the Note and the other Loan Documents, Mortgagor hereby unconditionally and irrevocably assigns, conveys, pledges, mortgages, transfers, delivers, deposits, sets over and confirms unto Mortgagee, and hereby grants to Mortgagee a security interest in, (i) the Impound Account, the Leasing Reserve, the Replacement Reserve and any other reserve or escrow account established pursuant to the terms hereof or of any other Loan Document (collectively, the "Reserves"), (ii) the accounts into which the Reserves have been deposited, (iii) all insurance on said accounts, (iv) all accounts, contract rights and general intangibles or other rights and interests pertaining thereto, (v) all sums now or hereafter therein or represented thereby, (vi) all replacements, substitutions or proceeds thereof, (vii) all instruments and documents now or hereafter evidencing the Reserves or such accounts, (viii) all powers, options, rights, privileges and immunities pertaining to the Reserves (including the right to make withdrawals therefrom), and (ix) all proceeds of the foregoing.   Mortgagor hereby authorizes and consents to the account into which the Reserves have been deposited being

-20-

held in Mortgagee's name or the name of any entity servicing the Note for Mortgagee and hereby acknowledges and agrees, that Mortgagee, or at Mortgagee's election, such servicing agent, shall have exclusive control over said account. Notice of the assignment and security interest granted to Mortgagee herein may be delivered by Mortgagee at any time to the financial institution wherein the Reserves have been established, and Mortgagee, or such servicing entity, shall have possession of all passbooks or other evidences of such accounts. Mortgagor hereby assumes all risk of loss with respect to amounts on deposit in the Reserves, except any loss arising out of Mortgagee's gross negligence, misappropriation or failure to account for deposits made by Mortgagor. Mortgagor hereby knowingly, voluntarily and intentionally stipulates, acknowledges and agrees that the advancement of the funds from the Reserves as set forth herein is at Mortgagor's direction and is not the exercise by Mortgagee of any right of set-off or other remedy upon a Default or an Event of Default. Mortgagor hereby waives all right to withdraw funds from the Reserves. If an Event of Default shall occur hereunder or under any other of the Loan Documents, then Mortgagee may, without notice or demand on Mortgagor, at its option: (A) withdraw any or all of the funds (including, without limitation, interest) then remaining in the Reserves and apply the same, after deducting all costs and expenses of safekeeping, collection and delivery (including, but not limited to, attorneys' fees, costs and expenses) to the indebtedness evidenced by the Note or any other obligations of Mortgagor under the other Loan Documents in such manner or as Mortgagee shall deem appropriate in its sole discretion, and the excess, if any, shall be paid to Mortgagor, (B) exercise any and all rights and remedies of a secured party under any applicable Uniform Commercial Code, and/or (C) exercise any other remedies available at law or in equity. No such use or application of the funds contained in the Reserves shall be deemed to cure any Default or Event of Default hereunder or under the other Loan Documents. The Reserves shall be held in an Eligible Account (as defined in the Cash Management (as defined herein)) and invested in Permitted Investments (as defined in the Cash Management Agreement).

1.9    Casualty and Condemnation.   Mortgagor shall give Mortgagee prompt written notice of the occurrence of any casualty affecting, or the institution of any proceedings for eminent domain or for the condemnation of, the Property or any portion thereof. Subject to the provisions of the Core's Lease, all insurance proceeds on the Property, and all causes of action, claims, compensation, awards and recoveries for any damage, condemnation or taking of all or any part of the Property or for any damage or injury to it for any loss or diminution in value of the Property, are hereby assigned to and shall be paid to Mortgagee. Mortgagee may participate in any suits or proceedings relating to any such proceeds, causes of action, claims, compensation, awards or recoveries and Mortgagee is hereby authorized, in its own name or in Mortgagor's name, to adjust any loss covered by insurance or any condemnation claim or cause of action, and to settle or compromise any claim or cause of action in connection therewith, and Mortgagor shall from time to time deliver to Mortgagee any instruments required to permit such participation; provided, however, that so long as no Default or Event of Default shall have occurred and be continuing Mortgagee shall not have the right to participate in the adjustment of any loss which is not in excess of the lesser of (i) ten percent (10%) of the then outstanding principal balance of the Note and (ii) $250,000.00. Subject to the provisions of the Core Lease, Mortgagee shall apply any sums received by it under this Section first to the payment of all of its costs and expenses (including, but not limited to, legal fees and disbursements) incurred in obtaining those sums, and then, subject to the terms of the Core Lease, as follows:

-21-

Doc#:   86028 Bk:23420 Pg:  254

(a)   In the event that (1) less than thirty percent (30%) of the Improvements (based on fair market value) located on the Real Estate have been destroyed, or (2) less than fifteen percent (15%) of the Improvements (based on fair market value) located on the Real Estate have been taken, then if:

(1)   no Default or Event of Default is then continuing hereunder or under any of the other Loan Documents, and

(2)   the Property can, in Mortgagee's judgment, with diligent restoration or repair, be returned to a condition at least equal to the condition thereof that existed prior to the casualty or partial taking causing the loss or damage within the earlier to occur of (i) six (6) months after the receipt of insurance proceeds or condemnation awards by either Mortgagor of Mortgagee, (ii) six (6) months prior to the stated maturity date of the Note, and (iii) the earliest date required under any of the Leases, and

(3)   all necessary governmental approvals can be obtained to allow the rebuilding and reoccupancy of the Property as described in Section 1.9(a)(2) above, and

(4)   there are sufficient sums available (through insurance proceeds or condemnation awards and contributions by Mortgagor, the full amount of which shall at Mortgagee's option have been deposited with Mortgagee) for such restoration or repair (including, without limitation, for any costs and expenses of Mortgagee to be incurred in administering said restoration or repair) and for payment of principal and interest to become due and payable under the Note during such restoration or repair, and

(5)   the economic feasibility of the Improvements after such restoration or repair will be such that income from their operation is reasonably anticipated to be sufficient to pay operating expenses of the Property and debt service on the indebtedness secured hereby in full with the same coverage ratio considered by Mortgagee in its determination to make the loan secured hereby including an assessment of the impact of the termination of any Leases due to such casualty or condemnation, and

(6)   in the event that the insurance proceeds or condemnation awards received as a result of such casualty or partial taking exceed the lesser of (i) five percent (5%) of the then outstanding principal balance of the Note and (ii) $150,000, Mortgagor shall have delivered to Mortgagee, at Mortgagor's sole cost and expense, an appraisal report in form and substance satisfactory to Mortgagee appraising the value of the Property as proposed to be restored or repaired to be not less than the appraised value of the Property considered by Mortgagee in its determination to make the loan secured hereby, and

(7)   the Core Lease remains in full force and effect and Mortgagee receives confirmation from the tenant under the Core Lease that same is not exercising any right to terminate the Core Lease, and

(8)   Mortgagor so elects by written notice delivered to Mortgagee within fifteen (15) days after settlement of the aforesaid insurance or condemnation claim,

-22-

NY:979574.7

then, Mortgagee shall, solely for the purposes of such restoration or repair, advance so much of the remainder of such sums as may be required for such restoration or repair, and any funds deposited by Mortgagor therefor, to Mortgagor in the manner and upon such terms and conditions as would be required by a prudent interim construction lender, including, but not limited to, the prior approval by Mortgagee of plans and specifications, contractors and form of construction contracts and the furnishing to Mortgagee of permits, bonds, lien waivers, invoices, receipts and affidavits from contractors and subcontractors in form and substance satisfactory to Mortgagee in its discretion, with any remainder being applied by Mortgagee for payment of the indebtedness secured hereby in whatever order Mortgagee directs in its absolute discretion.

(b)     In all other cases, namely, in the event that more than thirty percent (30%) of the Improvements (based on fair market value) located on the Real Estate have been destroyed, more than fifteen percent (15%) of the Improvements (based on fair market value) located on the Real Estate have been taken or Mortgagor does not elect to restore or repair the Property pursuant to clause (a) above, or otherwise fails to meet the requirements of clause (a) above, then in any of such events, Mortgagee shall elect, in Mortgagee's absolute discretion and without regard to the adequacy of Mortgagee's security, to do either of the following: (1) accelerate the maturity date of the Note and declare any and all indebtedness secured hereby to be immediately due and payable and apply the remainder of such sums received pursuant to this Section to the payment of the indebtedness secured hereby in whatever order Mortgagee directs in its absolute discretion, with any remainder being paid to Mortgagor, or (2) notwithstanding that Mortgagor may have elected not to restore or repair the Property pursuant to the provisions of Section 1.9(a)(7) above, require Mortgagor to restore or repair the Property in the manner and upon such terms and conditions as would be required by a prudent interim construction lender, including, but not limited to the deposit by Mortgagor with Mortgagee, within thirty (30) days after demand therefor, of any deficiency necessary in order to assure the availability of sufficient funds to pay for such restoration or repair, including Mortgagee's costs and expenses to be incurred in connection therewith, the prior approval by Mortgagee of plans and specifications, contractors and form of construction contracts and the furnishing to Mortgagee of permits, bonds, lien waivers, invoices, receipts and affidavits from contractors and subcontractors in form and substance satisfactory to Mortgagee in its discretion, and apply the remainder of such sums toward such restoration and repair, with any balance thereafter remaining being applied by Mortgagee for payment of the indebtedness secured hereby in whatever order Mortgagee directs in its absolute discretion.

(c)     Any reduction in the indebtedness secured hereby resulting from Mortgagee's application of any sums received by it hereunder shall take effect only when Mortgagee actually receives such sums and elects to apply such sums to the indebtedness secured hereby and, in any event, the unpaid portion of the indebtedness secured hereby shall remain in full force and effect and Mortgagor shall not be excused in the payment thereof. Partial payments received by Mortgagee, as described in the preceding sentence, shall be applied first to the final payment due under the Note and thereafter to installments due under the Note in the inverse order of their due date. If Mortgagor elects or Mortgagee directs Mortgagor to restore or repair the Property after the occurrence of a casualty or partial taking of the Property as provided above, Mortgagor shall promptly and diligently, at Mortgagor's sole cost and expense and regardless of whether the insurance proceeds or condemnation award, as appropriate, shall be

-23-

sufficient for the purpose, restore, repair, replace and rebuild the Property as nearly as possible to its value, condition and character immediately prior to such casualty or partial taking in accordance with the foregoing provisions and Mortgagor shall pay to Mortgagee all costs and expenses of Mortgagee incurred in administering said rebuilding, restoration or repair, provided the Mortgagee makes such proceeds or award available for such purpose. Mortgagor agrees to execute and deliver from time to time such further instruments as may be requested by Mortgagee to confirm the foregoing assignment to Mortgagee of any award, damage, insurance proceeds, payment or other compensation. Mortgagee is hereby irrevocably constituted and appointed the attorney-in-fact of Mortgagor (which power of attorney shall be irrevocable so long as any indebtedness secured hereby is outstanding, shall be deemed coupled with an interest, shall survive the voluntary or involuntary dissolution of Mortgagor and shall not be affected by any disability or incapacity suffered by Mortgagor subsequent to the date hereof), with full power of substitution, subject to the terms of this section, to settle for, collect and receive any such awards, damages, insurance proceeds, payments or other compensation from the parties or authorities making the same, to appear in and prosecute any proceedings therefor and to give receipts and acquittances therefor.

1.10    Mechanics' Liens.  Mortgagor shall pay when due all claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for the Real Estate or Improvements; provided, however, that, Mortgagor shall have the right to contest in good faith any such claim or demand, so long as it does so diligently, by appropriate proceedings and without prejudice to Mortgagee and provided that neither the Property nor any interest therein would be in any danger of sale, loss or forfeiture as a result of such proceeding or contest.  In the event Mortgagor shall contest any such claim or demand, Mortgagor shall promptly notify Mortgagee of such contest and thereafter if the claim or demand is not discharged by bonding or other deposit in the manner prescribed by law, Mortgagor shall, upon Mortgagee's request, promptly provide a bond, cash deposit or other security satisfactory to Mortgagee to protect Mortgagee's interest and security should the contest be unsuccessful.  If Mortgagor shall fail to immediately discharge or provide security against any such claim or demand as aforesaid, Mortgagee may do so and any and all expenses incurred by Mortgagee, together with interest thereon at the Default Interest Rate from the date incurred by Mortgagee until actually paid by Mortgagor, shall be immediately paid by Mortgagor on demand and shall be secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

1.11    Rents and Profits.  As additional and collateral security for the payment of the indebtedness secured hereby and cumulative of any and all rights and remedies herein provided for, Mortgagor hereby absolutely and presently assigns to Mortgagee all existing and future Rents and Profits.  Mortgagor hereby grants to Mortgagee the sole, exclusive and immediate right, without taking possession of the Property, to demand, collect (by suit or otherwise), receive and give valid and sufficient receipts for any and all of said Rents and Profits, for which purpose Mortgagor does hereby irrevocably make, constitute and appoint Mortgagee its attorney-in-fact with full power to appoint substitutes or a trustee to accomplish such purpose (which power of attorney shall be irrevocable so long as any indebtedness secured hereby is outstanding, shall be deemed to be coupled with an interest, shall survive the voluntary or involuntary dissolution of Mortgagor and shall not be affected by any disability or incapacity

-24-

Doc#:   86028 Bk:23420 Pg:  257

suffered by Mortgagor subsequent to the date hereof). Mortgagee shall be without liability for any loss which may arise from a failure or inability to collect Rents and Profits, proceeds or other payments. However, until the occurrence of an Event of Default under this Mortgage, Mortgagor shall have a license to collect and receive the Rents and Profits when due and prepayments thereof for not more than one month prior to due date thereof. Upon the occurrence of an Event of Default hereunder, Mortgagor's license shall automatically terminate without notice to Mortgagor and Mortgagee may thereafter, without taking possession of the Property, collect the Rents and Profits itself or by an agent or receiver. From and after the termination of such license, Mortgagor shall be the agent of Mortgagee in collection of the Rents and Profits and all of the Rents and Profits so collected by Mortgagor shall be held in trust by Mortgagor for the sole and exclusive benefit of Mortgagee and Mortgagor shall, within one (1) business day after receipt of any Rents and Profits, pay the same to Mortgagee to be applied by Mortgagee as hereinafter set forth. Neither the demand for or collection of Rents and Profits by Mortgagee shall constitute any assumption by Mortgagee of any obligations under any agreement relating thereto. Mortgagee is obligated to account only for such Rents and Profits as are actually collected or received by Mortgagee. Mortgagor irrevocably agrees and consents that the respective payors of the Rents and Profits shall, upon demand and notice from Mortgagee of an Event of Default hereunder, pay said Rents and Profits to Mortgagee without liability to determine the actual existence of any Event of Default claimed by Mortgagee. Mortgagor hereby waives any right, claim or demand which Mortgagor may now or hereafter have against any such payor by reason of such payment of Rents and Profits to Mortgagee, and any such payment shall discharge such payor's obligation to make such payment to Mortgagor. All Rents and Profits collected or received by Mortgagee shall be applied against all expenses of collection, including, without limitation, attorneys' fees, against costs of operation and management of the Property and against the indebtedness secured hereby, in whatever order or priority as to any of the items so mentioned as Mortgagee directs in its sole subjective discretion and without regard to the adequacy of its security. Neither the exercise by Mortgagee of any rights under this Section nor the application of any Rents and Profits to the secured indebtedness shall cure or be deemed a waiver of any Event of Default hereunder. The assignment of Rents and Profits hereinabove granted shall continue in full force and effect during any period of foreclosure or redemption with respect to the Property. Mortgagor has executed an Assignment of Leases and Rents dated of even date herewith (the "Assignment") in favor of Mortgagee covering all of the right, title and interest of Mortgagor, as landlord, lessor or licensor, in and to any Leases. All rights and remedies granted to Mortgagee under the Assignment shall be in addition to and cumulative of all rights and remedies granted to Mortgagee hereunder.

1.12    Leases and Licenses.

(a)    Mortgagor covenants and agrees that it shall not enter into any Lease or renewal or extension thereof of the Property without the prior written approval of Mortgagee, which approval shall not be unreasonably withheld or delayed. The request for approval of each such proposed new Lease or renewal or extension thereof shall be made to Mortgagee in writing and Mortgagor shall furnish to Mortgagee (and any loan servicer specified from time to time by Mortgagee): (i) such biographical and financial information about the proposed Tenant as Mortgagee may reasonably require in conjunction with its review, (ii) a copy of the proposed form of Lease, and (iii) a summary of the material terms of such proposed Lease (including,

-25-

without limitation, rental terms and the term of the proposed Lease and any options). It is acknowledged that Mortgagee intends to include among its criteria for approval of any such proposed Lease the following: (i) such Lease shall be with a bona-fide arm's-length Tenant; (ii) such Lease shall not contain any rental or other concessions which are not then customary and reasonable for similar properties and leases in the market area of the Real Estate; (iii) such Lease shall provide that the Tenant pays for its expenses, subject to any improvement allowance or similar concession which is then customary and reasonable for similar properties in the market area of the Real Estate; (iv) the rental shall be at least at the market rate then prevailing for similar properties and leases or renewals as applicable, in the market areas of the Real Estate; and (v) such Lease shall contain subordination and attornment provisions in form and content acceptable to Mortgagee. Failure of Mortgagee to approve or disapprove any such proposed Lease, specifying the reasons for disapproval, within fifteen (15) business days after receipt of such written request and all the documents and information required to be furnished to Mortgagee with such request shall be deemed approved, provided that the written request for approval specifically mentioned the same. Notwithstanding the foregoing, Mortgagee's consent shall not be required in connection with the extension or renewal of the Core Lease on terms and conditions which are at least as favorable as those for the current term under the Core Lease.

(b)     Prior to execution of any Leases of space in the Improvements after the date hereof, Mortgagor shall submit to Mortgagee, for Mortgagee's prior approval, which approval shall not be unreasonably withheld, a copy of the form Lease Mortgagor plans to use in leasing space in the Improvements. All Leases of space in the Improvements shall be on terms consistent with the terms for similar leases in the market area of the Real Estate, shall provide for free rent only if the same is consistent with prevailing market conditions and shall provide for market rents then prevailing in the market area of the Real Estate. Such Leases shall also provide for security deposits in reasonable amounts when the tenant is not part of an established chain. Mortgagor shall also submit to Mortgagee for Mortgagee's approval, which approval shall not be unreasonably withheld or delayed, prior to the execution thereof, any proposed Lease of the Improvements or any portion thereof that differs materially and adversely from the aforementioned form Lease. Mortgagor shall not execute any Lease for all or a substantial portion of the Property, except for an actual occupancy by the Tenant or its subtenant or assignee or licensee thereunder, and shall at all times promptly and faithfully perform, or cause to be performed, all of the covenants, conditions and agreements contained in all Leases with respect to the Property, now or hereafter existing, on the part of the landlord, lessor or licensor thereunder to be kept and performed. Mortgagor shall furnish to Mortgagee, within thirty (30) days after a request by Mortgagee to do so, but in any event by January 1 of each year, a current Rent Roll certified by Mortgagor as being true and correct containing the names of all Tenants with respect to the Property, the terms of their respective Leases, the spaces occupied and the rentals or fees payable thereunder and the amount of each tenant's security deposit. Upon the request of Mortgagee, Mortgagor shall deliver to Mortgagee a copy of each such Lease. Mortgagor shall not do or suffer to be done any act that might result in a default by the landlord, lessor or licensor under any such Lease or allow the Tenant thereunder to withhold payment or rent and, except as otherwise expressly permitted by the terms of Section 1.12 hereof, shall not further assign any such Lease or any such rents. Mortgagor, at no cost or expense to Mortgagee, shall enforce, short of termination, the performance and observance of each and every condition and covenant of each of the parties under such Leases. Mortgagor shall not, without the prior

-26-

NY:979574.7

written consent of Mortgagee which consent shall not be unreasonably withheld or delayed, modify any of the Leases, terminate or accept the surrender of any Leases, waive or release any other party from the performance or observance of any obligation or condition under such Leases.  Mortgagor shall not permit the prepayment of any rents under any of the Leases for more than one (1) month prior to the due date thereof.

(c)     Each Lease executed after the date hereof affecting any of the Real Estate or the Improvements must provide, in a manner approved by Mortgagee, that the Tenant will recognize as its landlord, lessor or licensor, as applicable, and attorn to any person succeeding to the interest of Mortgagor upon any foreclosure of this Mortgage or deed in lieu of foreclosure. Each such Lease shall also provide that, upon request of said successor-in-interest, the Tenant shall execute and deliver an instrument or instruments confirming its attornment as provided for in this Section; provided, however, that neither Mortgagee nor any successor-in-interest shall be bound by any payment of rental for more than one (1) month in advance, or any amendment or modification of said Lease made without the express written consent of Mortgagee or said successor-in-interest.

(d)     If Mortgagor shall, in any manner, fail to comply with this Section 1.12, Mortgagor covenants and agrees that Mortgagee may (but shall not be obligated to), subject to the provisions of the Core Lease, upon five (5) days' written notice to tenant under the Core Lease (or upon lesser notice, or without notice, if Mortgagee reasonably deems that the same is required to protect its interest in the Property), take any action that Mortgagee shall reasonably deem necessary or desirable to keep, observe and perform or cause to be kept, observed or performed any such terms, covenants, provisions or agreements and, subject to the provisions of the Core Lease, to enter upon the Property and take all action thereon as may be necessary therefor, or to prevent or cure any default by Mortgagor in the performance of or compliance with any of Mortgagor's covenants or obligations under the Core Lease.  Mortgagee may rely on any notice of default received from the tenant under the Core Lease.  Mortgagor shall promptly deliver to Mortgagee copy of any notice relating to defaults received from or given to the tenant under the Core Lease or the trustee, receiver or successor for or to said tenant.  Mortgagee may expend such sums of money as are reasonable and necessary for any such purposes, and Mortgagor hereby covenants and agrees to pay to Mortgagee, immediately upon demand, all sums so expended by Mortgagee, together with interest thereon from the date of such payment at the Default Interest Rate.

(e)     Upon the occurrence of an Event of Default under this Mortgage, whether before or after the whole principal sum secured hereby is declared to be immediately due or whether before or after the institution of legal proceedings to foreclose this Mortgage, forthwith, upon demand of Mortgagee, Mortgagor shall surrender to Mortgagee and Mortgagee shall be entitled to take actual possession of the Property or any part thereof personally, or by its agent or attorneys.  In such event, Mortgagee shall have, and Mortgagor hereby gives and grants to Mortgagee, the right, power and authority to make and enter into Leases with respect to the Property or portions thereof for such rents and for such periods of occupancy and upon conditions and provisions as Mortgagee may deem desirable in its sole discretion, and Mortgagor expressly acknowledges and agrees that the term of any such Lease may extend beyond the date of any foreclosure sale at the Property; it being the intention of Mortgagor that in such event

-27-

Doc#:    86028 Bk:23420 Ps:  260

Mortgagee shall be deemed to be and shall be the attorney-in-fact of Mortgagor for the purpose of making and entering into Leases of parts or portions of the Property for the rents and upon the terms, conditions and provisions deemed desirable to Mortgagee in its sole discretion and with like effect as if such Leases had been made by Mortgagor as the owner in fee simple of the Property free and clear of any conditions or limitations established by this Mortgage. The power and authority hereby given and granted by Mortgagor to Mortgagee shall be deemed to be coupled with an interest, shall not be revocable by Mortgagor so long as any indebtedness secured hereby is outstanding, shall survive the voluntary or involuntary dissolution of Mortgagor and shall not be affected by any disability or incapacity suffered by Mortgagor subsequent to the date hereof. In connection with any action taken by Mortgagee pursuant to this Section, Mortgagee shall not be liable for any loss sustained by Mortgagor resulting from any failure to let the Property, or any part thereof, or from any other act or omission of Mortgagee in managing the Property, nor shall Mortgagee be obligated to perform or discharge any obligation, duty or liability under any Lease covering the Property or any part thereof or under or by reason of this instrument or the exercise of rights or remedies hereunder. Mortgagor shall, and does hereby, indemnify Mortgagee for, and hold Mortgagee harmless from, any and all claims, actions, demands, liabilities, loss or damage which may or might be incurred by Mortgagee under any such Lease or under this Mortgage or by the exercise of rights or remedies hereunder and from any and all claims and demands whatsoever which may be asserted against Mortgagee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in any such Lease other than those finally determined by a count of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of Mortgagee.    Should Mortgagee incur any such liability, the amount thereof, including, without limitation, costs, expenses and attorneys' fees, together with interest thereon at the Default Interest Rate from the date incurred by Mortgagee until actually paid by Mortgagor, shall be immediately due and payable to Mortgagee by Mortgagor on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. Nothing in this Section shall impose on Mortgagee any duty, obligation or responsibility for the control, care, management or repair of the Property, or for the carrying out of any of the terms and conditions of any such Lease nor shall it operate to make Mortgagee responsible or liable for any waste committed on the Property by the Tenants or by any other parties or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property; provided, however, that Mortgagee shall be responsible for its gross negligence or willful misconduct. Mortgagor hereby assents to, ratifies and confirms any and all actions of Mortgagee with respect to the Property taken under this Section.

    1.13    Alienation and Further Encumbrances.

    (a)    Mortgagor acknowledges that Mortgagee has relied upon the principals of Mortgagor and their experience in owning and operating the Property and properties similar to the Property in connection with the closing of the loan evidenced by the Note. Accordingly, except as specifically allowed hereinbelow in this Section and notwithstanding anything to the contrary contained in Section 646 hereof, in the event that the Property or any part thereof or direct or indirect interest therein or direct or indirect interest in Mortgagor shall be sold, conveyed, disposed of, alienated, hypothecated, leased (except to Tenants of space in the

-28-

Improvements in accordance with the provisions of Section 1.12 hereof), assigned, pledged, mortgaged, further encumbered or otherwise transferred or Mortgagor shall be divested of its title to the Property or any direct or indirect interest therein, in any manner or way, whether voluntarily or involuntarily (each, a "Transfer"), without the prior written consent of Mortgagee being first obtained, which consent may be withheld in Mortgagee's sole discretion, then the same shall constitute an Event of Default and Mortgagee shall have the right, at its option, to declare any or all of the Debt, irrespective of the maturity date specified in the Note, immediately due and payable and to otherwise exercise any of its other rights and remedies contained in Article III hereof. Mortgagor shall also not cause or suffer to occur the creation of any further tenant-in-common interests if Mortgagor is a tenancy-in-common. A Transfer within the meaning of this Section 1.13 shall be deemed to include, among other things: (i) an installment sales agreement wherein Mortgagor agrees to sell the Property or any part thereof for a price to be paid in installments; and (ii) an agreement by Mortgagor leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Mortgagor's right, title and interest in and to any Leases or any Rents and Profits. Notwithstanding the foregoing, the following Transfers shall be permitted under this Section 1.13 without the prior consent of Mortgagee: (i) a Transfer of corporate stock, limited partnership interests and/or non-managing member interests in Mortgagor, or in any partner or member of Mortgagor, or any direct or indirect legal or beneficial owner of Mortgagor, so long as following such Transfer (whether in one or a series of transactions) or, with respect to any creation or issuance of new limited partnership interests or membership interests, not more than 49% of the beneficial economic interest in Mortgagor (whether directly or indirectly) has been transferred in the aggregate, there is no Change of Control and the persons responsible for the day to day management of the Property and Mortgagor remain unchanged following such Transfer, (ii) any involuntary Transfer caused by the death of Mortgagor, or any partner, shareholder, joint venturer, member or beneficial owner of a trust, or any direct or indirect legal or beneficial owner of Mortgagor, so long as Mortgagor is promptly reconstituted, if required, following such death and so long as there is no Change of Control and those persons responsible for the day to day management of the Property and Mortgagor remain unchanged as a result of such death or any replacement management or controlling parties are approved by Mortgagee, and (iii) a Transfer comprised of gifts for estate planning purposes of any individual's interests in Mortgagor, or in any of Mortgagor's partners, members, shareholders, beneficial owners of a trust or joint venturers, or any direct or indirect legal or beneficial owner of Mortgagor, to the spouse or any lineal descendant of such individual, or to a trust for the benefit of any one or more of such individual, spouse or lineal descendant, so long as Mortgagor is reconstituted promptly, if required, following such gift and so long as there is no Change of Control and those persons responsible for the day to day management of the Property and Mortgagor remain unchanged following such gift. Notwithstanding any provision of this Mortgage to the contrary, no person or entity may become an owner of a direct or indirect interest in Mortgagor, which interest exceeds forty-nine (49%) percent, without Mortgagee's prior written consent unless Mortgagor has complied with the provisions set forth in Section 1.13(b) below. For purposes of this Section 1.13(a), "Change of Control" shall mean a change in the identity of the individual or entities or group of individuals or entities who have the right, by virtue of any partnership agreement, articles of incorporation, by-laws, articles of organization, operating agreement or any other agreement, with or without taking any formative action, to cause Mortgagor to take some action or to prevent, restrict or impede Mortgagor from taking

-29-

Doc#:      86028 Bk:23420 Pg:  262

some action which, in either case, Mortgagor could take or could refrain from taking were it not for the rights of such individuals..

(b)      Notwithstanding the foregoing provisions of this Section, Mortgagee shall consent to one or more sales, conveyances or transfers of the Property in its entirety (hereinafter, "Sale") to any person or entity provided that each of the following terms and conditions are satisfied for each such Sale:

(1)      No Default or Event of Default is then continuing hereunder or under any of the other Loan Documents;

(2)      Mortgagor gives Mortgagee written notice of the terms of such prospective Sale not less than sixty (60) days before the date on which such Sale is scheduled to close and, concurrently therewith, gives Mortgagee all such information concerning the proposed transferee of the Property (hereinafter, "Buyer") as Mortgagee would require in evaluating an initial extension of credit to a borrower and pays to Mortgagee a non-refundable application fee in the amount of $5,000.00. Mortgagee shall have the right to approve or disapprove the proposed Buyer. In determining whether to give or withhold its approval of the proposed Buyer, Mortgagee shall consider the Buyer's or its principals' experience and track record in owning and operating facilities similar to the Property, the Buyer's or its principals' financial strength, the Buyer's or its principals' general business standing and the Buyer's or its principals' relationships and experience with contractors, vendors, tenants, lenders and other business entities; provided, however, that, notwithstanding Mortgagee's agreement to consider the foregoing factors in determining whether to give or withhold such approval, such approval shall be given or withheld based on what is commercially reasonable and, if given, may be given subject to such conditions as Mortgagee may reasonably deem appropriate;

(3)      Mortgagor pays Mortgagee, concurrently with the closing of such Sale, a non-refundable assumption fee in an amount equal to all out-of-pocket costs and expenses, including, without limitation, attorneys' fees, incurred by Mortgagee in connection with the Sale, plus an amount equal to one percent (1.0%) of the then outstanding principal balance of the Note;

(4)      The Buyer assumes and agrees to pay the indebtedness secured hereby subject to the provisions of Section 4.27 hereof and, prior to or concurrently with the closing of such Sale, the Buyer executes, without any cost or expense to Mortgagee, such documents and agreements as Mortgagee shall reasonably require to evidence and effectuate said assumption and delivers such legal opinions (including a non-consolidation opinion letter) as Mortgagee may require;

(5)      A party associated with the Buyer approved by Mortgagee in its reasonable discretion assumes the obligations of the current indemnitor under its guaranty or indemnity agreement which arise after the Buyer acquired the Property, and such party associated with the Buyer executes, without any cost or expense to Mortgagee, a new guaranty or indemnity agreement in form and substance satisfactory to Mortgagee and delivers such legal opinions as Mortgagee may require;

-30-

Doc#:     86028 Bk:23420 Pg:  263

(6)      Mortgagor and the Buyer execute, without any cost or expense to Mortgagee, new financing statements or financing statement amendments and any additional documents reasonably requested by Mortgagee;

(7)      Mortgagor delivers to Mortgagee, without any cost or expense to Mortgagee, such endorsements to Mortgagee's title insurance policy, hazard insurance endorsements or certificates and other similar materials which are then reasonably available, as Mortgagee may deem necessary at the time of the Sale, all in form and substance satisfactory to Mortgagee, including, without limitation, an endorsement or endorsements to Mortgagee's title insurance policy insuring the lien of this Mortgage, extending the effective date of such policy to the date of execution and delivery (or, if later, of recording) of the assumption agreement referenced above in subparagraph (4) of this Section, with no additional exceptions added to such policy (except any consented to by Mortgagee), and insuring that fee simple title to the Property is vested in the Buyer;

(8)      Mortgagor executes and delivers to Mortgagee, without any cost or expense to Mortgagee, a release of Mortgagee, its officers, directors, employees and agents, from all claims and liability relating to the transactions evidenced by the Loan Documents, through and including the date of the closing of the Sale, which agreement shall be in form and substance satisfactory to Mortgagee and shall be binding upon the Buyer;

(9)      Subject to the provisions of Section 4.27 hereof, such Sale is not construed so as to relieve Mortgagor of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Sale, and Mortgagor executes, without any cost or expense to Mortgagee, such documents and agreements as Mortgagee shall reasonably require to evidence and effectuate the ratification of said personal liability.  Mortgagor shall be released from and relieved of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising after the closing of such Sale which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Sale;

(10)     Such Sale is not construed so as to relieve any current indemnitor of its obligations under any guaranty or indemnity agreement for any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Sale, and each such current indemnitor executes, without any cost or expense to Mortgagee, such documents and agreements as Mortgagee shall reasonably require to evidence and effectuate the ratification of each such guaranty and indemnity agreement.  Each such current indemnitor shall be released from and relieved of any of its obligations under any guaranty or indemnity agreement executed in connection with the loan secured hereby for any acts or events occurring or obligations arising after the closing of such Sale which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Sale;

(11)     The Buyer shall furnish, if the Buyer is a corporation, partnership or other entity, all appropriate papers evidencing the Buyer's capacity and good standing, and the qualification of the signers to execute the assumption of the indebtedness secured hereby, which papers shall include certified copies of all documents relating to the organization and formation

-31-

Doc#:   86028 Bk:23420 Pg:  264

of the Buyer and of the entities, if any, which are partners of the Buyer. The Buyer and such constituent partners, members or shareholders of Buyer (as the case may be), as Mortgagee shall require, shall be single purpose, "bankruptcy remote" entities, whose formation documents shall be approved by counsel to Mortgagee. The individual recommended by the Mortgagor and approved by Mortgagee shall serve as an independent director of the Buyer (if the Buyer is a corporation) or the Buyer's corporate general partner or as an independent member or, in Mortgagee's discretion, as a manager, of Buyer if the Buyer a limited liability company. The consent of such independent party shall be required for, among other things, any merger, consolidation, dissolution, bankruptcy or insolvency of such independent party or of the Buyer; and

        (12)    Mortgagor delivers to Mortgagee a written statement from the applicable rating agency to the effect that the Sale will not result in a downgrading, withdrawal or qualification of the respective ratings (collectively, an "Adverse Rating Impact") in effect immediately prior to such Sale for any securities issues in connection with a Secondary Market Transaction (as hereinafter defined). In the event the Secondary Market Transaction has not yet occurred, Mortgagee shall, in its sole discretion, have determined that the Sale would not have resulted in an Adverse Rating Impact had the Secondary Market Transaction theretofor occurred.

        1.14   <u>Payment of Utilities, Assessments, Charges, Etc</u>. Mortgagor shall pay when due all utility charges which are incurred by Mortgagor or which may become a charge or lien against any portion of the Property for gas, electricity, water and sewer services furnished to the Real Estate and/or the Improvements and all other assessments or charges of a similar nature, or assessments payable pursuant to any restrictive covenants, whether public or private, affecting the Real Estate and/or the Improvements or any portion thereof, whether or not such assessments or charges are or may become liens thereon.

        1.15   <u>Access Privileges and Inspections</u>. Mortgagee and the agents, representatives and employees of Mortgagee shall, subject to the rights of tenants, have full and free access to the Real Estate and the Improvements and any other location where books and records concerning the Property are kept at all reasonable times for the purposes of inspecting the Property and of examining, copying and making extracts from the books and records of Mortgagor relating to the Property. Mortgagor shall lend assistance to all such agents, representatives and employees of Mortgagee.

        1.16   <u>Waste; Alteration of Improvements</u>. Mortgagor shall not commit, suffer or permit any waste on the Property nor take any actions that might invalidate any insurance carried on the Property. Mortgagor shall maintain the Property in good condition and repair. No part of the Improvements may be removed, demolished or materially altered, without the prior written consent of Mortgagee. Without the prior written consent of Mortgagee, Mortgagor shall not commence construction of any improvements on the Real Estate other than improvements required for the maintenance or repair of the Property or to comply with applicable law.

        1.17   <u>Zoning</u>. Without the prior written consent of Mortgagee, Mortgagor shall not seek, make, suffer, consent to or acquiesce in any change in the zoning or conditions of use of the Real Estate or the Improvements. Mortgagor shall comply with and make all payments required under the provisions of any covenants, conditions or restrictions affecting the Real



Estate or the Improvements. Mortgagor shall comply with all existing and future requirements of all governmental authorities having jurisdiction over the Property. Mortgagor shall keep all licenses, permits, franchises and other approvals necessary for the operation of the Property in full force and effect. Mortgagor shall operate the Property as a building for so long as the indebtedness secured hereby is outstanding. If, under applicable zoning provisions, the use of all or any part of the Real Estate or the Improvements is or becomes a nonconforming use, Mortgagor shall not cause or permit such use to be discontinued or abandoned without the prior written consent of Mortgagee. Further, without Mortgagee's prior written consent, Mortgagor shall not file or subject any part of the Real Estate or the Improvements to any declaration of condominium or co-operative or convert any part of the Real Estate or the Improvements to a condominium, co-operative or other form of multiple ownership and governance.

     1.18   <u>Financial Statements and Books and Records</u>. Mortgagor shall keep accurate books and records of account of the Property and its own financial affairs sufficient to permit the preparation of financial statements therefrom in accordance with generally accepted accounting principles. Mortgagee and its duly authorized representatives shall have the right to examine, copy and audit Mortgagor's records and books of account at all reasonable times. So long as this Mortgage continues in effect, Mortgagor shall provide to Mortgagee, in addition to any other financial statements required hereunder or under any of the other Loan Documents, the following financial statements and information, all of which must be certified to Mortgagee as being true and correct by Mortgagor or the person or entity to which they pertain, as applicable, and be prepared in accordance with generally accepted accounting principles consistently applied and be in form and substance acceptable to Mortgagee:

     (a)   copies of all tax returns filed by Mortgagor, within thirty (30) days after the date of filing;

     (b)   monthly operating statements for the Property within twenty (20) days after the end of each month during the first twelve months of the term of the loan secured hereby;

     (c)   quarterly operating statements for the Property, within thirty (30) days after the end of each calendar quarter;

     (d)   annual balance sheets for the Property and annual financial statements for Mortgagor or general partner in Mortgagor, and each indemnitor and guarantor under any indemnity or guaranty executed in connection with the loan secured hereby, within ninety (90) days after the end of each calendar year; and

     (e)   such other information with respect to the Property, Mortgagor, the principals or general partners in Mortgagor, and each indemnitor and guarantor under any indemnity or guaranty executed in connection with the loan secured hereby, which may be requested from time to time by Mortgagee, within a reasonable time after the applicable request.

If any of the aforementioned materials are not furnished to Mortgagee within the applicable time periods or Mortgagee is dissatisfied with the contents of any of the foregoing, in addition to any other rights and remedies of Mortgagee contained herein, Mortgagee shall have the right, but not the obligation, to obtain the same by means of an audit by an independent certified public



-33-

Doc#:     86028 Bk:23420 Pg: 266

accountant selected by Mortgagee, in which event Mortgagor agrees to pay, or to reimburse Mortgagee for, any expense of such audit and further agrees to provide all necessary information to said accountant and to otherwise cooperate in the making of such audit.

1.19  Further Documentation.(a) Mortgagor shall, on the request of Mortgagee and at the expense of Mortgagor:  (a) promptly correct any defect, error or omission which may be discovered in the contents of this Mortgage or in the contents of any of the other Loan Documents; (b) promptly execute, acknowledge, deliver and record or file such further instruments (including, without limitation, further mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements and assignments of rents or leases) and promptly do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Mortgage and the other Loan Documents and to subject to the liens and security interests hereof and thereof any property intended by the terms hereof and thereof to be covered hereby and thereby, including specifically, but without limitation, any renewals, additions, substitutions, replacements or appurtenances to the Property; (c) promptly execute, acknowledge, deliver, procure and record or file any document or instrument (including specifically any financing statement) deemed advisable by Mortgagee to protect, continue or perfect the liens or the security interests hereunder against the rights or interests of third persons; and (d) promptly furnish to Mortgagee, upon Mortgagee's request, a duly acknowledged written statement and estoppel certificate addressed to such party or parties as directed by Mortgagee and in form and substance supplied by Mortgagee, setting forth all amounts due under the Note, stating whether any Default or Event of Default has occurred hereunder, stating whether any offsets or defenses exist against the indebtedness secured hereby and containing such other matters as Mortgagee may reasonably require.

(b)  Mortgagor acknowledges that Mortgagee and its successors and assigns may effectuate a Secondary Market Transaction.  Mortgagor shall cooperate in good faith with Mortgagee in effecting any such Secondary Market Transaction (including, without limitation, obtaining ratings from 2 or more rating agencies) and shall cooperate in good faith to implement all requirements imposed by any rating agency involved in any Secondary Market Transaction including, without limitation, all structural or other changes to the Debt, all modifications to any documents evidencing or securing the secured indebtedness, including, without limitation, separating the loan secured hereby into two or more separate notes (or components that correspond to one or more tranches of the certificates/securities created in a securitization) and assigning such notes or components, as applicable, different interest rates so long as the initial weighted average of such interest rates equals the interest rate payable under the Note as of the date hereof, and, subject to the foregoing, splitting the loan secured hereby into a senior/subordinated A and B note structure both secured by this Mortgage and all other changes to the loan documentation, organizational documents, opinion letters (including, without limitation, any nonconsolidation opinion letters) and any other documentation; provided, however, that the Mortgagor shall not be required to modify any documents evidencing or securing the Debt which would modify (A) the interest rate payable under the Note (except as set forth hereinabove), (B) the stated maturity of the Note, (C) the amortization of principal of the Note, or (D) any other material terms of the Debt.  Mortgagor shall review prepared offering materials relating to the Property, Mortgagor, any guarantor or indemnitor and the loan secured hereby and participate in investor or rating agency meetings if requested by Mortgagee. Mortgagor shall provide such information, and documents relating to Mortgagor, any guarantor

NY:979574.7

Doc#:        86028 Bk:23420 Ps:   267

or indemnitor, the Property and any tenants of the Improvements as Mortgagee may reasonably request in connection with such Secondary Market Transaction. Mortgagor shall make available to Mortgagee all information concerning its business and operations that Mortgagee may reasonably request. Mortgagee shall be permitted to share all such information with the investment banking firms, rating agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan Documents or the applicable Secondary Market Transaction. It is understood that the information provided by Mortgagor to Mortgagee may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus various investors may also see some or all of the information. Mortgagee and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or at the direction of, Mortgagor and Mortgagor indemnifies Mortgagee as to any losses, claims, damages or liabilities that arise out of or are based upon any untrue statement of any material fact contained in such information or arise out of or are based upon the omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, or in light of the circumstances under which they were made, not misleading. Mortgagee may publicize the existence of the Debt in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development. For purposes hereof, a "Secondary Market Transaction" shall be (a) any sale of the Mortgage, Note and other Loan Documents to one or more investors as a whole loan; (b) a participation of the Debt to one or more investors, (c) any deposit of the Mortgage, Note and other Loan Documents with a trust or other entity which may sell certificates or other instruments to investors evidencing an ownership interest in the assets of such trust or other entity, or (d) any other sale or transfer of the Debt or any interest therein to one or more investors. In connection solely with this Section 1.19(b), at the request of Mortgagor, Mortgagee shall reimburse Mortgagor for the reasonable costs and expenses, including reasonable attorneys' fees, of such cooperation.

     1.20    Payment of Costs; Reimbursement to Mortgagee. Mortgagor shall pay all costs and expenses of every character incurred in connection with the closing of the loan evidenced by the Note and secured hereby or otherwise attributable or chargeable to Mortgagor as the owner of the Property, including, without limitation, appraisal fees, recording fees, documentary, stamp, mortgage or intangible taxes, brokerage fees and commissions incurred by Mortgagor, title policy premiums and title search fees, uniform commercial code/tax lien/litigation search fees, escrow fees and attorneys' fees. If Mortgagor defaults in any such payment, which default is not cured within any applicable grace or cure period, Mortgagee may pay the same and Mortgagor shall reimburse Mortgagee on demand for all such costs and expenses incurred or paid by Mortgagee, together with such interest thereon at the Default Interest Rate from and after the date of Mortgagee's making such payment until reimbursement thereof by Mortgagor. Any such sums disbursed by Mortgagee, together with such interest thereon, shall be additional indebtedness of Mortgagor secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note. Further, Mortgagor shall promptly notify Mortgagee in writing of any litigation or threatened litigation affecting the Property, or any other demand or claim which, if enforced, could impair or threaten to impair Mortgagee's security hereunder. Without limiting or waiving any other rights and remedies of Mortgagee hereunder, if Mortgagor fails to perform any of its covenants or agreements contained in this Mortgage or in any of the other Loan Documents and such failure is

-35-

not cured within any applicable grace or cure period, or if any action or proceeding of any kind (including, but not limited to, any bankruptcy, insolvency, arrangement, reorganization or other debtor relief proceeding) is commenced which might affect Mortgagee's interest in the Property or Mortgagee's right to enforce its security, then Mortgagee may, at its option, with or without notice to Mortgagor, make any appearances, disburse any sums and take any actions as may be necessary or desirable to protect or enforce the security of this Mortgage or to remedy the failure of Mortgagor to perform its covenants and agreements (without, however, waiving any default of Mortgagor).  Mortgagor agrees to pay on demand all expenses of Mortgagee incurred with respect to the foregoing (including, but not limited to, reasonable fees and disbursements of counsel), together with interest thereon at the Default Interest Rate from and after the date on which Mortgagee incurs such expenses until reimbursement thereof by Mortgagor.  Any such expenses so incurred by Mortgagee, together with interest thereon as provided above, shall be additional indebtedness of Mortgagor secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  The necessity for any such actions and of the amounts to be paid shall be determined by Mortgagee in its discretion.  Mortgagee is hereby empowered to enter and to authorize others to enter upon the Property or any part thereof for the purpose of performing or observing any such defaulted term, covenant or condition without thereby becoming liable to Mortgagor or any person in possession holding under Mortgagor.  Mortgagor hereby acknowledges and agrees that the remedies set forth in this Section 1.20 shall be exercisable by Mortgagee, and any and all payments made or costs or expenses incurred by Mortgagee in connection therewith shall be secured hereby and shall be, without demand, immediately repaid by Mortgagor with interest thereon at the Default Interest Rate, notwithstanding the fact that such remedies were exercised and such payments made and costs incurred by Mortgagee after the filing by Mortgagor of a voluntary case or the filing against Mortgagor of an involuntary case pursuant to or within the meaning of the Bankruptcy Reform Act of 1978, as amended, Title 11 U.S.C., or after any similar action pursuant to any other debtor relief law (whether statutory, common law, case law or otherwise) of any jurisdiction whatsoever, now or hereafter, in effect, which may be or become applicable to Mortgagor, Mortgagee, any guarantor or indemnitor, the secured indebtedness or any of the Loan Documents.  Mortgagor hereby indemnifies and holds Mortgagee harmless from and against all loss, cost and expenses with respect to any Event of Default hereof, any liens (i.e., judgments, mechanics' and materialmen's liens, or otherwise), charges and encumbrances filed against the Property, and from any claims and demands for damages or injury, including claims for property damage, personal injury or wrongful death, arising out of or in connection with any accident or fire or other casualty on the Real Estate or the Improvements or any nuisance made or suffered thereon, including, in any case, attorneys' fees, costs and expenses as aforesaid, whether at pretrial, trial or appellate level, and such indemnity shall survive payment in full of the indebtedness secured hereby.  This Section shall not be construed to require Mortgagee to incur any expenses, make any appearances or take any actions.

        1.21   Security Interest.  This Mortgage is also intended to encumber and create a security interest in, and Mortgagor hereby grants to Mortgagee a security interest in all sums on deposit with Mortgagee pursuant to the provisions of Sections 1.6, 1.7, 1.8, 1.34 and 1.35 hereof or any other Section hereof and all fixtures, chattels, accounts, equipment, inventory, contract rights, general intangibles and other personal property included within the Property, all renewals, replacements of any of the aforementioned items, or articles in substitution therefor or in addition

-36-

Doc#:   86028 Bk:23420 Ps:  269

thereto or the proceeds thereof (said property is hereinafter referred to collectively as the "Collateral"), whether or not the same shall be attached to the Real Estate or the Improvements in any manner. It is hereby agreed that to the extent permitted by law, all of the foregoing property is to be deemed and held to be a part of and affixed to the Real Estate and the Improvements. The foregoing security interest shall also cover Mortgagor's leasehold interest in any of the foregoing property which is leased by Mortgagor. Notwithstanding the foregoing, all of the foregoing property shall be owned by Mortgagor and no leasing or installment sales or other financing or title retention agreement in connection therewith shall be permitted without the prior written approval of Mortgagee. Mortgagor shall, from time to time upon the request of Mortgagee, supply Mortgagee with a current inventory of all of the property in which Mortgagee is granted a security interest hereunder, in such detail as Mortgagee may require. Mortgagor shall promptly replace all of the Collateral subject to the lien or security interest of this Mortgage when worn or obsolete with Collateral comparable to the worn out or obsolete Collateral when new and will not, without the prior written consent of Mortgagee, remove from the Real Estate or the Improvements any of the Collateral subject to the lien or security interest of this Mortgage except such as is being repaired or is replaced by an article of equal suitability and value as above provided, owned by Mortgagor free and clear of any lien or security interest except: (i) the lien of current real estate taxes and assessments; (ii) that created by this Mortgage and the other Loan Documents; and (iii) as otherwise expressly permitted by the terms of Section 1.13 of. this Mortgage. All of the Collateral shall be kept at the location of the Real Estate except as otherwise required by the terms of the Loan Documents. Mortgagor shall not use any of the Collateral in violation of any applicable statute, ordinance or insurance policy.

      1.22   <u>Security Agreement</u>. This Mortgage constitutes a security agreement between Mortgagor and Mortgagee with respect to the Collateral in which Mortgagee is granted a security interest hereunder, and, cumulative of all other rights and remedies of Mortgagee hereunder, Mortgagee shall have all of the rights and remedies of a secured party under any applicable Uniform Commercial Code. Mortgagor hereby agrees to execute and deliver on demand and hereby irrevocably constitutes and appoints Mortgagee the attorney-in-fact of Mortgagor to execute and deliver and, if appropriate, to file with the appropriate filing officer or office such security agreements, financing statements, continuation statements or other instruments as Mortgagee may request or require in order to impose, perfect or continue the perfection of the lien or security interest created hereby. Except with respect to Rents and Profits to the extent specifically provided herein to the contrary, Mortgagee shall have the right of possession of all cash, securities, instruments, negotiable instruments, documents, certificates and any other evidences of cash or other property or evidences of rights to cash rather than property, which are now or hereafter a part of the Property and Mortgagor shall promptly deliver the same to Mortgagee, endorsed to Mortgagee, without further notice from Mortgagee. Mortgagor agrees to furnish Mortgagee with notice of any change in the name, identity, organizational structure, residence, or principal place of business or mailing address of Mortgagor within ten (10) days of the effective date of any such change. Upon the occurrence of any Event of Default, Mortgagee shall have the rights and remedies as prescribed in this Mortgage, or as prescribed by general law, or as prescribed by any applicable Uniform Commercial Code, all at Mortgagee's election. Any disposition of the Collateral may be conducted by an employee or agent of Mortgagee. Any person, including both Mortgagor and Mortgagee, shall be eligible to purchase any part or all of the Collateral at any such disposition.

-37-

Doc#:     86028 Bk:23420 Ps:  270

Expenses of retaking, holding, preparing for sale, selling or the like (including, without limitation, Mortgagee's attorneys' fees and legal expenses), together with interest thereon at the Default Interest Rate from the date incurred by Mortgagee until actually paid by Mortgagor, shall be paid by Mortgagor on demand and shall be secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  Mortgagee shall have the right to enter upon the Real Estate and the Improvements or any real property where any of the property which is the subject of the security interest granted herein is located to take possession of, assemble and collect the same or to render it unusable, or Mortgagor, upon demand of Mortgagee, shall assemble such property and make it available to Mortgagee at the Real Estate, a place which is hereby deemed to be reasonably convenient to Mortgagee and Mortgagor.  If notice is required by law, Mortgagee shall give Mortgagor at least ten (10) days' prior written notice of the time and place of any public sale of such property or of the time of or after which any private sale or any other intended disposition thereof is to be made, and if such notice is sent to Mortgagor, as the same is provided for the mailing of notices herein, it is hereby deemed that such notice shall be and is reasonable notice to Mortgagor.  No such notice is necessary for any such property which is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market.  Any sale made pursuant to the provisions of this Section shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with the foreclosure sale as provided in Section 3.1(e) hereof upon giving the same notice with respect to the sale of the Property hereunder as is required under said Section 3.1(e).  Furthermore, to the extent permitted by law, in conjunction with, in addition to or in substitution for the rights and remedies available to Mortgagee pursuant to any applicable Uniform Commercial Code:

(a)     In the event of a foreclosure sale, the Property may, at the option of Mortgagee, be sold as a whole; and

(b)     It shall not be necessary that Mortgagee take possession of the aforementioned Collateral, or any part thereof, prior to the time that any sale pursuant to the provisions of this Section is conducted and it shall not be necessary that said Collateral, or any part thereof, be present at the location of such sale; and

(c)     Mortgagee may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Mortgagee, including the sending of notices and the conduct of the sale, but in the name and on behalf of Mortgagee.

The name and address of Mortgagor (as Debtor under any applicable Uniform Commercial Code) are:

Pendleton Westbrook SPE, LLC,
ZAK Westbrook SPE, LLC,
SRA Westbrook SPE, LLC,
SPC Westbrook SPE, LLC,
Paris Westbrook SPE, LLC
235 Moore Street, Suite 300
Hackensack, New Jersey 07601
Attn.: Peter O. Hanson

-38-

NY:979574.7

Doc#:   86028 Bk:23420 Ps:  271

The name and address of Mortgagee (as Secured Party under any applicable Uniform Commercial Code) are:

> Wachovia Bank, National Association
> Commercial Real Estate Services
> 8739 Research Drive URP – 4, NC 1075
> Charlotte, North Carolina 28262

1.23   <u>Easements and Rights of Way</u>.  Mortgagor shall not grant any easement or right-of-way with respect to all or any portion of the Real Estate or the Improvements without the prior written consent of Mortgagee.  The purchaser at any foreclosure sale hereunder may, at its discretion, disaffirm any easement or right-of-way granted in violation of any of the provisions of this Mortgage and may take immediate possession of the Property free from, and despite the terms of, such grant of easement or right-of-way.  If Mortgagee consents to the grant of an easement or right-of-way, Mortgagee agrees to grant such consent provided that Mortgagee is paid a standard review fee together with all other expenses, including, without limitation, attorneys' fees, incurred by Mortgagee in the review of Mortgagor's request and in the preparation of documents effecting the subordination.

1.24   <u>Compliance with Laws</u>.  Mortgagor shall at all times comply with all statutes, ordinances, orders, regulations and other governmental or quasi-governmental requirements and private covenants now or hereafter relating to the ownership, construction, use or operation of the Property, including, but not limited to, those concerning employment and compensation of persons engaged in operation and maintenance of the Property and any environmental or ecological requirements, even if such compliance shall require structural changes to the Property;  provided, however, that, Mortgagor may, upon providing Mortgagee with security satisfactory to Mortgagee, proceed diligently and in good faith to contest the validity or applicability of any such statute, ordinance, regulation or requirement so long as during such contest the Property shall not be subject to any lien, charge, fine or other liability and shall not be in danger of being forfeited, lost or closed.  Mortgagor shall not use or occupy, or allow the use or occupancy of, the Property in any manner which violates any Lease of or any other agreement applicable to the Property or any applicable law, rule, regulation or order or which constitutes a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto.

1.25   <u>Additional Taxes</u>.  In the event of the enactment after this date of any law of the state where the Property is located or of any other governmental entity deducting from the value of the Property for the purpose of taxing any lien or security interest thereon, or imposing upon Mortgagee the payment of the whole or any part of the taxes or assessments or charges of liens herein required to be paid by Mortgagor, or changing in any way the laws relating to the taxation of deeds of trust, mortgages or security agreements or debts secured by mortgages or security agreements or the interest of the Mortgagee or secured party in the property covered thereby, or the manner of collection of such taxes, so as to adversely affect this Mortgage or the indebtedness secured hereby or Mortgagee, then, and in any such event, Mortgagor, upon demand by Mortgagee, shall pay such taxes, assessments, charges or liens, or reimburse Mortgagee therefor; provided, however, that if in the opinion of counsel for Mortgagee (a) it might be unlawful to require Mortgagor to make such payment, or (b) the making of such

-39-

payment might result in the imposition of interest beyond the maximum amount permitted by law, then and in either such event, Mortgagee may elect, by notice in writing given to Mortgagor, to declare all of the indebtedness secured hereby to be and become due and payable in full thirty (30) days from the giving of such notice.

1.26    Secured Indebtedness.  It is understood and agreed that this Mortgage shall secure payment of not only the indebtedness evidenced by the Note but also any and all substitutions, replacements, renewals and extensions of the Note, any and all indebtedness and obligations arising pursuant to the terms hereof and any and all indebtedness and obligations arising pursuant to the terms of any of the other Loan Documents, all of which indebtedness is equally secured with and has the same priority as any amounts advanced as of the date hereof. Upon request of Mortgagor, Mortgagee may, at its sole option, from time to time make "future advances" to Mortgagor, provided, however, that the total principal secured hereby and remaining unpaid, including any such future advances, shall not at any time exceed the sum of Twenty Million and 00/100 Dollars ($20,000,000.00).  This Mortgage shall also secure "contingent obligations" in the maximum amount of Twenty Million and 00/100 Dollars ($20,000,000.00).  The terms "future advances" and "contingent obligations" shall have the meanings given them in 33 M.R.S.A. § 505, as the same may be amended or replaced from time to time.   Mortgagor shall execute and deliver to Mortgagee a note or other agreement or document evidencing each and every future advance which Mortgagee may make, which note or other agreement or document shall contain such terms and conditions as Mortgagee may require. Mortgagor shall pay when due all future advances with interest and other charges thereon, as applicable, and the same, and each note and agreement or document evidencing the same, shall be secured hereby.  All provisions of this Mortgage shall apply to each future advance as well as to all other indebtedness secured hereby.  Nothing herein contained, however, shall limit the amount secured by this Mortgage if such amount is increased by protective advances made by Mortgagee, as herein elsewhere provided.

1.27    Mortgagor's Waivers.  To the full extent permitted by law, Mortgagor agrees that Mortgagor shall not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, moratorium or extension, or any law now or hereafter in force providing for the reinstatement of the indebtedness secured hereby prior to any sale of the Property to be made pursuant to any provisions contained herein or prior to the entering of any decree, judgment or order of any court of competent jurisdiction, or any right under any statute to redeem all or any part of the Property so sold.  Mortgagor, for Mortgagor and Mortgagor's successors and assigns, and for any and all persons ever claiming any interest in the Property, to the full extent permitted by law, hereby knowingly, intentionally and voluntarily with and upon the advice of competent counsel:  (a) waives, releases, relinquishes and forever forgoes all rights of valuation, appraisement, stay of execution, reinstatement and notice of election or intention to mature or declare due the secured indebtedness (except such notices as are specifically provided for herein) and (b) waives, releases, relinquishes and forever forgoes all right to a marshalling of the assets of Mortgagor, including the Property, to a sale in the inverse order of alienation, or to direct the order in which any of the Property shall be sold in the event of foreclosure of the liens and security interests hereby created and agrees that any court having jurisdiction to foreclose such liens and security interests may order the Property sold as an entirety.  To the full extent permitted by law,

-40-

Doc#:    86028 Bk:23420 Ps:  273

Mortgagor shall not have or assert any right under any statute or rule of law pertaining to the exemption of homestead or other exemption under any federal, state or local law now or hereafter in effect, the administration of estates of decedents or other matters whatever to defeat, reduce or affect the right of Mortgagee under the terms of this Mortgage to a sale of the Property, for the collection of the secured indebtedness without any prior or different resort for collection, or the right of Mortgagee under the terms of this Mortgage to the payment of the indebtedness secured hereby out of the proceeds of sale of the Property in preference to every other claimant whatever. Further, Mortgagor hereby knowingly, intentionally and voluntarily, with and upon the advice of competent counsel, waives, releases, relinquishes and forever forgoes all present and future statutes of limitations as a defense to any action to enforce the provisions of this Mortgage or to collect any of the indebtedness secured hereby the fullest extent permitted by law.  Mortgagor covenants and agrees that upon the commencement of a voluntary or involuntary bankruptcy proceeding by or against Mortgagor, Mortgagor shall not seek a supplemental stay or otherwise shall not seek pursuant to 11 U.S.C. §105 or any other provision of the Bankruptcy Reform Act of 1978, as amended, or any other debtor relief law (whether statutory, common law, case law, or otherwise) of any jurisdiction whatsoever, now or hereafter in effect, which may be or become applicable, to stay, interdict, condition, reduce or inhibit the ability of Mortgagee to enforce any rights of Mortgagee against any guarantor or indemnitor of the secured obligations or any other party liable with respect thereto by virtue of any indemnity, guaranty or otherwise.

    1.28   SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.

        (a)    MORTGAGOR, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (i) SUBMITS TO PERSONAL JURISDICTION IN THE STATE IN WHICH THE PROPERTY IS LOCATED OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THE NOTE, THIS MORTGAGE OR ANY OTHER OF THE LOAN DOCUMENTS, (ii) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION OVER THE COUNTY IN WHICH THE PROPERTY IS LOCATED, (iii) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND, (iv) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT IT WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF MORTGAGEE TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM).  MORTGAGOR FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO MORTGAGOR AT THE ADDRESS FOR NOTICES DESCRIBED IN OR PURSUANT TO SECTION 4.5 HEREOF, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

        (b)    MORTGAGEE AND MORTGAGOR, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND

-41-

NY:979574.7

Doc#:     86028 Bk:23420 Pg:  274

VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVE, RELINQUISH AND FOREVER FORGO THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THE INDEBTEDNESS SECURED HEREBY OR ANY CONDUCT, ACT OR OMISSION OF MORTGAGEE OR MORTGAGOR, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH MORTGAGEE OR MORTGAGOR, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

1.29     Contractual Statute of Limitations.  Mortgagor hereby agrees that any claim or cause of action by Mortgagor against Mortgagee, or any of Mortgagee's directors, officers, employees, agents, accountants or attorneys, based upon, arising from or relating to the indebtedness secured hereby, or any other matter, cause or thing whatsoever, whether or not relating thereto, occurred, done, omitted or suffered to be done by Mortgagee or by Mortgagee's directors, officers, employees, agents, accountants or attorneys, whether sounding in contract or in tort or otherwise, shall be barred unless asserted by Mortgagor by the commencement of an action or proceeding in a court of competent jurisdiction by the filing of a complaint within one (1) year after Mortgagor first acquires or reasonably should have acquired knowledge of the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based and service of a summons and complaint on an officer of Mortgagee or any other person authorized to accept service of process on behalf of Mortgagee, within thirty (30) days thereafter.  Mortgagor agrees that such one (1) year period of time is reasonable and sufficient time for a borrower to investigate and act upon any such claim or cause of action.  The one (1) year period provided herein shall not be waived, tolled or extended except by the specific written agreement of Mortgagee.  This provision shall survive any termination of this Mortgage or any of the other Loan Documents.

1.30     Management.  The management of the Property shall be by either: (a) Mortgagor or an entity affiliated with Mortgagor approved by Mortgagee for so long as Mortgagor or said affiliated entity is managing the Property in a first class manner; or (b) a professional property management company approved by Mortgagee.  (Mortgagor hereby represents and warrants that Mortgagor is currently managing the Property).  Such management by an affiliated entity or a professional property management company shall be pursuant to a written agreement reasonably approved by Mortgagee.  In no event shall any manager be removed or replaced or the terms of any management agreement modified or amended without the prior written consent of Mortgagee, which consent shall not be unreasonably withheld or delayed.  Mortgagee shall have the right to terminate, or to direct Mortgagor to terminate, such management contract upon thirty (30) days' notice and to retain, or to direct Mortgagor to retain, a new management agent approved by Mortgagee in its sole discretion (w) upon the occurrence of an Event of Default hereunder or under any of the other Loan Documents or a default beyond any applicable grace or cure period under the management contract then in effect, (x) for cause (including, but not limited to, such management agent's gross negligence, misappropriation of funds, willful misconduct or fraud), (y) in the event the debt service coverage ratio for the Property is equal to or less than 1.10:1 computed by Mortgagee as of any date, as reasonably determined by Mortgagee in its sole but reasonable discretion, or (z) in the event of a change in the management and control of Manager, as determined by Mortgagee in its sole but reasonable

-42-

NY:979574.7

Doc#:   86028 Bk:23420 Pg:  275

discretion.  Whenever the approval or consent of Mortgagee is required hereunder, such approval may be conditioned, without limitation, on Mortgagee's obtaining evidence in writing from any rating agency to the effect that the proposed change in management will not result in a re-qualification, reduction, downgrade or withdrawal of any rating initially assigned or to be assigned in a Secondary Market Transaction or, if no such rating has been issued, in Mortgagee's good faith judgment, such change in management shall not have an adverse affect on the level of rating attainable in connection with the loan secured hereby.  All Rents and Profits generated by or derived from the Property shall first be utilized solely for current expenses directly attributable to the ownership and operation of the Property, including, without limitation, current expenses relating to Mortgagor's liabilities and obligations with respect to this Mortgage and the other Loan Documents, and none of the Rents and Profits generated by or derived from the Property shall be diverted by Mortgagor and utilized for any other purposes unless all such current expenses attributable to the ownership and operation of the Property have been fully paid and satisfied.  Any right of payment of Mortgagor (or any manager) arising out of or in any way connected with the management and ownership of the Property shall be fully and completely subordinated to the lien of this Mortgage and the other Loan Documents, and to Mortgagee's right to payment under the Note and the other Loan Documents

    1.31    <u>Hazardous Waste and Other Substances</u>.

    (a)    Mortgagor hereby represents and warrants to Mortgagee that, as of the date hereof: (i) to the best of Mortgagor's knowledge, information and belief, the Property is not in direct or indirect violation of any local, state or federal law, rule or regulation pertaining to environmental regulation, contamination or clean-up (collectively, "Environmental Laws"), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq. and 40 CFR §302.1 et seq.), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq. and 40 CFR §116.1 et seq.), those relating to lead based paint, and the Hazardous Materials Transportation Act (49 U.S.C. §1801 et seq.), and the regulations promulgated pursuant to said laws, all as amended; (ii) except as otherwise disclosed in the Environmental Report, no hazardous, toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, lead based paint, mold, fungus, spores, polychlorinated biphenyls, petroleum products, flammable explosives, radioactive materials, infectious substances or raw materials which include hazardous constituents) or any other substances or materials which are included under or regulated by Environmental Laws (collectively, "Hazardous Substances") are located on or have been handled, generated, stored, processed or disposed of on or released or discharged from the Property (including underground contamination) except for those substances used by Mortgagor or used or sold by the tenants under their Leases in the ordinary course of their business and in compliance with all Environmental Laws; (iii) except as otherwise disclosed in the Environmental Report, the Property is not subject to any private or governmental lien or judicial or administrative notice or action relating to Hazardous Substances; (iv) except as disclosed in the Environmental Reports and to the best of Mortgagor's knowledge, information and belief, there are no existing or closed underground storage tanks or other underground storage receptacles for Hazardous Substances on the Property; (v) Mortgagor has received no notice of, and to the best of Mortgagor's knowledge and belief, there exists no investigation, action,

-43-

Doc#:     8602B Bk:23420 Pg:  276

proceeding or claim by any agency, authority or unit of government or by any third party which could result in any liability, penalty, sanction or judgment under any Environmental Laws with respect to any condition, use or operation of the Property nor does Mortgagor know of any basis for such a claim; and (vi) Mortgagor has received no notice of and, to the best of Mortgagor's knowledge and belief, there has been no claim by any party that any use, operation or condition of the Property has caused any nuisance or any other liability or adverse condition on any other property nor does Mortgagor know of any basis for such a claim. "Environmental Report" means Phase I Environmental Site Assessment dated September 27, 2005 and prepared by IVI International, Inc.

(b)      Except for the presence of Hazardous Substances disclosed in the Environmental Report, Mortgagor shall keep or cause the Property to be kept free from Hazardous Substances (except those substances used or sold by Mortgagor or the tenants of the Property in the ordinary course of its business and in compliance with all Environmental Laws) and in compliance with all Environmental Laws, shall not install or use any underground storage tanks, shall expressly prohibit the use, generation, handling, storage, production, processing and disposal of Hazardous Substances by all tenants of space in the Improvements (except those substances used or sold by the tenants in the ordinary course of their business and in compliance with all Environmental Laws), and, without limiting the generality of the foregoing, during the term of this Mortgage, shall not install in the Improvements or permit to be installed in the Improvements asbestos or any substance containing asbestos.

(c)      Except for those Hazardous Substances disclosed in the Environmental Report, those Hazardous Substances used or sold by Mortgagor or the tenants of the Property in the ordinary course of its business and in compliance with all Environmental Laws: (i) Mortgagor shall promptly notify Mortgagee if Mortgagor shall become aware of the possible existence of any Hazardous Substances on the Property or if Mortgagor shall become aware that the Property is or may be in violation of any Environmental Laws; and (ii) immediately upon receipt of the same, Mortgagor shall deliver to Mortgagee copies of any and all orders, notices, permits, applications, reports, and other communications, documents and instruments pertaining to the actual, alleged or potential presence or existence of any Hazardous Substances at, on, about, under, within, near or in connection with the Property. Mortgagor shall, promptly and when and as required by Environmental Laws, at Mortgagor's sole cost and expense, take all actions as shall be necessary or advisable for the clean-up of any and all portions of the Property or other affected property, including, without limitation, all investigative, monitoring, removal, containment and remedial actions in accordance with all applicable Environmental Laws (and in all events in a manner satisfactory to Mortgagee), and shall further pay or cause to be paid, at no expense to Mortgagee, all clean-up, administrative and enforcement costs of applicable governmental agencies which may be asserted against the Property. In the event Mortgagor fails to do so, Mortgagee may, but shall not be obligated to, cause the Property or other affected property to be freed from any violations of Environmental Laws related to Hazardous Substances or otherwise brought into conformance with Environmental Laws and any and all costs and expenses incurred by Mortgagee in connection therewith, together with interest thereon at the Default Interest Rate from the date incurred by Mortgagee until actually paid by Mortgagor, shall be immediately paid by Mortgagor on demand and shall be secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

-44-

NY:979574.7

Doc#:    86028 Bk:23420 Ps: 277

Mortgagor hereby grants to Mortgagee and its agents and employees, subject to the rights of tenants, access to the Property and a license to remove any items deemed by Mortgagee to be Hazardous Substances (except those used or sold by the tenants or Mortgagor in the ordinary course and in compliance with Environmental Laws) and to do all things Mortgagee shall deem necessary to bring the Property in conformance with Environmental Laws. Mortgagor covenants and agrees, at Mortgagor's sole cost and expense, to indemnify, defend (at trial and appellate levels, and with attorneys, consultants and experts acceptable to Mortgagee), and hold Mortgagee harmless from and against any and all liens, damages, losses, liabilities, obligations, settlement payments, penalties, assessments, citations, directives, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, reasonable attorneys', consultants' and experts' fees and disbursements actually incurred in investigating, defending, settling or prosecuting any claim, litigation or proceeding) which may at any time be imposed upon, incurred by or asserted or awarded against Mortgagee or the Property, and arising directly or indirectly from or out of: (i) the presence, release or threat of release of any Hazardous Substances on, in, under or affecting all or any portion of the Property or any surrounding areas, regardless of whether or not caused by or within the control of Mortgagor; (ii) the violation of any Environmental Laws relating to or affecting the Property, whether or not caused by or within the control of Mortgagor; (iii) the failure by Mortgagor to comply fully with the terms and conditions of this Section 1.31; (iv) the breach of any representation or warranty contained in this Section 1.31; or (v) the enforcement of this Section 1.31, including, without limitation, the cost of assessment, containment and/or removal of any and all Hazardous Substances to the extent required by Environmental Laws from all or any portion of the Property or any surrounding areas if released from the Property, the cost of any actions taken in response to the presence, release or threat of release of any Hazardous Substances on, in, under or affecting any portion of the Property or released from the Property onto any surrounding areas to prevent or minimize such release or threat of release so that it does not migrate or otherwise cause or threaten danger to present or future public health, safety, or the  environment, and costs incurred to comply with the Environmental Laws in connection with all or any portion of the Property or any release of Hazardous Substances from the Property onto surrounding areas. The indemnity set forth in this Section 1.31(c) shall also include any diminution in the value of the security afforded by the Property or any future reduction in the sales price of the Property by reason of any matter set forth in this Section 1.31(c).  Mortgagee's rights under this Section shall survive payment in full of the indebtedness secured hereby and shall be in addition to all other rights of Mortgagee under this Mortgage, the Note and the other Loan Documents.  The foregoing indemnity shall specifically not include any such costs in connection with (i) Mortgagee's gross negligence or willful misconduct or (ii) relating to Hazardous Substances which are initially placed on, in or under the Property after foreclosure or other taking of title to the Property by Mortgagee or its successors or assigns.

(d)    Upon Mortgagee's request, at any time after the occurrence of an Event of Default hereunder or at such other time as Mortgagee has reasonable grounds to believe that Hazardous Substances are or have been released, stored or disposed of on or around the Property in violation of Environmental Laws or that the Property may be in violation of the Environmental Laws, Mortgagor shall provide, at Mortgagor's sole cost and expense, an inspection or audit of the Property prepared by a hydrogeologist or environmental engineer or other appropriate

NY:979574.7



Doc#:      8602B Bk:23420 Pg:  278

consultant approved by Mortgagee indicating the presence or absence of Hazardous Substances on the Property or an inspection or audit of the Improvements prepared by an engineering or consulting firm approved by Mortgagee indicating the presence or absence of friable asbestos or substances containing asbestos on the Property. If Mortgagor fails to provide such inspection or audit within thirty (30) days after such request, Mortgagee may order the same, and Mortgagor hereby grants to Mortgagee and its employees and agents access to the Property and a license to undertake such inspection or audit. The cost of such inspection or audit, together with interest thereon at the Default Interest Rate from the date incurred by Mortgagee until actually paid by Mortgagor, shall be immediately due and payable to Mortgagee by Mortgagor on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

(e)      Reference is made to that certain Hazardous Substances Indemnity Agreement of even date herewith by Mortgagor and Pendleton II, L.L.C. in favor of Mortgagee (the "Hazardous Indemnity Agreement"). The provisions of this Mortgage and the Hazardous Indemnity Agreement shall be read together to maximize the coverage with respect to the subject matter thereof, as determined by Mortgagee.

(f)      If, prior to the date hereof, it was determined that the Property contains Lead Based Paint, Mortgagor had prepared an assessment report describing the location and condition of the Lead Based Paint (a "Lead Based Paint Report"). If, at any time hereafter, Lead Based Paint is suspected of being present on the Property, Mortgagor agrees, at its sole cost and expense and within twenty (20) days thereafter, to cause to be prepared a Lead Based Paint Report prepared by an expert, and in form, scope and substance, acceptable to Mortgagee.



(g)      Mortgagor agrees that if it has been, or if at any time hereafter it is, determined that the Property contains Lead Based Paint, on or before thirty (30) days following (i) the date hereof, if such determination was made prior to the date hereof or (ii) such determination, if such determination is hereafter made, as applicable, Mortgagor shall, at its sole cost and expenses, develop and implement, and thereafter diligently and continuously carry out (or cause to be developed and implemented and thereafter diligently and continually to be carried out), an operations, abatement and maintenance plan for the Lead Based Paint on the Property, which plan shall be prepared by an expert, and be in form, scope and substance, acceptable to Mortgagee (together with any Lead Based Paint Report, the "O&M Plan"). (If an O&M Plan has been prepared prior to the date hereof, Mortgagor agrees to diligently and continually carry out (or cause to be carried out) the provisions thereof). Compliance with the O&M Plan shall require or be deemed to require, without limitation, the proper preparation and maintenance of all records, papers and forms required under the Environmental Laws.

1.32    Indemnification; Subrogation.

(a)      Mortgagor shall indemnify, defend and hold Mortgagee harmless against: (i) any and all claims for brokerage, leasing, finders or similar fees which may be made relating to the Property or by persons engaged by Mortgagor in connection with the secured indebtedness, and (ii) any and all liability, obligations, losses, damages, penalties, claims, actions, suits, costs and expenses (including Mortgagee's reasonable attorneys' fees, together with reasonable appellate counsel fees, if any) of whatever kind or nature which may be asserted against, imposed on or incurred by Mortgagee in connection with the secured indebtedness, this Mortgage, the

-46-

Doc#:   86028 Bk:23420 Ps:   279



Property, or any part thereof, or the exercise by Mortgagee of any rights or remedies granted to it under this Mortgage; provided, however, that nothing herein shall be construed to obligate Mortgagor to indemnify, defend and hold harmless Mortgagee from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs and expenses enacted against, imposed on or incurred by Mortgagee by reason of Mortgagee's willful misconduct or gross negligence or failure to account for funds received.

(b)     If Mortgagee is made a party defendant to any litigation or any claim is threatened or brought against Mortgagee concerning the secured indebtedness, this Mortgage, the Property, or any part thereof, or any interest therein, or the construction, maintenance, operation or occupancy or use thereof, then Mortgagor shall indemnify, defend and hold Mortgagee harmless from and against all liability by reason of said litigation or claims, including reasonable attorneys' fees (together with reasonable appellate counsel fees, if any) and expenses incurred by Mortgagee in any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment. If Mortgagee commences an action against Mortgagor to enforce any of the terms hereof or to prosecute any breach by Mortgagor of any of the terms hereof or to recover any sum secured hereby, Mortgagor shall pay to Mortgagee its reasonable attorneys' fees (together with reasonable appellate counsel fees, if any) and expenses.  The right to such attorneys' fees (together with reasonable appellate counsel fees, if any) and expenses shall be deemed to have accrued on the commencement of such action, and shall be enforceable whether or not such action is prosecuted to judgment. If Mortgagor breaches any term of this Mortgage, Mortgagee may engage the services of an attorney or attorneys to protect its rights hereunder, and in the event of such engagement following any breach by Mortgagor, Mortgagor shall pay Mortgagee reasonable attorneys' fees (together with reasonable appellate counsel fees, if any) and expenses incurred by Mortgagee, whether or not an action is actually commenced against Mortgagor by reason of such breach.  All references to "attorneys" in this Subsection and elsewhere in this Mortgage shall include without limitation any attorney or law firm engaged by Mortgagee and Mortgagee's in-house counsel, and all references to "fees and expenses" in this Subsection and elsewhere in this Mortgage shall include without limitation any reasonable fees of such attorney or law firm and any reasonable allocation charges and allocation costs of Mortgagee's in-house counsel.



(c)     A waiver of subrogation shall be obtained by Mortgagor from its insurance carrier, if any, and, consequently, Mortgagor waives any and all right to claim or recover against Mortgagee, its officers, employees, agents and representatives, for loss of or damage to Mortgagor, the Property, Mortgagor's property or the property of others under Mortgagor's control from any cause insured against or required to be insured against by the provisions of this Mortgage.

1.33   <u>Negative Covenants with Respect to Indebtedness, Operations and Fundamental Changes of Mortgagor</u>.  Mortgagor hereby represents, warrants and covenants, as of the date hereof and until such time as the indebtedness secured hereby is paid in full, that Mortgagor:

A(a)   has not, will not, nor will any partner, limited or general, member or shareholder thereof, as applicable, amend, modify or otherwise change its partnership certificate, partnership agreement, articles of incorporation, by-laws, operating agreement, articles of

-47-

organization, or other formation agreement or document, as applicable, in any material term or manner, or in a manner which adversely affects Mortgagor's existence as a single purpose entity;

(b)     has not and will not enter into any transaction of merger or consolidation, or liquidate or dissolve itself (or suffer any liquidation or dissolution), or acquire by purchase or otherwise all or substantially all the business or assets of, or any stock or other evidence of beneficial ownership of, any entity;

(c)     except pursuant to this Mortgage and the other Loan Documents, has not and will not guarantee, pledge its assets for the benefit of, or otherwise become liable on or in connection with any obligation of any other person or entity;

(d)     has not, does not own and will not own any asset other than (i) the Property, and (ii) incidental personal property necessary for the operation of the Property;

(e)     has not engaged, is not engaged and will not engage, directly or indirectly, in any business other than the ownership, management and operation of the Property;

(f)     has not and will not enter into any contract or agreement with any general partner, member, principal or Affiliate (as hereinafter defined) of the Mortgagor or any Affiliate of the general partner, principal or member of the Mortgagor except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than an Affiliate;

(g)     has not incurred and will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than (i) the indebtedness secured hereby, and (ii) trade payables or accrued expenses which (w) is not evidenced by a note, (x) is incurred in the ordinary course of business of operating the Property with trade creditors and in amounts as are normal and reasonable under the circumstances, (y) is paid prior to the earlier to occur of the 60th day from the date incurred or the date when due and (z) does not to exceed in the aggregate two (2%) percent of the outstanding principal balance of the Loan; and no other debt may be secured (senior, subordinate or pari passu) by the Property;

(h)     has not made and will not make any loans or advances to any third party (including any Affiliate);

(i)     has been, is and will be solvent and pay its debt from its assets as the same shall become due;

(j)     has done or caused to be done and will do all things necessary to preserve its existence, and will not, nor will any partner, limited or general, or shareholder thereof, amend, modify or otherwise change its partnership certificate, partnership agreement, articles of incorporation or bylaws in a manner which adversely affects the Mortgagor's existence as a single purpose entity;

(k)     will conduct and operate its business as presently conducted and operated;

-48-

Doc#:   86028 Bk:23420 Pg:  281

(l)     has maintained and will maintain financial statements, books and records and bank accounts separate from those of its Affiliates, including its general partners and members;

(m)     has held, will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate thereof, including any general partner or member, Affiliate of the general partner or member of the Mortgagor);

(n)     will file its own tax returns or as part of consolidated tax returns;

(o)     has maintained and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(p)     will not seek the dissolution or winding up, in whole or in part, of the Mortgagor;

(q)     except in the operating account maintained by Mortgagor's management agent, has not and will not commingle the funds and other assets of Mortgagor with those of any general partner, member, any Affiliate or any other person so long as at all times the operating account is in the name of or solely for the benefit of Mortgagor and its creditors;

(r)     has and will maintain its assets in such a manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or any other person;

(s)     has not, does not and will not hold itself out to be responsible for the debts or obligations of any other person;

(t)     will not do any act which would make it impossible to carry on the ordinary business of Mortgagor;

(u)     will not possess or assign the Property or incidental personal property necessary for the operation of the Property for other than a business or company purpose;

(v)     except as otherwise permitted by this Mortgage, has not and will not sell, encumber or otherwise dispose of all or substantially all of the Property or incidental personal property necessary for the operation of the Property;

(w)     has not and will not hold title to Mortgagor's assets other than in Mortgagor's name; and

(x)     without the unanimous affirmative vote of the Mortgagor's members, including the affirmative vote of any Independent Directors, has not instituted, will not institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy

-49-

NY:979574.7

or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Mortgagor or a substantial part of Mortgagor's property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due; or take any action in furtherance of any such action.

B (a)   If Mortgagor is a limited partnership or a limited liability company (other than a Delaware single member limited liability company), its general partner or managing member (the "SPC Entity") shall be a corporation whose sole asset is its interest in Mortgagor and the SPC Entity will at all times comply, and will cause Mortgagor to comply, with each of the representations, warranties, and covenants contained in this Paragraph 1.33 as if such representation, warranty or covenant was made directly by such general partner or managing member. An SPC Entity is one that:

(i)      if a corporation, must have at least one Independent Director (as hereinafter defined), or if requested by Mortgagee (which request Mortgagor shall comply with within five (5) business days) in connection with a Secondary Market Transaction, two Independent Directors, and must not take any action that, under the terms of any certificate or articles of incorporation, by-laws, or any voting trust agreement with respect to such entity's common stock, requires the unanimous affirmative vote of 100% of the members of the board of directors unless all of the directors, including, without limitation, all Independent Directors, shall have participated in such vote ("SPE Corporation");

(ii)     if a limited partnership, must have each general partner be an SPE Corporation; and

(iii)    if a limited liability company, must have one managing member (the "SPE Member") and such managing member must be an SPE Corporation. Only the SPE Member may be designated as a manager under Mortgagor's operating agreement and pursuant to the law where Mortgagor is organized. Mortgagor may be a single member Delaware limited liability company without an SPE Corporation managing member so long as Mortgagor complies with the provisions set forth in Sections 1.33 B and 1.33 C below.

C    In the event Mortgagor is a single-member Delaware limited liability company, the limited liability company agreement of Mortgagor (the "LLC Agreement") shall provide that (i) upon the occurrence of any event that causes the sole member of Mortgagor ("Member") to cease to be the member of Mortgagor (other than (A) upon an assignment by Member of all of its limited liability company interest in Mortgagor and the admission of the transferee, or (B) the resignation of Member and the admission of an additional member in either case in accordance with the terms of the Loan Documents and the LLC Agreement), any person acting as Independent Director of Mortgagor shall without any action of any other Person and simultaneously with the Member ceasing to be the member of Mortgagor, automatically be admitted to Mortgagor ("Special Member") and shall continue Mortgagor without dissolution and (ii) Special Member may not resign from Mortgagor or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to Mortgagor as Special Member in accordance with requirements of Delaware law and (B) such successor Special Member has also

-50-

Doc#:    86028 Bk:23420 Pg:   283

accepted its appointment as an Independent Director. The LLC Agreement shall further provide that (i) Special Member shall automatically cease to be a member of Mortgagor upon the admission to Mortgagor of a substitute Member, (ii) Special Member shall be a member of Mortgagor that has no interest in the profits, losses and capital of Mortgagor and has no right to receive any distributions of Mortgagor assets, (iii) pursuant to Section 18-301 of the Delaware Limited Liability Company Act (the "Act"), Special Member shall not be required to make any capital contributions to Mortgagor and shall not receive a limited liability company interest in Mortgagor, (iv) Special Member, in its capacity as Special Member, may not bind Mortgagor, and (v) except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, Mortgagor, including, without limitation, the merger, consolidation or conversion of Mortgagor; provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Director, to vote on such matters required by the Loan Documents or the LLC Agreement. In order to implement the admission to Mortgagor of Special Member, Special Member shall execute a counterpart to the LLC Agreement. Prior to its admission to Mortgagor as Special Member, Special Member shall not be a member of Mortgagor. Upon the occurrence of any event that causes the Member to cease to be a member of Mortgagor, to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in Mortgagor, agree in writing (i) to continue Mortgagor and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Mortgagor, effective as of the occurrence of the event that terminated the continued membership of Member of Mortgagor in Mortgagor. Any action initiated by or brought against Member or Special Member under any creditors rights laws shall not cause Member or Special Member to cease to be a member of Mortgagor and upon the occurrence of such an event, the business of Mortgagor shall continue without dissolution. The LLC Agreement shall provide that each of Member and Special Member waives any right it might have to agree in writing to dissolve Mortgagor upon the occurrence of any action initiated by or brought against Member or Special Member under any creditors rights laws, or the occurrence of an event that causes Member or Special Member to cease to be a member of Mortgagor.

As used in this Section 1.33, "Independent Director" shall mean a duly appointed member of the board of directors of any SPE Corporation or board of managers or of a single member Delaware limited liability company which is an SPE who is provided by a nationally-recognized company that provides professional independent directors who shall not have been at the time of initial appointment or at any time while serving as an Independent Director, and may not have been at any time (i) a stockholder, director, officer, employee, partner, attorney or counsel of such SPE Corporation, single member Delaware limited liability company which is an SPE, Mortgagor or any affiliate of any of them, (ii) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with such SPE Corporation, single member Delaware limited liability company which is an SPE, Mortgagor or any affiliate of any of them, (iii) a Person or other entity controlling or under common control with any such stockholder, partner, customer, supplier or other Person, or (iv) a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to

-51-

direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.  As used herein, the term "Affiliate" shall mean:  (1)  any person or entity directly or indirectly owning, controlling or holding with power to vote ten percent (10%) or more of the outstanding voting securities or interests of such other person or entity; (2) any person or entity ten percent (10%) or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by such other person or entity; (3) any person or entity directly or indirectly controlling, controlled by or under common control with such other person or entity; (4) any officer, director or partner of such other person or entity; (5) if such other person or entity is an officer, director or partner, any company for which such person or entity acts in any such capacity; and (6) any close relative or spouse of the specified person.

　　　1.34　Rent Reserve.  On the date hereof, Mortgagor shall deposit $251,262 with Mortgagee as a deposit to a reserve (the "the Rent Reserve Account").  Provided no Event of Default is continuing, Mortgagee shall advance to itself on each Payment Date through and including December 11, 2007, an amount equal to $10,469.25 (the "Payment") for deposit into the Cash Collateral Account (as defined in the Cash Management Agreement) to be used for the payment of the items set forth in Section 3(a) (First through Eighth) of the Cash Management Agreement as if such Payment were Rent.  Mortgagee's failure to disburse funds from the Rent Account shall not relieve Mortgagor of its obligation to pay all amounts due Mortgagee in accordance with this Mortgage on any Payment Date.  Mortgagor acknowledges that Mortgagee has no obligation to disburse more than the remaining balance of the Rent Reserve Account if such amount is less than the full Payment due.  Nothing contained herein, including, without limitation, the existence of the Rent Account, shall release Mortgagor of any obligation to make payments under the Note, this Mortgage or the other Loan Documents strictly in accordance with the terms hereof or thereof.

　　　1.35　Leasing Reserve.  A.  Upon the occurrence and during the continuance of a "Cash Trap Event" (as hereinafter defined) until the occurrence of a "Cash Trap Cessation Event" (as hereinafter defined), any excess amounts remaining after the allocation of all Rents pursuant to Section 3(a) (items First through Seventh) of the Cash Management Agreement shall be paid by Mortgagor to Mortgagee to a reserve (the "Leasing Reserve") as additional security for the indebtedness secured hereby and to be held and/or disbursed for tenant improvements and up-front leasing costs, including by way of example only, relocation allowances, tenant improvement allowances, rent concessions, commissions and attorneys' fees ("Leasing Costs") to retain or replace Core.  Upon the execution of any Lease with respect to which Mortgagor is obligated to undertake or pay for any Leasing Costs, Mortgagor shall submit to Mortgagee a copy of the executed Lease for which such Leasing Costs relate.  So long as no Event of Default has occurred, sums in the Leasing Reserve shall be held by Mortgagee to pay Leasing Costs.  Additionally, so long as no Event of Default has occurred, Mortgagee shall, to the extent funds are available for such purpose in the Leasing Reserve, disburse to Mortgagor the amount paid by Mortgagor in performing such Leasing Costs following:  (a) the receipt by Mortgagee of a written request from Mortgagor for disbursement from the Leasing Reserve and a certification by Mortgagor that (i) for Leasing Costs consisting of commissions payable to brokers not affiliated with Mortgagor and at a rate not greater than the then-current market rate, such leasing commission has been paid by Mortgagor, and (ii) for Leasing Costs consisting of amounts

-52-

required to be expended pursuant to the relevant Lease for tenant improvement or related costs, said Leasing Costs have been paid and the tenant under such Lease has taken possession of its demised premises and begun to pay rent under its Lease, (b) the delivery to Mortgagee of invoices, receipts or other evidence satisfactory to Mortgagee verifying the cost of such Leasing Costs; (c) for disbursement requests in excess of $20,000.00, the delivery to Mortgagee of affidavits, lien waivers or other evidence reasonably satisfactory to Mortgagee showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished material or labor to the property have been paid (or will be paid out of such disbursement) all amounts due for labor and materials furnished to the Property; (d) for disbursement requests in excess of $20,000.00 (other than with respect to leasing commissions), delivery to Mortgagee of a certification from an inspecting architect or other third party acceptable to Mortgagee describing the completed tenant improvement or other work, and verifying the completion and the value thereof; (e) for disbursement requests in excess of $20,000.00 (other than with respect to leasing commissions), delivery to Mortgagee of a new certificate of occupancy for the portion of the Improvements covered by such Lease, if said new certificate of occupancy was required by law, or a certification by Mortgagor that no new certificate of occupancy was required and (f) the receipt by Mortgagee of an administrative fee in the amount of $150.00. Mortgagee shall also pay such servicing fees related to the Leasing Reserve as are normally and customarily charged by the servicer of the Loan for administrating similar leasing reserves. In making any payment from the Leasing Reserve, Mortgagee shall be entitled to rely on such request from Mortgagor without any inquiry into the accuracy, validity or contestability of any such amount. The Leasing Reserve shall not, unless otherwise explicitly required by applicable law, be or be deemed to be escrow or trust funds, but, at Mortgagee's option and in Mortgagee's discretion, may either be held in a separate account or be commingled by Mortgagee with the general funds of Mortgagee. No interest on the funds contained in the Leasing Reserve shall be paid by Mortgagee to Mortgagor. The Leasing Reserve is solely for the protection of Mortgagee and entails no responsibility on Mortgagee's part beyond the payment of the costs and expenses described in this paragraph in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received. In the event that the amounts on deposit or available in the Leasing Reserve are inadequate to pay Leasing Costs in connection with any Lease, Mortgagor shall pay the amount of such deficiency.

B.   Upon satisfaction of the conditions set forth in the definition of Cash Trap Cessation Event with Core or a bona fide third party tenant acceptable to Mortgagee in its sole discretion, after application of any such funds for Leasing Costs, provided no Event of Default has occurred and is continuing, the balance of the funds in the Leasing Reserve shall be returned to Mortgagor and Mortgagor's obligations to make the foregoing monthly deposits to the Leasing Reserve shall be discontinued.

As used herein: "Cash Trap Event" shall mean the period of time commencing upon the occurrence of the earlier to occur of (1) Mortgagor's receipt of notice (whether written, oral or otherwise) that Core intends not to renew or extend the Core Lease and/or to terminate the Core Lease, (2) Core's failure to deliver to Mortgagor a notice to renew or to extend the Core Lease by December 11, 2012 pursuant to and in accordance with the applicable provisions of the Core Lease, (3) Core (i) vacates the Property or "goes dark" and (ii) ceases payment of base rent

-53-

Doc#:   86028 Bk:23420 Pg: 286

due under the its lease with Mortgagor, and (4) Core becomes bankrupt or insolvent or becomes a debtor in bankruptcy or insolvency proceeding, and continuing thereafter unless and until the occurrence of a Cash Trap Cessation Event (as hereinafter defined).

As used herein, "Cash Trap Cessation Event" shall mean, provided no Event of Default has occurred and is continuing, the occurrence of:

(x) Mortgagee's receipt of evidence in form and substance satisfactory to Mortgagee that Core (1) has renewed or extended the Core Lease pursuant to and in accordance with the applicable provisions thereof, or (2) has entered into a new lease for all of the Property on economic terms at least as favorable as those contained in the Core Lease (including, without limitation, for base rent in an amount equal to or greater than the then current base rent set forth in the Core Lease) and otherwise in form and substance reasonably satisfactory to Mortgagee and for a term expiring on or after January 31, 2021 (the "Core Renewal Lease"), which evidence shall include, without limitation, (1) a copy of the renewal or extension of the Core Lease or the Core Renewal Lease, as applicable, and (2) a tenant estoppel certificate from Core which shall be in form and substance satisfactory to Mortgagee and provide, among other things, (A) that Core is occupying all of the Property, is open for business and is paying base rent in accordance with the Core Lease (as renewed or extended) or the Core Renewal Lease, as applicable, (B) that all of the obligations of Mortgagor under the applicable Lease which are required to be fulfilled as of the date of the tenant estoppel certificate have been duly performed and completed including, without limitation, any obligations of Mortgagor to make or to pay or reimburse Core for any tenant improvements at the Property, (C) that the improvements described in the applicable Lease have been constructed in accordance with the plans and specifications therefor and have been accepted by Core, (D) that Core is not then entitled to any concession or rebate of rent or other charges from time to time due and payable under the applicable Lease, (E) that there are no unpaid or unreimbursed construction or other allowances or other offsets due Core under the applicable Lease which are then due and payable, and (F) that there are no defaults by Mortgagor under the applicable Lease, or

(y) Mortgagee's receipt of (1) evidence in form and substance satisfactory to Mortgagee that a replacement tenant or tenants satisfactory to Mortgagee in its sole discretion (collectively, the "Core Replacement Tenant") has entered into a lease or leases, as applicable, for all of the space at the Property occupied Core on economic terms at least as favorable as those contained in the Core Lease (including, without limitation, for base rent in an amount equal to or greater than the then current base rent set forth in the Core Lease) and otherwise in form and substance reasonably satisfactory to Mortgagee and for a term expiring on or after January 31, 2021 (the "Core Replacement Lease"), which evidence shall include, without limitation, (A) a copy of the Core Replacement Lease and (B) a tenant estoppel certificate from the Core Replacement Tenant which shall be in form and substance satisfactory to Mortgagee and provide, among other things, (i) that the Core Replacement Tenant is occupying all of the Property, is open for business and is paying base rent in accordance with the Core Replacement Lease, (ii) that all of the obligations of Mortgagor under the Core Replacement Lease which are required to be fulfilled as of the date of the tenant estoppel certificate have been duly performed and completed including, without limitation, any obligations of Mortgagor to make or to pay or reimburse the Core Replacement Tenant for any tenant improvements at the Property, (iii) that

-54-

the improvements described in the Core Replacement Lease have been constructed in accordance with the plans and specifications therefor and have been accepted by the Core Replacement Tenant, (iv) that the Core Replacement Tenant is not then entitled to any concession or rebate of rent or other charges from time to time due and payable under the Core Replacement Lease, (v) that there are no unpaid or unreimbursed construction or other allowances or other offsets due the Core Replacement Tenant under the Core Replacement Lease which are then due and payable, and (vi) that there are no defaults by Mortgagor under the Core Replacement Lease), and (2) a subordination, non-disturbance and attornment agreement from the Core Replacement Tenant in form and substance satisfactory to Mortgagee.

1.36    Cash Management Agreement.  On or before the date hereof Mortgagor covenants and agrees to enter into one or more servicing account agreements, lockbox servicing agreements and/or cash management agreements acceptable to Mortgagee between Mortgagor, Manager, Mortgagee and, as applicable, one or more certain financial institutions (together with any modification, amendment, substitution or replacement thereof, hereinafter collectively referred to as the "**Cash Management Agreement**").  All Rents and Profits shall be applied as set forth in the Cash Management Agreement and the escrows and reserves required hereunder shall be funded as provided therein.  Mortgagor shall pay all costs and expenses of the servicer and any bank as required under the Cash Management Agreement.  Upon the occurrence of an Event of Default, Mortgagee may apply any sums then held pursuant to the Cash Management Agreement to the payment of the indebtedness secured hereby in any order in its sole discretion. Until expended or applied, amounts held pursuant to the Cash Management Agreement shall constitute additional security for the indebtedness secured hereby.

ARTICLE II
EVENTS OF DEFAULT

2.1    Events of Default.  The occurrence of any of the following events (each, an "Event of Default") shall be an Event of Default hereunder:

(a)    Mortgagor fails to pay (i) any scheduled payment (whether such amount is interest, principal, Reserves, or otherwise) owing to Mortgagee as and when the same is due under the Note, this Mortgage, or any of the other Loan Documents, or (ii) any other amount from time to time owing to Mortgagee under the Note, this Mortgage or any of the other Loan Documents.

(b)    Mortgagor fails to provide insurance as required by Section 1.4 hereof or fails to perform any covenant, agreement, obligation, term or condition set forth in Sections 1.5, 1.15, 1.31, 1.33 or 1.34 hereof.

(c)    Mortgagor fails to perform any other covenant, agreement, obligation, term or condition set forth herein other than those otherwise described in this Section 2.1 and, to the extent such failure or default is susceptible of being cured, the continuance of such failure or default for thirty (30) days after written notice thereof from Mortgagee to Mortgagor; provided, however, that if such default is susceptible of cure but such cure cannot be accomplished with reasonable diligence within said period of time, and if Mortgagor commences to cure such default promptly after receipt of notice thereof from Mortgagee, and thereafter prosecutes the

curing of such default with reasonable diligence, such period of time shall be extended for such period of time as may be necessary to cure such default with reasonable diligence, but not to exceed an additional ninety (90) days.

(d)    Any representation or warranty made herein, in or in connection with any application or commitment relating to the loan evidenced by the Note, or in any of the other Loan Documents to Mortgagee by Mortgagor, by any principal or general partner, manager or member in Mortgagor or by any indemnitor or guarantor under any indemnity or guaranty executed in connection with the loan secured hereby is determined by Mortgagee to have been false or misleading in any material respect at the time made.

(e)    There shall be a sale, conveyance, disposition, alienation, hypothecation, leasing, assignment, pledge, mortgage, granting of a security interest in  or other transfer or further encumbrancing of the Property, Mortgagor or its general partners or members, or any portion thereof or any interest therein, in violation of Section 1.13 hereof.

(f)    An Event of Default or default occurs under any of the other Loan Documents which has not been cured within any applicable grace or cure period therein provided.

(g)    Mortgagor, any principal, managing member or general partner in Mortgagor or any indemnitor or guarantor under any indemnity or guaranty executed in connection with the loan secured hereby becomes insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors, shall file a petition in bankruptcy, shall voluntarily be adjudicated insolvent or bankrupt or shall admit in writing the inability to pay debts as they mature, shall petition or apply to any tribunal for or shall consent to or shall not contest the appointment of a receiver, trustee, custodian or similar officer for Mortgagor, for any such principal, managing member or general partner of Mortgagor or for any such indemnitor or guarantor or for a substantial part of the assets of Mortgagor, of any such principal, managing member or general partner of Mortgagor or of any such indemnitor or guarantor, or shall commence any case, proceeding or other action under any bankruptcy, reorganization, arrangement, readjustment or debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect.

(h)    (i) A petition is filed or any case, proceeding or other action is commenced against Mortgagor, against any principal, managing member or general partner of Mortgagor or against any indemnitor or guarantor under any indemnity or guaranty executed in connection with the loan secured hereby seeking to have an order for relief entered against it as debtor or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or other relief under any law relating to bankruptcy, insolvency, arrangement, reorganization, receivership or other debtor relief under any law or statute of any jurisdiction whether now or hereafter in effect or a court of competent jurisdiction enters an order for relief against Mortgagor, against any principal, managing member or general partner of Mortgagor or against any indemnitor or guarantor under any indemnity or guaranty executed in connection with the loan secured hereby, as debtor, or an order, judgment or decree is entered appointing, with or without the consent of Mortgagor, of any such principal, managing member or general partner of Mortgagor or of any such indemnitor or guarantor, a receiver, trustee, custodian or similar officer

-56-

Doc#:    86028 Bk#23420 Pg:  289

for Mortgagor, for any such principal, managing member or general partner of Mortgagor or for any such indemnitor or guarantor, or for any substantial part of any of the properties of Mortgagor, of any such principal, managing member or general partner of Mortgagor or of any such indemnitor or guarantor, and (ii) if any such event shall occur, such petition, case, proceeding, action, order, judgment or decree shall not be dismissed within sixty (60) days after being commenced.

(i)     The Property or any part thereof shall be taken on execution or other process of law except condemnation in any action against Mortgagor.

(j)     Mortgagor abandons all or a portion of the Property.

(k)     The holder of any lien or security interest on the Property (without implying the consent of Mortgagee to the existence or creation of any such lien or security interest), whether superior or subordinate to this Mortgage or any of the other Loan Documents, declares a default and such default is not cured within any applicable grace or cure period set forth in the applicable document and such holder institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

(l)     The Property, or any part thereof, is subjected to actual or threatened waste or to removal, demolition or material alteration so that the value of the Property is materially diminished thereby and Mortgagee determines (in its subjective determination) that it is not adequately protected from any loss, damage or risk associated therewith; provided, however, that no action taken by the tenant under the Core Lease which is authorized by the terms of the Core Lease shall constitute an Event of Default.

(m)     Any dissolution, termination, partial or complete liquidation, merger or consolidation of Mortgagor, any of its principals or any general partner or any managing member.

(n)     SPC Entity fails to perform any covenant, agreement, obligation, terms or condition of Section 1.33 hereof.

(o)     If Mortgagor transfers any of its tenancy-in-common interests without the prior written consent of Mortgagee except as permitted in Section 1.13, or if Mortgagor has the Property partitioned or files a complaint or institutes any proceeding at law or in equity to have the Property partitioned, or if Mortgagor fails to comply with any of the provisions contained in the TIC Agreement (as defined herein) and the default is not cured by any of the entities comprising Mortgagor.

(p)     If the Core Lease terminates or Mortgagor is otherwise in default in fulfillment of any material obligation after the expiration of any applicable grace or notice period.

(q)     There shall occur any default by Mortgagor, as lessee under the Parking Spaces Lease, in the observance or performance of any term, covenant or condition of the Parking Spaces Lease on the part of Mortgagor, to be observed or performed or any other document executed in connection therewith, and said default is not cured within five (5) days

-57-

Doc#:   86028 Bk:23420 Ps:  290

prior to the expiration of any applicable grace period therein provided, or any one or more of the events referred to in the Parking Spaces Lease shall occur which would cause the Parking Spaces Lease to terminate without notice or action by the Parking Spaces Lessor or which would entitle the Parking Spaces Lessor to terminate the Parking Spaces Lease and the term thereof by giving notice to Mortgagor, as tenant thereunder, or if the leasehold estate created by the Parking Spaces Lease shall be surrendered or the Parking Spaces Lease shall be terminated or cancelled for any reason or under any circumstances whatsoever, or any of the terms, covenants or conditions of the Parking Spaces Lease shall in any manner be modified, changed, supplemented, altered or amended without the written consent of Mortgagee.

## ARTICLE III
## REMEDIES

3.1     Remedies Available.  If there shall occur an Event of Default under this Mortgage, then this Mortgage is subject to foreclosure as provided by law and Mortgagee may, at its option and by or through a trustee, nominee, assignee or otherwise, to the fullest extent permitted by law, exercise any or all of the following rights, remedies and recourses, either successively or concurrently:

(a)     Acceleration.  Accelerate the maturity date of the Note and declare any or all of the indebtedness secured hereby to be immediately due and payable without any presentment, demand, protest, notice, or action of any kind whatever (each of which is hereby expressly waived by Mortgagor), whereupon the same shall become immediately due and payable.  Upon any such acceleration, payment of such accelerated amount shall constitute a prepayment of the principal balance of the Note and any applicable prepayment fee provided for in the Note shall then be immediately due and payable.

(b)     Entry on the Property.  Either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, subject to the rights of the tenants and other occupants under the Leases under any applicable subordination, non-disturbance and attornment agreement, enter upon and take possession of the Property, or any part thereof, without force or with such force as is permitted by law and without notice or process or with such notice or process as is required by law unless such notice and process is waivable, in which case Mortgagor hereby waives such notice and process, and do any and all acts and perform any and all work which may be desirable or necessary in Mortgagee's judgment to complete any unfinished construction on the Real Estate, to preserve the value, marketability or rentability of the Property, to increase the income therefrom, to manage and operate the Property or to protect the security hereof and all sums expended by Mortgagee therefor, together with interest thereon at the Default Interest Rate, shall be immediately due and payable to Mortgagee by Mortgagor on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

(c)     Collect Rents and Profits.  With or without taking possession of the Property, sue or otherwise collect the Rents and Profits, including those past due and unpaid.

-58-

NY:979574.7

Doc#: 86028 Bk:23420 Pg: 291

(d)   Appointment of Receiver.   Upon, or at any time prior or after, initiating the exercise of any power of sale, instituting any judicial foreclosure or instituting any other foreclosure of the liens and security interests provided for herein or any other legal proceedings hereunder, make application to a court of competent jurisdiction for appointment of a receiver for all or any part of the Property, as a matter of strict right and without notice to Mortgagor and without regard to the adequacy of the Property for the repayment of the indebtedness secured hereby or the solvency of Mortgagor or any person or persons liable for the payment of the indebtedness secured hereby, and Mortgagor does hereby irrevocably consent to such appointment, waives any and all notices of and defenses to such appointment and agrees not to oppose any application therefor by Mortgagee, but nothing herein is to be construed to deprive Mortgagee of any other right, remedy or privilege Mortgagee may now have under the law to have a receiver appointed, provided, however, that, the appointment of such receiver, trustee or other appointee by virtue of any court order, statute or regulation shall not impair or in any manner prejudice the rights of Mortgagee to receive payment of the Rents and Profits pursuant to other terms and provisions hereof.   Any such receiver shall have all of the usual powers and duties of receivers in similar cases, including, without limitation, the full power to hold, develop, rent, lease, manage, maintain, operate and otherwise use or permit the use of the Property upon such terms and conditions as said receiver may deem to be prudent and reasonable under the circumstances as more fully set forth in Section 3.3 below.   Such receivership shall, at the option of Mortgagee, continue until full payment of all of the indebtedness secured hereby or until title to the Property shall have passed by foreclosure sale under this Mortgage or deed in lieu of foreclosure.

(e)   Foreclosure.   Immediately commence an action to foreclose this Mortgage or to specifically enforce its provisions or any of the indebtedness secured hereby pursuant to the statutes in such case made and provided and sell the Property or cause the Property to be sold in accordance with the requirements and procedures provided by said statutes in a single parcel or in several parcels at the option of Mortgagee.

(1)   In the event foreclosure proceedings are filed by Mortgagee, all expenses incident to such proceeding, including, but not limited to, reasonable attorneys' fees and costs, shall be paid by Mortgagor and secured by this Mortgage and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.   The secured indebtedness and all other obligations secured by this Mortgage, including, without limitation, interest at the Default Interest Rate (as defined in the Note), any prepayment charge, fee or premium required to be paid under the Note in order to prepay principal (to the extent permitted by applicable law), attorneys' fees and any other amounts due and unpaid to Mortgagee under the Loan Documents, may be bid by Mortgagee in the event of a foreclosure sale hereunder.   In the event of a judicial sale pursuant to a foreclosure decree, it is understood and agreed that Mortgagee or its assigns may become the purchaser of the Property or any part thereof.

-59-



Doc#:    86028 Bk:23420 Ps: 292

(f)     Other.  Exercise any other right or remedy available hereunder, under any of the other Loan Documents or at law or in equity.

3.2     Application of Proceeds.   To the fullest extent permitted by law, the proceeds of any sale under this Mortgage shall be applied to the extent funds are so available to the following items in such order as Mortgagee in its discretion may determine:

(a)     To payment of the costs, expenses and fees of taking possession of the Property, and of holding, operating, maintaining, using, leasing, repairing, improving, marketing and selling the same and of otherwise enforcing Mortgagee's right and remedies hereunder and under the other Loan Documents, including, but not limited to, receivers' fees, court costs, attorneys', accountants', appraisers', managers' and other professional fees, title charges and transfer taxes.

(b)     To payment of all sums expended by Mortgagee under the terms of any of the Loan Documents and not yet repaid, together with interest on such sums at the Default Interest Rate.

(c)     To payment of the secured indebtedness and all other obligations secured by this Mortgage, including, without limitation, interest at the Default Interest Rate and, to the extent permitted by applicable law, any prepayment fee, charge or premium required to be paid under the Note in order to prepay principal, in any order that Mortgagee chooses in its sole discretion.

The remainder, if any, of such funds shall be disbursed to Mortgagor or to the person or persons legally entitled thereto.

3.3     Right and Authority of Receiver or Mortgagee in the Event of Default; Power of Attorney.  Upon the occurrence of an Event of Default hereunder, which default is not cured within any applicable grace or cure period, and entry upon the Property pursuant to Section 3.1(b) hereof or appointment·of a receiver pursuant to Section 3.1(d) hereof, and under such terms and conditions as may be prudent and reasonable under the circumstances in Mortgagee's or the receiver's sole discretion, all at Mortgagor's expense, Mortgagee or said receiver, or such other persons or entities as they shall hire, direct or engage, as the case may be, may do or permit one or more of the following, successively or concurrently: (a) subject to applicable law, enter upon and take possession and control of any and all of the Property, subject to the rights of tenants and other occupants under subordination, non-disturbance and attornment agreements; (b) take and maintain possession of all documents, books, records, papers and accounts relating to the Property; (c) subject to applicable law, exclude Mortgagor and its agents, servants and employees wholly from the Property; (d) manage and operate the Property; (e) preserve and maintain the Property; (f) make repairs and alterations to the Property; (g) complete any construction or repair of the Improvements, with such changes, additions or modifications of the plans and specifications or intended disposition and use of the Improvements as Mortgagee may in its sole discretion deem appropriate or desirable to place the Property in such condition as will, in Mortgagee's sole discretion, make it or any part thereof readily marketable or rentable; (h) conduct a marketing or leasing program with respect to the Property, or employ a marketing or leasing agent or agents to do so, directed to the leasing or sale of the Property under such terms

-60-

Doc#:    86028 Bk:23420 Pg:   293

and conditions as Mortgagee may in its sole discretion deem appropriate or desirable; (i) employ such contractors, subcontractors, materialmen, architects, engineers, consultants, managers, brokers, marketing agents, or other employees, agents, independent contractors or professionals, as Mortgagee may in its sole discretion deem appropriate or desirable to implement and effectuate the rights and powers herein granted; (j) execute and deliver, in the name of Mortgagee as attorney-in-fact and agent of Mortgagor or in its own name as Mortgagee, such documents and instruments as are necessary or appropriate to consummate authorized transactions; (k) enter into such leases, whether of real or personal property, or tenancy agreements, under such terms and conditions as Mortgagee may in its sole discretion deem appropriate or desirable; (l) collect and receive the Rents and Profits from the Property; (m) eject Tenants or repossess personal property, as provided by law, for breaches of the conditions of their Leases; (n) sue for unpaid Rents and Profits, payments, income or proceeds in the name of Mortgagor or Mortgagee; (o) maintain actions in forcible entry and detainer, ejectment for possession and actions in distress for rent; (p) compromise or give acquittance for Rents and Profits, payments, income or proceeds that may become due; (q) delegate or assign any and all rights and powers given to Mortgagee by this Mortgage; and (r) do any acts which Mortgagee in its sole discretion deems appropriate or desirable to protect the security hereof and use such measures, legal or equitable, as Mortgagee may in its sole discretion deem appropriate or desirable to implement and effectuate the provisions of this Mortgage.  This Mortgage shall constitute a direction to and full authority to any lessee, or other third party who has heretofore dealt or contracted or may hereafter deal or contract with Mortgagor or Mortgagee, at the request of Mortgagee, to pay all amounts owing under any Lease, contract, concession, license or other agreement to Mortgagee without proof of the Event of Default relied upon.  Any such lessee or third party is hereby irrevocably authorized to rely upon and comply with (and shall be fully protected by Mortgagor in so doing) any request, notice or demand by Mortgagee for the payment to Mortgagee of any Rents and Profits or other sums which may be or thereafter become due under its Lease, contract, concession, license or other agreement, or for the performance of any undertakings under any such Lease, contract, concession, license or other agreement, and shall have no right or duty to inquire whether any Event of Default under this Mortgage or under any of the other Loan Documents has actually occurred or is then existing.  Mortgagor hereby constitutes and appoints Mortgagee, its assignees, successors, transferees and nominees, as Mortgagor's true and lawful attorney-in-fact and agent, with full power of substitution in the Property, in Mortgagor's name, place and stead, to do or permit any one or more of the foregoing described rights, remedies, powers and authorities, successively or concurrently, and said power of attorney shall be deemed a power coupled with an interest and irrevocable so long as any indebtedness secured hereby is outstanding.  Any money advanced by Mortgagee in connection with any action taken under this Section 3.3, together with interest thereon at the Default Interest Rate from the date of making such advancement by Mortgagee until actually paid by Mortgagor, shall be a demand obligation owing by Mortgagor to Mortgagee and shall be secured by this Mortgage and by every other instrument securing the secured indebtedness.

       3.4    <u>Occupancy After Foreclosure</u>.  In the event there is a foreclosure sale hereunder and at the time of such sale, Mortgagor or Mortgagor's representatives, successors or assigns, or any other persons claiming any interest in the Property by, through or under Mortgagor (except tenants of space in the Improvements subject to Leases either entered into prior to the date hereof or which are the subject of subordination, non-disturbance and attornment

Doc#: 86028 Bk:23420 Pg: 294



agreements), are occupying or using the Property, or any part thereof, then, to the extent not prohibited by applicable law, each and all shall, at the option of Mortgagee or the purchaser at such sale, as the case may be, immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the Property occupied or used, such rental to be due daily to the purchaser. Further, to the extent permitted by applicable law, in the event the tenant fails to surrender possession of the Property upon the termination of such tenancy, the purchaser shall be entitled to institute and maintain an action for unlawful detainer of the Property in the appropriate court of the county in which the Real Estate is located.

3.5    Notice to Account Debtors.    Mortgagee may, at any time after an Event of Default notify the account debtors and obligors of any accounts, chattel paper, negotiable instruments or other evidences of indebtedness, to Mortgagor included in the Property to pay Mortgagee directly.    Mortgagor shall at any time or from time to time upon the request of Mortgagee provide to Mortgagee a current list of all such account debtors and obligors and their addresses.

3.6    Cumulative Remedies.    All remedies contained in this Mortgage are cumulative and Mortgagee shall also have all other remedies provided at law and in equity or in any other Loan Documents.    Such remedies may be pursued separately, successively or concurrently at the sole subjective direction of Mortgagee and may be exercised in any order and as often as occasion therefor shall arise.    No act of Mortgagee shall be construed as an election to proceed under any particular provisions of this Mortgage to the exclusion of any other provision of this Mortgage or as an election of remedies to the exclusion of any other remedy which may then or thereafter be available to Mortgagee.    No delay or failure by Mortgagee to exercise any right or remedy under this Mortgage shall be construed to be a waiver of that right or remedy or of any Event of Default hereunder.    Mortgagee may exercise any one or more of its rights and remedies at its option without regard to the adequacy of its security.

3.7    Payment of Expenses.    (a) Mortgagor shall pay on demand all of Mortgagee's fees and expenses incurred in connection with (i) Mortgagor's performance of and compliance with Mortgagor's respective agreements and covenants contained in this Mortgage and the other Loan Documents on its part to be performed or complied with after the date hereof, (ii) the administration of the loan secured hereby and (iii) obtaining the consent or approval of the Mortgagee for all actions requiring the consent or approval of Mortgagee under the Loan Documents and (iv) any efforts to enforce any terms of this Mortgage, whether or not any lawsuit is filed and whether or not foreclosure is commenced but not completed, including, but not limited to, reasonable legal fees and disbursements, foreclosure costs and title charges, together with interest thereon from and after the date incurred by Mortgagee until actually paid by Mortgagor at the Default Interest Rate, and the same shall be secured by this Mortgage and by all of the other Loan Documents securing all or any part of the loan secured hereby.

(b)    In the event that the provisions of this Mortgage or any Loan Documents require the receipt of written confirmation from any rating agency with respect to the ratings on the certificates, or, in accordance with the terms of the transaction documents relating to a Secondary Market Transaction, such a rating confirmation is required in order for the consent of the Mortgagee to be given, the Mortgagor shall pay all of the reasonable costs and expenses of



NY:979574.7

Doc#: 8602B Bk:23420 Pg: 295

the Mortgagee, servicer and each rating agency in connection therewith, and, if applicable, shall pay any fees imposed by any rating agency as a condition to the delivery of such confirmation.

ARTICLE IV
MISCELLANEOUS TERMS AND CONDITIONS

4.1    Time of Essence.  Time is of the essence with respect to all provisions of this Mortgage.

4.2    Release of Mortgage.  If all of the secured indebtedness be paid, then and in that event only, all rights under this Mortgage shall terminate except for those provisions hereof which by their terms survive, and the Property shall become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, which shall be released by Mortgagee in due form at Mortgagor's cost.  No release of this Mortgage or the lien hereof shall be valid unless executed by Mortgagee or its duly authorized servicing agent.

4.3    Certain Rights of Mortgagee.  Without affecting Mortgagor's liability for the payment of any of the indebtedness secured hereby, Mortgagee may from time to time and without notice to Mortgagor: (a) release any person liable for the payment of the indebtedness secured hereby; (b) extend or modify the terms of payment of the indebtedness secured hereby; (c) accept additional real or personal property of any kind as security or alter, substitute or release any property securing the indebtedness secured hereby; (d) recover any part of the Property; (e) consent in writing to the making of any subdivision map or plat thereof; (f) join in granting any easement therein; or (g) join in any extension agreement of the Mortgage or any agreement subordinating the lien hereof.

4.4    Waiver of Certain Defenses.  No action for the enforcement of the lien hereof or of any provision hereof shall be subject to any defense which would not be good and available to the party interposing the same in an action at law upon the Note or any of the other Loan Documents.

4.5    Notices.  All notices, demands, requests or other communications to be sent by one party to the other hereunder or required by law shall be in writing and shall be deemed to have been validly given or served by delivery of the same in person to the intended addressee, or by depositing the same with Federal Express or another reputable private courier service for next business day delivery, or by depositing the same in the United States mail, postage prepaid, registered or certified mail, return receipt requested, in any event addressed to the intended addressee at its address set forth on the first page of this Mortgage or at such other address as may be designated by such party as herein provided.  All notices, demands and requests to be sent to Mortgagee shall be addressed to the attention of the Capital Markets Group.  All notices, demands and requests shall be effective upon such personal delivery, or one (1) business day after being deposited with the private courier service, or two (2) business days after being deposited in the United States mail as required above.  Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, demand or request sent.  By giving to the other party hereto at least fifteen (15) days' prior written notice thereof in accordance with the provisions hereof, the parties hereto shall have the right from time to time to change their

-63-

Doc#:    86028 Bk:23420 Pg:   296

respective addresses and each shall have the right to specify as its address any other address within the United States of America.

4.6    Successors and Assigns.    The terms, provisions, indemnities, covenants and conditions hereof shall be binding upon Mortgagor and the successors and assigns of Mortgagor, including all successors in interest of Mortgagor in and to all or any part of the Property, and shall inure to the benefit of Mortgagee, its directors, officers, shareholders, employees and agents and their respective successors and assigns and shall constitute covenants running with the land.    All references in this Mortgage to Mortgagor or Mortgagee shall be deemed to include all such parties' successors and assigns, and the term "Mortgagee" as used herein shall also mean and refer to any lawful holder or owner, including pledgees and participants, of any of the indebtedness secured hereby.    If Mortgagor consists of more than one person or entity, each will be jointly and severally liable to perform the obligations of Mortgagor.

4.7    Severability.    A determination that any provision of this Mortgage is unenforceable or invalid shall not affect the enforceability or validity of any other provision, and any determination that the application of any provision of this Mortgage to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

4.8    Gender.    Within this Mortgage, words of any gender shall be held and construed to include any other gender, and words in the singular shall be held and construed to include the plural, and vice versa, unless the context otherwise requires.

4.9    Waiver: Discontinuance of Proceedings.    Mortgagee may waive any single Event of Default by Mortgagor hereunder without waiving any other prior or subsequent Event of Default.    Mortgagee may remedy any Event of Default by Mortgagor hereunder without waiving the Event of Default remedied.    Neither the failure by Mortgagee to exercise, nor the delay by Mortgagee in exercising, any right, power or remedy upon any Event of Default by Mortgagor hereunder shall be construed as a waiver of such Event of Default or as a waiver of the right to exercise any such right, power or remedy at a later date.    No single or partial exercise by Mortgagee of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time.    No modification or waiver of any provision hereof nor consent to any departure by Mortgagor therefrom shall in any event be effective unless the same shall be in writing and signed by Mortgagee, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose given.    No notice to nor demand on Mortgagor in any case shall of itself entitle Mortgagor to any other or further notice or demand in similar or other circumstances.    Acceptance by Mortgagee of any payment in an amount less than the amount then due on any of the secured indebtedness shall be deemed an acceptance on account only and shall not in any way affect the existence of an Event of Default hereunder.    In case Mortgagee shall have proceeded to invoke any right, remedy or recourse permitted hereunder or under the other Loan Documents and shall thereafter elect to discontinue or abandon the same for any reason, Mortgagee shall have the unqualified right to do so and, in such an event, Mortgagor and Mortgagee shall be restored to their former positions with respect to the indebtedness secured hereby, the Loan Documents, the Property and otherwise, and the

-64-

Doc#:    86028 Bk:23420 Ps:   297

rights, remedies, recourses and powers of Mortgagee shall continue as if the same had never been invoked.

4.10    Section Headings. The headings of the sections and paragraphs of this Mortgage are for convenience of reference only, are not to be considered a part hereof and shall not limit or otherwise affect any of the terms hereof.

4.11    Governing Law. This Mortgage will be governed by and construed in accordance with the laws of the State in which the Real Estate is located provided that to the extent any of such laws may now or hereafter be preempted by Federal law, in which case such Federal law shall so govern and be controlling; and provided further that the laws of the state in which the Real Estate is located shall govern as to the creation, priority and enforcement of liens and security interests in property located in such state.

4.12    Counting of Days. The term "days" when used herein shall mean calendar days. If any time period ends on a Saturday, Sunday or holiday officially recognized by the state within which the Real Estate is located, the period shall be deemed to end on the next succeeding business day. The term "business day" when used herein shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in Maine are authorized by law to be closed.

4.13    Relationship of the Parties. The relationship between Mortgagor and Mortgagee is that of a borrower and a lender only and neither of those parties is, nor shall it hold itself out to be, the agent, employee, joint venturer or partner of the other party.

4.14    Application of the Proceeds of the Note. To the extent that proceeds of the Note are used to pay indebtedness secured by any outstanding lien, security interest, charge or prior encumbrance against the Property, such proceeds have been advanced by Mortgagee at Mortgagor's request and Mortgagee shall be subrogated to any and all rights, security interests and liens owned by any owner or holder of such outstanding liens, security interests, charges or encumbrances, irrespective of whether said liens, security interests, charges or encumbrances are released.

4.15    Unsecured Portion of Indebtedness. If any part of the secured indebtedness cannot be lawfully secured by this Mortgage or if any part of the Property cannot be lawfully subject to the lien and security interest hereof to the full extent of such indebtedness, then all payments made shall be applied on said indebtedness first in discharge of that portion thereof which is unsecured by this Mortgage.

4.16    Cross Default. An Event of Default hereunder shall be a default under each of the other Loan Documents.

4.17    Interest After Sale. In the event the Property or any part thereof shall be sold upon foreclosure as provided hereunder, to the extent permitted by law, the sum for which the same shall have been sold shall, for purposes of redemption (pursuant to the laws of the state in which the Property is located), bear interest at the Default Interest Rate.

-65-



4.18   <u>Inconsistency with Other Loan Documents</u>.   In the event of any inconsistency between the provisions hereof and the provisions in any of the other Loan Documents, it is intended that the provisions selected by Mortgagee in its sole subjective discretion shall be controlling.

4.19   <u>Construction of this Document</u>.   This document is a mortgage, security deed, deed of trust, chattel mortgage, conveyance, assignment, security agreement, pledge, financing statement, hypothecation or contract, or any one or more of the foregoing, in order to fully effectuate the liens and security interests created hereby and the purposes and agreements herein set forth.

4.20   <u>No Merger</u>.   It is the desire and intention of the parties hereto that this Mortgage and the lien hereof do not merge in fee simple title to the Property.   It is hereby understood and agreed that should Mortgagee acquire any additional or other interests in or to the Property or the ownership thereof, then, unless a contrary intent is manifested by Mortgagee as evidenced by an appropriate document duly recorded, this Mortgage and the lien hereof shall not merge in such other or additional interests in or to the Property, toward the end that this Mortgage may be foreclosed as if owned by a stranger to said other or additional interests.

4.21   <u>Rights With Respect to Junior Encumbrances</u>.   Subject to the provisions of 33 M.R.S.A. § 505(5)(A) or (B), Any person or entity purporting to have or to take a junior mortgage or other lien upon the Property or any interest therein shall be subject to the rights of Mortgagee to amend, modify, increase, vary, alter or supplement this Mortgage, the Note or any of the other Loan Documents and to extend the maturity date of the indebtedness secured hereby and to increase the amount of the indebtedness secured hereby and to waive or forebear the exercise of any of its rights and remedies hereunder or under any of the other Loan Documents and to release any collateral or security for the indebtedness secured hereby, in each and every case without obtaining the consent of the holder of such junior lien and without the lien or security interest of this Mortgage losing its priority over the rights of any such junior lien.

4.22   <u>Mortgagee May File Proofs of Claim</u>.   In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Mortgagor or the principals or general partners in Mortgagor, or their respective creditors or property, Mortgagee, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Mortgagee allowed in such proceedings for the entire secured indebtedness at the date of the institution of such proceedings and for any additional amount which may become due and payable by Mortgagor hereunder after such date.

4.23   <u>Fixture Filing</u>.   This Mortgage shall be effective from the date of its recording as a financing statement filed as a fixture filing with respect to all goods constituting part of the Property which are or are to become fixtures.

4.24   <u>After-Acquired Property</u>.   All property or interests on the Leasehold Real Estate acquired by Mortgagor after the date of this Mortgage which by the terms of this Mortgage shall be subject to the lien and the security interest created hereby, shall immediately upon the acquisition thereof by Mortgagor and without further mortgage, conveyance or assignment

-66-

Doc#:   8602B Bk#23420 Pg:   299

become subject to the lien and security interest created by this Mortgage.  Mortgagor shall execute, acknowledge, deliver and record or file, as appropriate, all and every such further mortgages, security agreements, financing statements, assignments and assurances, as Mortgagee shall require for accomplishing the purposes of this Mortgage.

4.25    No Representation.  By accepting delivery of any item required to be observed, performed or fulfilled or to be given to Mortgagee pursuant to the Loan Documents, including, but not limited to, any officer's certificates balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, Mortgagee shall not be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance of delivery thereof shall not be or constitute any warranty, consent or affirmation with respect thereto by Mortgagee.

4.26    Counterparts.  This Mortgage may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.  Any signature page of this Mortgage may be detached from any counterpart of this Mortgage without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Mortgage identical in form hereto but having attached to it one or more additional signature pages.

4.27    Personal Liability.  Notwithstanding anything to the contrary contained in this Mortgage, the liability of Mortgagor and its officer, directors, general partners, managers, members and principals for the indebtedness secured hereby and for the performance of the other agreements, covenants and obligations contained herein and in the other Loan Documents shall be limited as set forth in Section 2.6 of the Note.

4.28    Recording and Filing.  Mortgagor will cause the Loan Documents and all amendments and supplements thereto and substitutions therefor to be recorded, filed, re-recorded and re-filed in such manner and in such places as Mortgagee shall reasonably request, and will pay on demand all such recording, filing, re-recording and re-filing taxes, fees and other charges.  Mortgagor shall reimburse Mortgagee, or its servicing agent, for the costs incurred in obtaining a tax service company to verify the status of payment of taxes and assessments on the Property.

4.29    Entire Agreement and Modification.  This Mortgage and the other Loan Documents contain the entire agreements between the parties relating to the subject matter hereof and thereof and all prior agreements relative hereto and thereto which are not contained herein or therein are terminated.  This Mortgage and the other Loan Documents may not be amended, revised, waived, discharged, released or terminated orally but only by a written instrument or instruments executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted.  Any alleged amendment, revision, waiver, discharge, release or termination which is not so documented shall not be effective as to any party.  Pursuant to 10 M.R.S.A. § 1146, no action may be maintained upon any agreement to lend money, extend credit, forbear from collection of a debt or make any other accommodation for the repayment of a debt for more than $250,000.00 unless the promise, contract or agreement on which the action is brought or some memorandum thereof is in writing and signed by the party to

-67-

Doc#:   86028 Bk:23420 Pg:   300

be charged therewith.  Neither Mortgagor nor any other obligor will, under any circumstances, rely on any oral statements, promises or assurances made by or on behalf of Mortgagee with respect to any loan or advance, any loan document or the intentions of Mortgagee with respect thereto, including, but not limited to, any statement, promise or agreement to execute any written promise, contract, agreement or memorandum thereof.

4.30   Maximum Interest.  The provisions of this Mortgage and of all agreements between Mortgagor and Mortgagee, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of demand or acceleration of the maturity of the Note or otherwise, shall the amount paid, or agreed to be paid ("Interest"), to Mortgagee for the use, forbearance or retention of the money loaned under the Note exceed the maximum amount permissible under applicable law.  If, from any circumstance whatsoever, performance or fulfillment of any provision hereof or of any agreement between Mortgagor and Mortgagee shall, at the time performance or fulfillment of such provision shall be due, exceed the limit for Interest prescribed by law or otherwise transcend the limit of validity prescribed by applicable law, then ipso facto the obligation to be performed or fulfilled shall be reduced to such limit and if, from any circumstance whatsoever, Mortgagee shall ever receive anything of value deemed Interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive Interest shall be applied to the reduction of the principal balance owing under the Note in the inverse order of its maturity (whether or not then due) or at the option of Mortgagee be paid over to Mortgagor, and not to the payment of Interest.  All Interest (including any amounts or payments deemed to be Interest) paid or agreed to be paid to Mortgagee shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full period until payment in full of the principal balance of the Note so that the Interest thereon for such full period will not exceed the maximum amount permitted by applicable law.  This paragraph will control all agreements between Mortgagor and Mortgagee.

4.31   Interest Payable by Mortgagee.  Mortgagee shall cause funds in the Replacement Reserve to be deposited into an interest bearing account of the type customarily maintained by Mortgagee or its servicing agent for the investment of similar reserves, which account may not yield the highest interest rate then available.  Interest payable on such amounts shall be computed based on the daily outstanding balance in the Replacement Reserve.  Such interest shall be calculated on a simple, non-compounded interest basis based solely on contributions made to the Replacement Reserve by Mortgagor.  All interest earned on amounts contributed to the Replacement Reserve shall be retained by Mortgagee and added to the balance in the Replacement Reserve and shall be disbursed for payment of the items for which other funds in the Replacement Reserve are to be disbursed.

4.32   Secondary Market.  Mortgagee may sell, transfer and deliver the Loan Documents to one or more investors in the secondary mortgage market.  In connection with such sale, may retain or assign responsibility for servicing the loan or may delegate some or all of such responsibility and/or obligations to a servicer, including, but not limited to, any subservicer or master servicer, on behalf of the investors.  All references to Mortgagee herein shall refer to and include, without limitation, any such servicer, to the extent applicable.

-68-

Doc#:   86028 Bk:23420 Ps:  301

4.33   Further Stipulations.  The additional covenants, agreements and provisions set forth in Exhibits N/A attached hereto and made a part hereof, if any, shall be a part of this Mortgage and shall, in the event of any conflict between such further stipulations and any of the other provisions of this Mortgage, be deemed to control.

4.34   Property Encumbered. Mortgagor represents that this Mortgage does not encumber property principally improved or to be improved by one or more structures containing in the aggregate not more than six residential dwelling units.

4.35   Non-disturbance Agreements.  Within ten days after a request is made by the Mortgagee, at no cost to Mortgagee, the Mortgagee shall sign and deliver a non-disturbance, attornment and subordination agreement in favor of Core and any other tenant who is approved by the Mortgagee in form and substance reasonably acceptable to Mortgagee.

4.36   Estoppel Certificate. Within 15 days after a request is made by the Mortgagor, but not more than twice a year, Mortgagee shall sign and deliver a certificate setting forth the unpaid principal balance of the loan secured by the Note, the current interest rate on the Loan, the Mortgagee has no actual knowledge of any default by the Mortgagor under the Loan (or enumerating any such defaults).

4.37   Tenancy-In-Common Provisions.

(a)   TIC Agreement.  Each party obligated hereunder as "Mortgagor" is a party to an agreement of co-tenancy (the "TIC Agreement"), dated as of November 15, 2005, as amended by side letter agreement in favor of Mortgagee dated as of the date hereof.  Each Mortgagor shall comply with the provisions of the TIC Agreement and shall cause the TIC Agreement to remain in full force and effect at all times until payment in full of the Loan.  It shall constitute an Event of Default hereunder (i) if the TIC Agreement shall not be in full force and effect as a binding agreement among all owners of the Property, or (ii) if the TIC Agreement shall be amended in any material respect, canceled, modified in any material respect or terminated, or any party shall be admitted thereto, in each case without the prior written consent of Mortgagee.

(b)   Notice Owner.  Each person or entity constituting Mortgagor hereby acknowledges that it would be difficult for Mortgagee to administer the Loan if a single party (the "Notice Owner") were not designated to give and receive all notices required to be given to or received from Mortgagor under the Loan Documents.  Therefore, each Mortgagor designates Pendleton Westbrook SPE, LLC, as the "Notice Owner", and agrees that (a) all notices required to be given to Mortgagor hereunder shall be given to Notice Owner at the address shown for "Notice Owner" in this Mortgage or at such other address of which notice shall have been given to Mortgagee pursuant to Section 4.5 hereof ; (b) except for notices from a Mortgagor as to a matter personal to such Mortgagor (i.e., those matters involving such Mortgagor and not involving either the Property or any other Mortgagor), all notices to Mortgagee from Mortgagor shall be given solely by the Notice Owner, and Mortgagee is hereby authorized to act in reliance thereon; (c) Mortgagee shall be authorized to deal exclusively with Notice Owner with respect to matters involving the obligations of Mortgagor under the Loan Documents, without consultation with or notice to any other party comprising Mortgagor; and (d) Mortgagee shall not be required

-69-

Doc#:    86028 Bk:23420 Ps:   302

to accept notice from any party comprising Mortgagor other than the Notice Owner, except for a notice from all Mortgagors designating another party comprising Mortgagor as the Notice Owner; any Notice Owner shall be subject to the approval of Mortgagee not to be unreasonably withheld, which approval may be conditioned, in part, upon (i) demonstration to Mortgagee's satisfaction that such Notice Owner has experience in owning and operating properties comparable to the Property and, (ii) if a Secondary Market Transaction shall have occurred, Mortgagee's receipt of a confirmation from the Rating Agency with respect to the designation of the Notice Owner.

ARTICLE V
PARKING SPACES LEASE

5.1 . (a)  With respect to the Parking Spaces Lease, Mortgagor hereby warrants and represents as follows:  (i) Mortgagor is the owner of a valid and subsisting interest as lessee under the Parking Spaces Lease; (ii) the Parking Spaces Lease is in full force and effect, unmodified by any writing or otherwise; (iii) all rent, additional rent and other charges reserved therein have been paid to the extent they are payable to the date hereof; (iv) Mortgagor enjoys the quiet and peaceful possession of the individual property demised thereby; (v) Mortgagor is not in default under any of the terms thereof and there are no defaults under any of the terms thereof beyond the giving of any required notice and the expiration of any applicable cure period; (vi) Mortgagor has not received notice from lessor under the Parking Spaces Lease of a default thereunder, which default has not been timely cured; (vii) to the best of Mortgagor's knowledge, lessor under the Parking Spaces Lease is not in default under any of the terms or provisions thereof on the part of the lessor to be observed or performed; (viii) the Parking Spaces Lease or a memorandum thereof has been duly recorded; and (ix) the term of the Parking Spaces Lease (including extension options) extends not less than ten (10) years beyond the maturity date of the Note secured hereby.

(b)    Further, with respect to the Parking Spaces Lease, Mortgagor covenants and agrees as follows:  (i) to promptly and faithfully observe, perform and comply with all the terms, covenants and provisions thereof on its part to be observed, performed and complied with, at the times set forth therein and to do all things necessary to preserve unimpaired its rights thereunder; (ii) not to do, permit, suffer or refrain from doing anything, as a result of which, there could be a default under any of the terms thereof beyond the giving of any required notice and the expiration of any applicable cure period or a breach of any of the terms thereof; (iii) not to exercise any right or option to cancel or otherwise terminate the Parking Spaces Lease; (iv) not to cancel, surrender, modify, amend or in any way alter or permit the alteration of any of the terms thereof and not to release the lessor under the Parking Spaces Lease from any obligations imposed upon it thereby; (v) to give Mortgagee immediate written notice of any default by anyone thereunder and to immediately deliver to Mortgagee copies of each notice of default and, after the occurrence of an Event of Default, copies of all other notices, communications, plans, specifications and other similar instruments received or delivered by Mortgagor in connection therewith; and (vi) to furnish to Mortgagee such information and evidence as Mortgagee may reasonably require concerning Mortgagor's due observance, performance and compliance with the terms, covenants and provisions thereof.

-70-

(c)     In the event of any default by Mortgagor in the performance of any of its obligations under the Parking Spaces Lease, including, without limitation, any default in the payment of rent, additional rent and other charges and impositions made payable by the lessee under the Parking Spaces Lease, then, in each and every case, Mortgagee may, at its option and without notice, cause the default or defaults to be remedied and otherwise exercise any and all of the rights of Mortgagor thereunder in the name of and on behalf of the Mortgagor but no such action by Mortgagee shall release Mortgagor from any default under this Mortgage.  Mortgagor shall, on demand, reimburse Mortgagee for all advances made and expenses incurred by Mortgagee in curing any such default (including, without limitation, attorneys' fees and disbursements), together with interest thereon at the Default Rate, from the date that an advance is made or expense is incurred, to and including the date the same is paid and such monies so expended by Mortgagee with interest thereon shall be secured by this Mortgage.

(d)     It is hereby agreed that the fee title and the leasehold estate in the individual property demised by the Parking Spaces Lease shall not merge but shall always be kept separate and distinct, notwithstanding the union of said estates in either the lessor thereunder, Mortgagor or a third party, whether by purchase or otherwise and Mortgagee shall continue to have and enjoy all of the rights and privileges of the Mortgagee as to the separate estates.  If Mortgagor acquires the fee title, the interest of the lessor thereunder or any other estate, title or interest in the individual property demised by the Parking Spaces Lease, or any part thereof, the lien of this Mortgage shall attach to, cover and be a lien upon such acquired estate, title or interest and same shall thereupon be and become a part of the Property with the same force and effect as if specifically encumbered herein.  Mortgagor agrees to execute all instruments and documents which Mortgagee may reasonably require to ratify, confirm and further evidence Mortgagee's lien on the acquired estate, title or interest.  Furthermore, Mortgagor hereby appoints Mortgagee its true and lawful attorney-in-fact to execute and deliver all such instruments and documents in the name and on behalf of Mortgagor.  This power, being coupled with an interest, shall be irrevocable as long as the secured indebtedness remains unpaid. Mortgagor shall not purchase the premises demised by the Parking Spaces Lease or acquire the interest of the lessor in such premises or sell its interest in the leasehold estate created by the Parking Spaces Lease without Mortgagee's prior written consent.

(e)     If the Parking Spaces Lease is canceled or terminated, and if Mortgagee or its nominee shall acquire an interest in any new lease of the individual property demised thereby, Mortgagor shall have no right, title or interest in or to the new lease or the leasehold estate created by such new lease.

(f)     Mortgagor shall use its diligent efforts to obtain and deliver to Mortgagee from time to time within ten (10) days after written demand by Mortgagee, an estoppel certificate from the lessor under the Parking Spaces Lease, as requested by Mortgagee, setting forth (i) the name of the lessor under the Parking Spaces Lease, (ii) that the Parking Spaces Lease has not been modified or, if it has been modified, the date of each modification (together with copies of each such modification), (iii) the basic rent and additional rent payable under the Parking Spaces Lease, (iv) the date to which all rental charges have been paid by the lessee under the Parking Spaces Lease, and (v) whether there are any alleged defaults of the lessee under the Parking Spaces Lease or if there are any events which have occurred which with notice, such passage of

-71-

Doc#:   86028 Bk:23420 Pg: 304

time or both, would constitute a default under the Parking Spaces Lease, and, if there are, setting forth the nature thereof in reasonable detail.

(g)     Mortgagee shall have no liability or obligation under the Parking Spaces Lease by reason of its acceptance of this Mortgage.  Mortgagee shall be liable for the obligations of the lessee arising under the Parking Spaces Lease for only that period of time which Mortgagee is in possession of the individual Property or has acquired, by foreclosure or otherwise, and is holding all of the Mortgagor's right, title and interest therein.

(h)     No release or forbearance of any of Mortgagor's obligations under the Parking Spaces Lease, pursuant to the Parking Spaces Lease or otherwise, shall release Mortgagor from any of its obligations under this Mortgage or the other Loan Documents.

(i)     Mortgagor shall enforce the obligations of the lessor under the Parking Spaces Lease to the end that Mortgagor may enjoy all of the rights granted to it under the Parking Spaces Lease and will immediately notify Mortgagee of any default by the lessor, or by Mortgagor as lessee, in the performance or observance of any of the terms, covenants and conditions on the part of such lessor or Mortgagor, as the case may be, to be performed or observed under the Parking Spaces Lease and Mortgagor will immediately advise Mortgagee of the occurrence of any of the events of default enumerated in the Parking Spaces Lease and of the giving of any notice by the lessor under the Parking Spaces Lease to Mortgagor of any default by Mortgagor, as such lessee, in the performance or observance of any of the terms, covenants or conditions of the Parking Spaces Lease on the part of Mortgagor to be performed or observed and will immediately deliver to Mortgagee a true copy of each such notice.  If, pursuant to the Parking Spaces Lease, the lessor shall deliver to Mortgagee a copy of any notice of default given to Mortgagor, as lessee under the Parking Spaces Lease, such notice shall constitute full authority and protection to Mortgagee for any action taken or omitted to be taken by Mortgagee, in good faith and in reliance thereon.

(j)     Mortgagor shall give Mortgagee immediate notice of the commencement of any arbitration or appraisal proceeding to which Mortgagor is a party or of which Mortgagor has been otherwise notified concerning the provisions of the Parking Spaces Lease.  Mortgagee shall have the right to intervene and participate in any such proceeding if such proceeding, if adversely determined, would be reasonably expected to have a material adverse effect on Mortgagor or the individual Property and Mortgagor shall confer with Mortgagee and its attorneys and experts and cooperate with them to the extent which Mortgagee deems reasonably necessary for the protection of Mortgagee.  Upon the request of Mortgagee, Mortgagor will exercise all rights of arbitration conferred upon it by the Parking Spaces Lease.  If at any time such proceeding shall have commenced, Mortgagor shall be in material default in the performance or observance of any covenant, condition or other requirement of the Parking Spaces Lease on the part of Mortgagor to be performed or observed or an Event of Default shall have occurred, Mortgagee shall have, and is hereby granted, the sole and exclusive right to designate and appoint on behalf of Mortgagor, the arbitrator or arbitrators, or appraiser, in such proceeding.

(k)     Mortgagor shall give Mortgagee immediate written notice of the imposition of any fee mortgage of the Property covered by the Parking Spaces Lease and

-72-

Doc#:      86028 Bk:23420 Pg: 305

Mortgagor's entering into any subordination and non-disturbance agreement with such fee mortgagee shall be subject to Mortgagee's approval of the form of such subordination and non-disturbance agreement.

(l)    If the Parking Spaces Lease is rejected in any case, proceeding or other action commenced by or against the lessor under the Parking Spaces Lease (or any person or party constituting or having an interest in the Parking Spaces Lease) under the Bankruptcy Code or any comparable federal or state statute or law, (i) Mortgagor, immediately after obtaining notice thereof, shall give notice thereof to Mortgagee, (ii) Mortgagor, without the prior written consent of Mortgagee, shall not elect to treat the Parking Spaces Lease as terminated pursuant to Section 365(h)(1)(A)(i) of the Bankruptcy Code or any comparable federal or state statute or law, and any election by Mortgagor made without such consent shall be void and (iii) this Mortgage and all the liens, terms, covenants and conditions of this Mortgage shall extend to and cover Mortgagor's possessory rights under Section 365(h) of the Bankruptcy Code and to any claim for damages due to lessor's rejection of the Parking Spaces Lease. In addition, Mortgagor hereby assigns to Mortgagee Mortgagor's rights to remain in possession of the premises demised under the Parking Spaces Lease and to offset rents under the Parking Spaces Lease under Section 365(h)(1)(A)(ii) of the Bankruptcy Code in the event any case, proceeding or other action is commenced by or against the lessor under the Parking Spaces Lease under the Bankruptcy Code or any comparable federal or state statute or law.

(m)    No purchaser or transferee, at any foreclosure sale held pursuant to this Mortgage or other transfer in lieu of foreclosure, shall acquire any right, title or interest in or to the Parking Spaces Lease or the Property, unless such purchaser or transferee shall, in writing, assume and agree to perform all the terms and conditions of the Parking Spaces Lease to be performed by the Mortgagor except, that if the purchaser or transferee upon foreclosure or upon any other transfer, in lieu of foreclosure, shall be a bank, insurance company or other similar lending institution or a nominee of such lenders, its or their liability under such assumption agreement shall be limited to the period of its ownership of the Parking Spaces Lease.

ARTICLE VI
STATE OF MAINE PROVISIONS

A.    This Mortgage is given upon THE STATUTORY CONDITION and the Mortgagee, its successors and assigns, for breach of THE STATUTORY CONDITION or breach of any other term, condition, covenant or agreement contained or referred to herein if such breach is not cured prior to the expiration of any applicable grace or cure period and following any notice of default required by this Mortgage or any other Loan Document, shall have the right of foreclosure and any and all other rights and remedies given to a mortgagee and secured party under the laws of Maine, this Mortgage and any instrument it secures. This Mortgage is given primarily for a business, commercial or agricultural purpose; the Mortgagor, therefore, agrees that the Mortgagee, its successors and assigns, subject to compliance with Maine law, shall have "THE STATUTORY POWER OF SALE" pursuant to Title 33 M.R.S.A. § 501-A, which is expressly incorporated herein by reference. Such Statutory Power of Sale shall be in addition to all rights and remedies set forth herein or available under applicable law. Upon any default in the performance or the observance of any of the foregoing covenants, terms or conditions of this

-73-

Doc#:   86028 Bk:23420 Pg:  306



Mortgage if such default is not cured prior to the expiration of any applicable grace or cure period and following any notice of default required by this Mortgage or any other Loan Document, the Mortgagee, its successors and assigns or its or their agent or attorney, may sell the Property or such portion thereof as may remain subject to the Mortgage in case of any partial release thereof, either as a whole or in parcels, together with all improvements that may be thereon, by a public sale on or near any part of the Property then subject to this Mortgage or at the Mortgagee's principal place of business or at any other office of the Mortgagee or any attorney or agent thereof located in the same county in which any part of the Property is located, first complying with the terms of this Mortgage and the statutes relating to the foreclosure of a mortgage by the exercise of a Power of Sale, and the Mortgagee, its successors and assigns, may convey the same by proper deed or deeds to the purchaser or purchasers absolutely and in fee simple; and such sale shall forever bar the Mortgagor and all persons claiming under it from all right and interest in the Property, whether at law or in equity.

B.      The Mortgagor agrees for itself, its successors and assigns, that the acceptance, before the expiration of the right of redemption and after the commencement of foreclosure proceedings of this Mortgage, of insurance proceeds, eminent domain awards, rents or anything else of value to be applied on or to the mortgage indebtedness by the Mortgagee or any person or party holding under it shall not constitute a waiver of such foreclosure, and this agreement by the Mortgagor shall be that agreement referred to in Title 14 M.R.S.A. §§ 6204 as necessary to prevent such waiver of foreclosure.  This agreement by the Mortgagor is intended to apply to the acceptance and such application of any such proceeds, awards, rents and other sums or anything else of value whether the same shall be accepted from, or for the account of, the Mortgagor or from any other source whatsoever by the Mortgagee or by any person or party holding under the Mortgagee at any time or times in the future while any of the indebtedness secured hereby shall remain outstanding.



NY:979574.7

Doc#:    86028 Bk:23420 Pg: 307

IN WITNESS WHEREOF, Mortgagor has executed this Mortgage as of the day and year first above written.

MORTGAGOR:

PENDLETON WESTBROOK SPE, LLC,
a Delaware limited liability company

By:  Pendleton Maine 2005, LLC,
      a Delaware limited liability company
      Its: Sole Member

      By: Pendleton II L.L.C.
          a New Jersey limited liability company
          Its: Manager

*Beverley Murray*
Witness

          By:
          Name:   Peter O. Hanson
          Title:     Manager

ZAK WESTBROOK SPE, LLC,
a Delaware limited liability company

By: ZAK REALTY LLC,
      a Delaware limited liability company
      Its: Sole Member

      By: Zak Corporation.
          a Delaware corporation
          Its: Managing Manager

*Beverley Murray*
Witness

          By:
          Name:   Peter O. Hanson
          Title:     President

NY:979574.5

Doc#: 86028 Bk:23420 Pg: 308

PARIS WESTBROOK SPE, LLC,
a Delaware limited liability company

By: Paris Maine 2005, LLC,
    a Delaware limited liability company
    Its: Sole Member

    By: Paris Center Associates, Ltd.,
        a New Jersey limited partnership
        Its: Sole Member

        By: Property Investors Associates, Inc.,
            a Delaware corporation
            Its: General Partner

Beverley Murray
Witness

By: _____
    Name: Peter O. Hanson
    Title: President

NY:979574.5

Doc#:     86028 Bk:23420 Pg:  309

SRA WESTBROOK SPE, LLC,
a Delaware limited liability company

By:  SRA Maine 2005, LLC,
    a Delaware limited liability company
    Its: Sole Member

    By:  SPC Maine 2005 LLC,
        a Maine limited liability company
        Its: Sole Member

        By:  Pendleton II L.L.C.,
            a New Jersey limited liability company
            Its: Manager

_Beverley Murray_
Witness

            By: _Peter O. Hanson_
               Name:  Peter O. Hanson
               Title:   Manager

SPC WESTBROOK SPE, LLC,
a Delaware limited liability company

By:  Newnan Maine 2005, LLC,
    a Delaware limited liability company
    Its: Sole Member

    By: James E. Hanson, Inc. Profit Sharing Plan
    Its: Sole Member

_Beverley Murray_
Witness

    By: _Peter O. Hanson_
       Name:   Peter O. Hanson
       Title:   Trustee

NY:979574.5

Doc#:     86028 Bk:23420 Pg:   310

STATE OF _New Jersey_ )
                      )
COUNTY OF _Bergen_    )

November _13_ 2005

On this day, before me, personally appeared PETER O. HANSON, who being by me duly sworn, did say that he is the Trustee of James E. Hanson, Inc. Profit Sharing Plan, the Sole Member of Newnan Maine 2005, LLC, a Delaware limited liability company, the Sole Member of Paris Maine 2005, LLC, a Delaware limited liability company; and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said limited liability company.

_Paris Westbrook SPE, LLC_

                                        _Joan K. Hoerauf_
                                        Notary Public
                                        My commission expires:

STATE OF _New Jersey_ )
                      )
COUNTY OF _Bergen_    )

November _17_, 2005

                                        JOAN K. HOERAUF
                                        NOTARY PUBLIC OF NEW JERSEY
                                        MY COMMISSION EXPIRES SEPT. 27, 2008

On this day, before me, personally appeared PETER O. HANSON, who being by me duly sworn, did say that he is the President of Property Investors Associates, Inc., a Delaware corporation, the General Partner of Paris Center Associates, Ltd., a New Jersey limited partnership, the Sole Member of Paris Maine 2005, LLC, a Delaware limited liability company, the sole member of Paris Westbrook SPE, LLC, a Delaware limited liability company; and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said limited liability company.

                                        _Joan K. Hoerauf_
                                        Notary Public
                                        My commission expires:

                                        JOAN K. HOERAUF
                                        NOTARY PUBLIC OF NEW JERSEY
                                        MY COMMISSION EXPIRES SEPT. 27, 2008



NY:979574.5

Doc#:    86028 Bk:23420 Pg:  311

STATE OF _New Jersey_ )
                                          )
COUNTY OF _Bergen_    )

November _17_, 2005

On this day, before me, personally appeared PETER O. HANSON, who being by me duly sworn, did say that he is Manager of Pendleton II L.L.C., a New Jersey limited liability company which limited liability company is the Manager of Pendleton Maine 2005, LLC, a Delaware limited liability company, which limited liability company is the Sole Member of PENDLETON WESTBROOK SPE, LLC, a Delaware limited liability company; and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said limited liability company.

SEAL

Joan K. Hoerauf
Notary Public
My commission expires:

JOAN K. HOERAUF
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 27, 2008

STATE OF _New Jersey_ )
                                          )
COUNTY OF _Bergen_    )

November _17_, 2005

On this day, before me, personally appeared PETER O. HANSON, who being by me duly sworn, did say that he is President of Zak Corporation, which is the Managing Member of Zak Realty LLC, a Delaware limited liability company, which limited liability company is the Sole Member of Zak Westbrook SPE, LLC, a Delaware limited liability company; and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said corporation.

SEAL

Joan K. Hoerauf
Notary Public
My commission expires:

JOAN K. HOERAUF
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 27, 2008

STATE OF _New Jersey_ )
                                          )
COUNTY OF _Bergen_    )

November _17_, 2005

On this day, before me, personally appeared Peter O. Hanson, who being by me duly sworn, did say that he is the Manager of Pendleton II L.L.C., a New Jersey limited liability company, the Manager of SPC Maine 2005 LLC, a Maine limited liability company, the Sole Member of SRA Maine 2005, LLC, a Delaware limited liability company, which is the Sole Member of SRA WESTBROOK SPE, LLC, a Delaware limited liability company; and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said limited liability company.

Joan K. Hoerauf
Notary Public
My commission expires:

JOAN K. HOERAUF
NOTARY PUBLIC OF NEW JERSEY
MY COMMISSION EXPIRES SEPT. 27, 2008

SEAL

NY:979574.5



Doc#: 86028 Bk:23420 Pg: 312

## EXHIBIT A

(Legal Description)

**PARCEL ONE**

A certain lot or parcel of land located on the easterly side of Bridge Street in the City of Westbrook, County of Cumberland, State of Maine, bounded and described as follows:

Beginning at an angle point in the easterly sideline of Bridge Street, said point of beginning lying S. 28°13'51" E by said Bridge Street a distance of Seventy-Five and 51/100 (75.51) feet from the southerly corner of land now or formerly of Lori E. Carrier and Ronald H. Carrier as described in a deed recorded in the Cumberland County Registry of Deeds in Book 20568, Page 281. Thence:

(1) N 00°30'05" W by the discontinued portion of Dana Court as per Order of Discontinuance recorded in the Cumberland County Registry of Deeds in Book 19427, Page 103 and the proposed relocation of said Dana Court a distance of Twenty-Seven; and 67/100 (27.67) feet to a point.

(2) N 89°29'09" E by said proposed relocation of Dana Court a distance of Sixteen and 64/100 (16.64) feet to a point.

(3) N 68°42'09" E by said proposed relocation of Dana Court a distance of One Hundred Twenty and 29/100 (120.29) feet to a point.

(4) S 83°39'38" E by said proposed relocation of Dana Court a distance of Fifty-Six and 39/100 (56.39) feet to a point.

(5) S 00°11'18" E a distance of Thirty-Five and 96/100 (35.96) feet to a point.

(6) N 89°29'09" E a distance of One and 60/100 (1.60) feet to a point.

(7) S 00°31'53" E a distance of Nine and 06/100 (9.06) feet to a point.

(8) S 74°34'32" E a distance of Two and 46/100 (2.46) feet to a point.

(9) S 17°20'53" E a distance of Twenty-Two and 32/100 (22.32) feet to a point.

(10) S 00°25'51" E a distance of Seventy-Seven and 93/100 (77.93) feet to a point.

(11) N 88°13'34" E a distance of 00 and 70/100 (00.70) feet to a point.

(12) S 00°00'42" E a distance of Eleven and 98/100 (11.98) feet to a point.

(13) S 87°11'17" W a distance of Four and 12/100 (4.12) feet to a point.

(14) S 00°51'03" E a distance of Twelve and 36/100 (12.36) feet to a point.

(15) S 89°08'57" W a distance of One and 60/100 (1.60) feet to a point.

NY:979574.7

Doc#:    86028 Bk:23420 Pg:  313



(16) N 00°51'03" W a distance of Three and 52/100 (3.52) feet to a point.

(17) S 89°27'13" W a distance of Seventy-Five and 79/100 (75.79) feet to a point.

(18) S 00°33'16" E a distance of Sixty-Three and 32/100 (63.32) feet to a point.

(19) S 89°34'18" W a distance of One Hundred Twelve and 58/100 (112.58) feet to a point and land now or formerly of S. D. Warren Company.

(20) N 65°06'23" W by said land of S. D. Warren Company a distance of Two and 05/100 (2.05) feet to a point.

(21) N 00°30'05" W a distance of One Hundred Sixty-Four and 66/100 (164.66) feet to the point of beginning.

## PARCEL TWO

Also conveyed herein are the following easements:



1.    The perpetual right and easement to use, inspect, install, maintain, repair and replace the foundation drains shown as "FD" on the ALTA/ACSM Land Title Survey of One Riverfront Plaza, Westbrook, Maine prepared for Roebling Investment Company by Titcomb Associates, dated August 3, 2004, to be recorded in said Registry of Deeds (the "Plan"), including the right to enter upon Grantor's property with people, machinery and equipment for the purposes of inspection, construction, maintenance, repair and replacement as necessary of such foundation drains and all equipment associated with such drains. The foregoing rights are intended to be descriptive and not in limitation of Grantee's rights for the purposes herein mentioned.

2.    The perpetual right and easement to use, inspect, install, maintain, repair and replace the "4 PVC" drain located southerly of the most southerly side of Grantee's property as shown on the Plan, including the right to enter upon Grantor's property with people, machinery and equipment for the purposes of inspection, construction, maintenance, repair and replacement as necessary of such PVC drain and all appurtenances associated with such PVC drain. The foregoing rights are intended to be descriptive and not in limitation of Grantee's rights for the purposes herein mentioned.

The above-described easements shall be for the benefit of the Grantee, its successors and assigns, including any employees, agents, invitees and vendors of Grantee, and shall be appurtenant to Grantee's property described above as shown on the Plan.
The above-described property is also conveyed together with the benefit of, subject to the rights of others, in and to:

NY:979574.7



Doc#:   26028 Bk:23420 Ps:  314

I.    Access Easement.

The perpetual right and easement for building construction and maintenance and for pedestrian and vehicular access, ingress and egress over and upon, the following described premises now owned by the City of Westbrook:

Beginning at a point at the intersection of the easterly sideline of Bridge Street with the southerly sideline of discontinued Dana Court;

(1)    Thence N 02°43'31" E, along said Bridge Street, a distance of Forty-Two and 56/100 (42.56) feet to a point;

(2) Thence N 28°13'51" W, along said Bridge Street, a distance of Twenty and 10/100 (20.10) feet to a point;

(3) Thence N 68°42'09" E a distance of One Hundred Forty-Eight and 10/100 (148.10) feet to a point;

(4) Thence S 83°39'38" E a distance of One Hundred Seventy-Four and 82/100 (174.82)feet to a point;

(5) Thence N 77°52'19" E a distance of Seventy-Six and 91/100 (76.91) feet to a point;

(6) Thence S 12°07' 41" E a distance of Eight and 00/100 (8.00) feet to a point on the northerly line of land now or formerly of the City of Westbrook;

(7) Thence S 74°52'09" W, along said land of City of Westbrook, a distance of Five and 01/100 (5.01) feet to a point;

(8) Thence N 12°07'41" W a distance of Four and 40/100 (4.40) feet to a point;

(9) Thence S 77°52'19" W a distance of One Hundred Twenty-Two and 00/100 (122.00) feet to a point;

(10) Thence N 12°07'41" W a distance of Eighteen and 50/100 (18.50) feet to a point;

(11) Thence S 77°52'19" W a distance of Fifty and 00/100 (50.00) feet to a point;

(12) Thence N 12°07'41" W a distance of Three and 67/100 (3.67) feet to a point;

(13) Thence S 77°52'19" W a distance of Sixteen and 30/100 (16.30) feet to a point;

(14)    Thence S 00°11'18" E a distance of Twenty-Five and 51/100 (25.51) feet to a point;

(15) Thence S 89°30'01" W a distance of One Hundred Eighty-Two and 50/100 (182.50) feet to a point;

(16) Thence S 00°29' 59" E a distance of One Hundred Eighty-Two and 001100 (182.00) feet to a point;



NY:979574.7

Doc#:   86028 Bk:23420 Ps:   315

(17) Thence N 89°30'01" E a distance of Ninety-Two and 00/100 (92.00) feet to a point;

(18) Thence S 00°29'59" E a distance of Nineteen and 00/100 (19.00) feet to a point on the northerly sideline of land now or formerly o S.D. Warren Company;

(19) Thence S 85°05'37" W, along said land of S.D. Warren Company, a distance of Forty-Nine and 02/100 (49.02) feet to a point;

(20) Thence N 65°06'23" W, along said land of S.D. Warren Company, a distance of Sixty and 33/100 (60.33) feet to a point on the easterly sideline of said Bridge Street; and

(21) Thence N 02°43'31" E, along said Bridge Street, a distance of One Hundred Eighteen and 07/100 (118.07) feet to the point of beginning.

Containing 10,778 square feet.  Bearings are referenced to magnetic north, 2001.

Excepting from the Access Easement that portion that overlaps and falls within the fee parcel.

II.     Courtyard Easement.

The perpetual right and easement for building construction and maintenance and for pedestrian and vehicular access, ingress and egress over and upon the following described premises now owned by the City of Westbrook:

Beginning at a point at the intersection of the easterly sideline of Bridge Street and the southerly sideline of the proposed relocation of Dana Court; thence N 68°42'09" E, along the southerly sideline of the said proposed relocation of Dana Court, a distance of One Hundred Forty-Eight and 10/100 (148.10) feet to an angle point in said sideline; thence S 83°39'38" E, along the southerly sideline of the said proposed relocation of Dana Court, a distance of Fifty-Six and 39/100 (56.39) feet to a point; thence S 00°11'18" E a distance of Twenty-Seven and 84/100 (27.84) feet to the TRUE POINT OF BEGINNING;

(1)  Thence S 12°07'40" E a distance of Two Hundred Twelve and 39/100 (212.39) feet to a point on the northerly line of land now or formerly of S.D. Warren Company;

(2)  Thence S 85°05'37" W, along said land of S.D. Warren Company, a distance of One Hundred Thirty-Three and 80/100 (133.80) feet to a point;

(3)  Thence N 00°29'59" W, a distance of One Hundred Nine and 00/100 (109.00) feet to a point;

(4)  Thence N 89°30'01" E, a distance of Ninety and 00/100 (90.00) feet to a point; and

(5)  Thence N 00° 11' 18" W a distance of One Hundred Nine and 311100 (109.31) feet to the true point of beginning.

Excepting from the Courtyard Easement that portion that overlaps and falls within the fee parcel herein conveyed.

NY:979574.7

Doc#:   86028 Bk:23420 Ps:   316

III.   Turnaround Easement.

The perpetual right and easement for vehicular and pedestrian ingress and egress for purposes turning and backing vehicles, including heavy equipment, providing deliveries, products and/or services, including waste and trash removal services to tenants or owners of the premises conveyed herewith, their successors and assigns, including all of such rights in connection with the exercise and use of the dumpster and oil tank easements also described herein, over and upon the following described premises now owned by the City of Westbrook:

Beginning at a point at a corner on the southerly line of land now or formerly of Philip E. Chayer and Gertrude E. Chayer; thence N 68°35'09" E, along the southerly line of said Chayer, a distance of Sixty-Three and 28/100 (63.28) feet to a point; thence S 21°24'51" E a distance of Ten and 79/100 (10.79) feet to the TRUE POINT OF BEGINNING,

(1)   Thence S 84°44'22" E a distance of Forty-Five and 00/100 (45.40) feet to a point;

(2)   Thence S 05°15'38" W a distance of Twenty and 77/100 (20.77) feet to a point in the northerly sideline of the proposed relocation of Dana Court;

(3)   Thence N 83°39'38" W a distance of Forty-Five and 38/100 (45.38) feet to a point along the northerly sideline of the proposed relocation of Dana Court; and

(4)   Thence N 06°20'22" E a distance of Nineteen and 92/100 (19.92) feet to the true point of beginning.

IV.   Dumpster Easement

The perpetual right and easement to maintain, store, replace, upgrade, repair, install and utilize a trash dumpster for the purpose of collecting and removing waste, trash, debris (including construction debris) by vehicle or other mechanical means, generated in connection with the use by the owners or tenants (and their successors and assigns) of the buildings, improvements and appurtenances constructed or to be constructed on the premises herewith, over and upon the following described premises now owned by the City of Westbrook:

Beginning at a point at a corner on the southerly line of land now or formerly of Philip E. Chayer and Gertrude E. Chayer;

(1)   Thence N 68°35'09" E, along said land of Chayer, a distance of Sixty-Three and 28/100 (63.28) feet to a point;

(2)   Thence S 21°24'51" E a distance of Ten and 79/100 (10.79) feet to a point;

(3)   Thence S 06°20' 22" W a distance of Nineteen and 92/100 (19.92) feet to a point on the northerly sideline of the proposed relocation of Dana Court; and

(4)   Thence N 83°39'38" W, along said proposed relocation of Dana Court, a distance of

Doc#:    86028 Bk:23420 Pg:  317

Sixty-One and 03/100 (61.03) feet to the point of beginning.

V.    Oil Tank Easement.

The perpetual right and easement to maintain, store, replace, upgrade, repair, install and utilize an above-ground oil tank for the purpose of providing oil service to the owners or tenants (and their successors and assigns) of the buildings, improvements and appurtenances constructed or to be constructed on the premises conveyed herewith, and in connection with the use and enjoyment of such right and easement to gain access by foot and by vehicle over and upon the following described premises now owned by the City of Westbrook:

Beginning at a point at the southwesterly corner of land now or formerly of Lawrence A. Robinson and Lynne F. Robinson, thence N 70°37'09" E, along the southerly line of said Robinson, a distance of Twenty-Two and 35/100 (22.35) feet to a point; thence S 15°07'51" E a distance of Thirty-Eight and 23/100 (38.23) feet to the northerly line of the proposed relocation of Dana Court; thence S 83°39' 38" E, along said proposed relocation of Dana Court, a distance of Seven and 03/100 (7.03) feet to the TRUE POINT OF BEGINNING;

(1)  Thence N 05°15'38" E a distance of Thirty and 00/100 (30.00) feet to a point;

(2)  Thence S 84°44'22" E a distance of Thirty and 00/100 (30.00) feet to a point;

(3)  Thence S 05°15'38" W a distance of Thirty and 56/100 (30.56) feet to the proposed relocation of Dana Court; and

(4)  Thence N 83°39'38" W, along the proposed relocation of Dana Court, a distance of Thirty and 01/100 (30.01) feet to the trust point of beginning.

VI.   Oil Line Easement.

The perpetual right and easement to maintain, replace, upgrade, repair, install and utilize a below-ground oil pipeline for the purpose of providing oil service to the owners or tenants (and their successors and assigns) of the buildings, improvements and appurtenances constructed or to be constructed on the premises conveyed herewith,, and in connection with the use and enjoyment of such right and easement to gain access to such pipeline, over and upon the following described premises now owned by the City of Westbrook:

Beginning at a point at the southwesterly corner of land now or formerly of Lawrence A. Robinson and Lynne F. Robinson, thence N 70°37'09" E, along the southerly line of said Robinson, a distance of Twenty-Two and 35/100 (22.35) feet to a point; thence S 15°07'51" E a distance of Thirty-Eight and 23/100 (38.23) feet to the northerly line of the proposed relocation of Dana Court; thence S 83°39' 38" E, along said proposed relocation of Dana Court, a distance of Twenty-Seven and 04/100 (27.04) feet to the TRUE POINT OF BEGINNING and the center line of a Twenty (20) foot wide easement;

NY:979574.7



Doc#:    86028 Bk:23420 Pg:  318

(1)  Thence S 05°15'38" W a distance of Thirteen and 48/100 (13.48) feet to a point;

(2)  Thence S 72°58'55" W a distance of Fifty-One and 16/100 (51.16) feet to a point;

(3)  Thence S 00°11'18" E a distance of plus/minus Fifty-Three and 00/100 (53.00) feet, more or less, to a point and being the northeasterly section of land described in a certain deed from the City of Westbrook to One Riverfront Plaza, LLC dated June 19, 2003 and recorded in said Registry of Deeds in Book 19592, Page 205.

Bearings are referenced to magnetic north, 2001.

Excepting from the Oil Line Easement that portion that overlaps and falls within the fee parcel herein conveyed.

VII.   Aerial Crosswalk Easement.

The perpetual right and easement to construct, install, repair, maintain, improve and replace from time to time a certain enclosed aerial crosswalk for the transmission of pedestrian traffic to and from the above-described premises to and from the property of Dana Warp Mill, LLC, as described in a Deed from Timothy A. Flannery and H. Roger Flannery, II, Trustees of CCK Realty Trust dated September 27, 1999 and recorded in the Cumberland County Registry of Deeds in Book 15076, Page 32, and to enter into the building on the said property of Dana Warp Mill, LLC, over and above Bridge Street in Westbrook, Maine as depicted on a plan entitled "Plan of Property, Dana Court, Westbrook, Maine made for Environmental Engineering and Remediation", prepared by Titcomb Associates, dated February 24, 2003" recorded in the Cumberland County Registry of Deeds in Plan Book 203, Page 311.

For a depiction of the foregoing perpetual rights and easements appurtenant to the above-described premises, reference is hereby made to a plan entitled "Plan of Property, Dana Court, Westbrook, Maine made for Environmental Engineering and Remediation", prepared by Titcomb Associates, dated February 24, 2003" recorded in the Cumberland County Registry of Deeds in Plan Book 203, Page 311.

The foregoing perpetual rights and easements are subject to all rights and easements of others of record over and upon any of the foregoing properties burdened by the particular easements described by metes and bounds descriptions herein.

The above-described parcel is conveyed subject to an aerial crosswalk easement as described in the Quitclaim Deed With Covenant from One Riverfront Plaza, LLC to Dana Warp Mill, LLC, dated June 19, 2003 and recorded in said Registry of Deeds in Book 19592, Page 210, as amended by the First Amendment of Aerial Crosswalk Easement and Dana Warp Mill Agreement by and between Dana Warp Mill, LLC and One Riverfront Plaza, LLC, dated of near or even date herewith, to be recorded in said Registry of Deeds.



NY:979574.7

Doc#:    86028 Bk:23420 Pg: 319

## PARCEL THREE

Tenant's interest in the parking spaces described in Parking Space Lease Agreement by and between the City of Westbrook (as Landlord) and One Riverfront Plaza, LLC (as Tenant) dated as of June 19, 2003 and recorded in the Cumberland County Registry of Deeds in Book 19592, Page 321, re-recorded in Book 19672, Page 261, Amended and Restated Parking Space Lease Agreement dated October 27th, 200 and recorded in the Cumberland County Registry of Deeds in Book 23420, Page 84, subject to the perms and provisions set forth in said Lease.

Doc#:    86028 Bk:23420 Pg:  320

## EXHIBIT B

### MORTGAGOR'S CERTIFICATE

The undersigned is the _____ of _____, the general partner of _____ (the "Mortgagor") and has made due investigation as to the matters hereinafter set forth and does hereby certify the following to induce **WACHOVIA BANK, NATIONAL ASSOCIATION,** (the "Mortgagee") to advance the aggregate sum of $_____ (the "Disbursement") [from the Replacement Reserve or Repair and Remediation Reserve or Environmental Reserve] to the Mortgagor pursuant to the terms of that certain Mortgage and Security Agreement, dated as of _____ __, 200_, between the Mortgagee and the Mortgagor (together with any amendments, modifications, supplements and replacements thereof or therefor, the "Mortgage"), dated _____, pursuant to that certain Disbursement request which is being submitted to the Mortgagee.  (Capitalized terms used and not otherwise define shall have the respective meanings given to them in the Mortgage.)

1.      No default beyond any applicable notice and/or grace period exists under the Mortgage or under any of the other Loan Documents.

2.      The [Repairs, Deferred Maintenance or Environmental Work] relative to the Disbursement have been delivered or provided to Mortgagor and are properly, completely and permanently installed on or about the Property or otherwise properly completed, as applicable.

3.      All of the statements, invoices, receipts and information delivered in connection with the Disbursement request being submitted to the Mortgagee in connection herewith are true and correct as of the date hereof, and the amount requested in said Disbursement request accurately reflects the precise amounts due and payable during the period covered by such Disbursement request.  All of the funds to be received pursuant to such Disbursement request shall be used solely for the purpose of reimbursing the Mortgagor for items previously paid.

4.      Nothing has occurred subsequent to the date of the Mortgage which has or may result in the creation of any lien, charge or encumbrance upon the Real Estate or the Improvements or any part thereof, or anything affixed thereto or used in connection therewith, or which has or may substantially and adversely impair the ability of the Mortgagor to make any payments of principal and interest on the Note or the ability of the Mortgagor to meet its obligations under the Mortgage.

5.      None of the labor, materials, overhead or other items of expense specified in the Disbursement request submitted herewith has previously been the basis of any Disbursement request by the Mortgagor or any payment by the Mortgagee and, when added to all sums previously disbursed by Mortgagee on account of the [Deferred Maintenance, Repairs or Environmental Work], do not exceed the costs of all [Deferred Maintenance, Repairs or Environmental Work] services completed, installed and/or delivered, as applicable, to the date of that certificate.

B-1

NY:979574.7

Doc#:    86028 Bk:23420 Pg:  321



6.    The amount remaining in the [Account] allocated to the payment of items on the [Deferred Maintenance, Repairs or Environmental Work] will be sufficient to pay in full the entire remaining cost of [Deferred Maintenance, Repairs or Environmental Work] required to be completed in accordance with the Mortgage.

7.    All work required permits and approvals required to complete the work which work is now in process or was previously completed have been obtained.

8.    All conditions to the Disbursement to be made in accordance with the Disbursement request submitted herewith have been met in accordance with the terms of the Mortgage.

By:_____

Received
Recorded Resister of Deeds
Nov 23,2005 10:01:13A
Cumberland County
John B OBrien

B-2

NY:979574.7

PLEASE RETURN TO:
BERNSTEIN SHUR SAWYER & NELSON
ATTN:   KJ
100 MIDDLE STREET
PORTLAND, MAINE  04104

# EXHIBIT F

31 2005 C22 WACH

Doc#:   43311 Bk:24152 Pg:   98

DOCUMENT PREPARED BY AND
RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO :
KC WILSON & ASSOCIATES
23232 PERALTA DR., SUITE 218
LAGUNA HILLS, CA 92653
PHONE: (949) 470-3960

By: Frank Snip

LN 31-2005-C22 CSFB          WACH

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## ASSIGNMENT OF FEE AND LEASEHOLD MORTGAGE AND
## SECURITY AGREEMENT

### WACHOVIA BANK, NATIONAL ASSOCIATION
### (ASSIGNOR)

to

### WELLS FARGO BANK, N.A, AS TRUSTEE FOR THE REGISTERED
### HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST,
### COMMERCIAL MORTGAGE PASS-THROUGH CERITIFCATES,
### SERIES 2005-C22
### (ASSIGNEE)

Doc#:   43311 Bk:24152 Pg:   99

## ASSIGNMENT OF FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT

THIS ASSIGNMENT OF FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT (this "Assignment"), made and entered into as of the *10* day of *Apr*, 200*6*, is by WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association, having an office at 8739 Research Drive URP - 4, NC 1075, Charlotte, North Carolina 28262 ("Assignor"), in favor of SEE ATTACHED EXHIBIT B FOR ASSIGNEE NAME & ADDRESS , having an office at SEE ATTACHED EXHIBIT B FOR ASSIGNEE NAME & ADDRESS ("Assignee").

### WITNESSETH

WHEREAS, Assignor is the present legal and equitable owner and holder of that certain Promissory Note dated as of November 21, 2005, executed by PENDLETON WESTBROOK SPE, LLC, ZAK WESTBROOK SPE, LLC, SRA WESTBROOK SPE, LLC, SPC WESTBROOK SPE, LLC, and PARIS WESTBROOK SPE, LLC, each a Delaware limited liability company, jointly and severally, as tenants-in-common, collectively, ("Borrower"), and made payable to the order of Assignor in the stated principal amount of TWENTY MILLION AND 00/100 DOLLARS ($20,000,000.00) (collectively the "Note") in connection with the refinancing of certain real property situated in the County of Cumberland and State of Maine as more particularly described     in document(s) referred hereto; and,



WHEREAS, the Note is secured by the Fee and Leasehold Mortgage and Security Agreement, as hereinafter defined; and

WHEREAS, the parties hereto desire that Assignor assign to Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Mortgage, Security Agreement and Fixture Filing.

NOW, THEREFORE, in consideration of the premises above set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, Assignor and Assignee hereby covenant and agree as follows:

1. Assignment. Assignor does hereby transfer, assign, grant and convey to Assignee, its successors and assigns, all of the right, title and interest of Assignor in and to the following documents and does hereby grant and delegate to Assignee, its successors and assigns, any and all of the duties and obligations of Assignor under the following documents from and after the date hereof: Fee and Leasehold Mortgage and Security Agreement dated as of November 21, 2005, between Borrower, as mortgagor and Assignor, as mortgagee (the "Security Instrument") and recorded on *11-23-05*, as instrument no. *86028* in book *23420* at page *232* in the Cumberland County Clerk's Office, encumbering the Premises, together with the notes and bonds secured thereby; and

2.     Assumption. From and after the date hereof, Assignee hereby accepts the Assignment and assumes and agrees to observe, perform and be bound by all of the terms,



NY:995404.1

Doc#:   43311 Bk:24152 Ps:  100

covenants, agreements, conditions and obligations of the Security Instrument required to be observed or performed by Assignor thereunder.

3.    Representations and Warranties of Assignor.  This Assignment is an absolute assignment.  This Assignment is without recourse, representation or warranty, express or implied, upon Assignor, except that Assignor hereby warrants and represents to Assignee that:

(a)    Prior to the execution hereof, Assignor has not sold, transferred, assigned, conveyed, pledged or endorsed any right, title or interest in the Security Instrument or the Assignment of Leases to any person or entity other than Assignee; and

(b)    Assignor has full right and power to sell and assign the same to Assignee subject to no interest or participation of, or agreement with, any party other than Assignee.

4.    Governing Law.  This Assignment shall be governed by and construed in accordance with the laws of the State of Maine.

5.    Successors and Assigns.  This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.    Headings.  The headings of the paragraphs of this Assignment have been included only for convenience, and shall not be deemed in any manner to modify or limit any of the provisions of this Assignment or be used in any manner in the interpretation of this Assignment.

7.    Interpretation.  Whenever the context so requires in this Assignment, all words used in the singular shall be construed to have been used in the plural (and vice versa), each gender shall be construed to include any other genders, and the word "person" shall be construed to include a natural person, a corporation, a firm, a partnership, a joint venture, a trust, an estate or any other entity.

8.    Partial Invalidity.  Each provision of this Assignment shall be valid and enforceable to the fullest extent permitted by law.  If any provision of this Assignment or the application of such provision to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Assignment, or the application of such provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected by such invalidity or unenforceability.

Doc#:    43311 Bk:24152 Pg:   101

IN WITNESS WHEREOF, Assignor has executed this Assignment of Security Instrument as of the date above first written.

Assignor:

WACHOVIA BANK, NATIONAL
ASSOCIATION

By: _____
Name: Renee D. Siles
Title: AVP

NY:995404.1

Doc#:    43311 Bk:24152 Pg:  102

State of North Carolina

County of Mecklenburg

Personally appeared before me, the undersigned authority in and for said county and state, on this 10th day of April , 2005, within my jurisdiction, the within named Renee O. Sides, who acknowledged that he is the ___AVP___ of WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association, and that for and on behalf of the said banking association, and as its act and deed he executed the above and foregoing instrument, after first having been duly authorized by said banking association so to do.

_____
Notary Public

Printed Name: S L Wilson

My Commission Expires: 8/28/2006

S L WILSON
NOTARY PUBLIC
MECKLENBURG COUNTY, N.C.
Commission Expires: 8/28/2006

NY:995404.1

Doc#:   43311 Bk:24152 Pg:  103

## Exhibit B

### Assignee Name and Address

Loan number:          312005C22

Property:             One Riverfront Plaza

Assignee Name:        Wells Fargo Bank, N.A., as trustee for the
                      registered holders of Wachovia Bank
                      Commercial Mortgage Trust, Commercial
                      Mortgage Pass-Through Certificates, Series
                      2005-C22

Assignee Address:     Wells Fargo Bank, N.A.
                      CMBS Department
                      1015 10th Avenue SE
                      Minneapolis, MN 55414

6/90

n *H.C Wilson* +
associates

# EXHIBIT G

WACH 31 2005C22

Doc#:      50496 Bk:27181 Pg:  140

THIS DOCUMENT PREPARED BY AND
UPON RECORDATION RETURN TO:
VANESSA ORTA, ESQ.
ANDERSON, McCOY & ORTA, P.C.
100 North Broadway, Suite 2600
Oklahoma City, Oklahoma 73102
Telephone: 888-236-0007
AMO ID: 1937.090
Loan/File Name: One Riverfront Plaza
Custodian ID: 312005C22
**Cumberland County, Maine**

---

### ASSIGNMENT OF FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT
### AND
### ASSIGNMENT OF ASSIGNMENT OF LEASES AND RENTS

KNOW THAT

    **WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22,** as predecessor trustee, having an address at 1055 10th Avenue SE, Minneapolis, MN 55414 ("Assignor"),

For valuable consideration given by:

    **BANK OF AMERICA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22,** as successor trustee, having an address at 540 West Madison Street, Mail Code IL 4-540-18-04, Chicago, IL, 60661 ("Assignee"),

Doc# 50496 Bk#27181 Pg: 141

the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby grant, bargain, sell, convey, assign, transfer, and set over, without recourse, representation and warranty, except as set forth in that certain related Agreement, all of Assignor's right, title and interest, of any kind whatsoever, in and to the subject note(s) and loan documents, and including that of mortgagee, beneficiary, payee, assignee or secured party (as the case may be), in and to the following:

FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT (as same may have been amended) by PENDLETON WESTBROOK SPE, LLC, a Delaware limited liability company, ZAK WESTBROOK SPE, LLC, a Delaware limited liability company, SRA WESTBROOK SPE, LLC, a Delaware limited liability company, SPC WESTBROOK SPE, LLC, a Delaware limited liability company, and PARIS WESTBROOK SPE, LLC, a Delaware limited liability company ("Borrower"), to WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association ("Lender"), and recorded November 23, 2005, as Instrument Number 86028, in Book 23420, Page 232, in the Real Estate Records pertaining to the land situated in the State of Maine, County of Cumberland ("Real Estate Records");

ASSIGNMENT OF LEASES AND RENTS (as same may have been amended) by Borrower to Lender, and recorded November 23, 2005, as Instrument Number 86029, in Book 23420, Page 322, in the Real Estate Records;

the foregoing instrument(s) assigned to Assignor by Assignment instrument(s) recorded July 20, 2006, as Instrument Number 43311, in Book 24152, Page 98, and July 10, 2006, as Instrument Number 43312, in Book 24152, Page 104, in the Real Estate Records;

covering the property described on EXHIBIT "A" attached hereto and made a part hereof;

TO HAVE AND TO HOLD the same unto the Assignee and to the successors, legal representatives and assigns of the Assignee forever.

IN WITNESS WHEREOF, the Assignor has caused these presents to be effective as of March 31, 2009.

**(The remainder of this page has been intentionally left blank.)**

Doc#:    50496 Bk:27181 Pg: 142

ASSIGNOR:

WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE
REGISTERED   HOLDERS   OF   WACHOVIA   BANK
COMMERCIAL   MORTGAGE   TRUST,   COMMERCIAL
MORTGAGE   PASS-THROUGH   CERTIFICATES,   SERIES
2005-C22

By:    Anderson, McCoy and Orta, a professional corporation,
       Attorney-in-Fact

By:    _Vanessa A. Orta_____
       Name: Vanessa A. Orta
       Title:  President

STATE OF OKLAHOMA          )
                           )
COUNTY OF OKLAHOMA         )

This instrument was acknowledged before me, the undersigned Notary Public, on the 14th
day of April, 2009, by Vanessa A. Orta, who personally appeared and is known to me to be
the person whose name is subscribed to the within instrument and who executed the same in
her authorized capacity as President of Anderson, McCoy & Orta, a professional corporation,
and that by her signature on the instrument, the entity upon behalf of which she acted,
executed the instrument.

WITNESS my hand and official seal.

My Commission Expires:

1937                                    Signature: _Glee Rhodes_____

GLEE RHODES
NOTARY
# 01014641
EXP. 08/28/09
PUBLIC
STATE OF OKLAHOMA

Doc#:    50496 Bk:27181 Pg:  143

## EXHIBIT A

(Legal Description)

**PARCEL ONE**
A certain lot or parcel of land located on the easterly side of Bridge Street in the City of Westbrook, County of Cumberland, State of Maine, bounded and described as follows:

Beginning at an angle point in the easterly sideline of Bridge Street, said point of beginning lying S. 28°13'51" E by said Bridge Street a distance of Seventy-Five and 51/100 (75.51) feet from the southerly corner of land now or formerly of Lori E. Carrier and Ronald H. Carrier as described in a deed recorded in the Cumberland County Registry of Deeds in Book 20568, Page 281. Thence:

(1)   N 00°30'05" W by the discontinued portion of Dana Court as per Order of Discontinuance recorded in the Cumberland County Registry of Deeds in Book 19427, Page 103 and the proposed relocation of said Dana Court a distance of Twenty-Seven; and 67/100 (27.67) feet to a point.

(42) N 89°29'09" E by said proposed relocation of Dana Court a distance of Sixteen and 64/100 (16.64) feet to a point.

(43) N 68°42'09" E by said proposed relocation of Dana Court a distance of One Hundred Twenty and 29/100 (120.29) feet to a point.

(44) S 83°39'38" E by said proposed relocation of Dana Court a distance of Fifty-Six and 39/100 (56.39) feet to a point.

(45) S 00°11'18" E a distance of Thirty-Five and 96/100 (35.96) feet to a point.

(46) N 89°29'09" E a distance of One and 60/100 (1.60) feet to a point.

(47) S 00°31'53" E a distance of Nine and 06/100 (9.06) feet to a point.

(48) S 74°34'32" E a distance of Two and 46/100 (2.46) feet to a point.

(49) S 17°20'53" E a distance of Twenty-Two and 32/100 (22.32) feet to a point.

(50) S 00°25'51" E a distance of Seventy-Seven and 93/100 (77.93) feet to a point.

(51) N 88°13'34" E a distance of 00 and 70/100 (00.70) feet to a point.

(52) S 00°00'42" E a distance of Eleven and 98/100 (11.98) feet to a point.

(53) S 87°11'17" W a distance of Four and 12/100 (4.12) feet to a point.

(54) S 00°51'03" E a distance of Twelve and 36/100 (12.36) feet to a point.

(55) S 89°08'57" W a distance of One and 60/100 (1.60) feet to a point.

NY:995404.1

Doc#:   50496 Bk:27181 Ps:  144

(56) N 00°51'03" W a distance of Three and 52/100 (3.52) feet to a point.

(57) S 89°27'13" W a distance of Seventy-Five and 79/100 (75.79) feet to a point.

(58) S 00°33'16" E a distance of Sixty-Three and 32/100 (63.32) feet to a point.

(59) S 89°34'18" W a distance of One Hundred Twelve and 58/100 (112.58) feet to a point and land now or formerly of S. D. Warren Company.

(60) N 65°06'23" W by said land of S. D. Warren Company a distance of Two and 05/100 (2.05) feet to a point.

(61) N 00°30'05" W a distance of One Hundred Sixty-Four and 66/100 (164.66) feet to the point of beginning.

## PARCEL TWO

Also conveyed herein are the following easements:

5.    The perpetual right and easement to use, inspect, install, maintain, repair and replace the foundation drains shown as "FD" on the ALTA/ACSM Land Title Survey of One Riverfront Plaza, Westbrook, Maine prepared for Roebling Investment Company by Titcomb Associates, dated August 3, 2004, to be recorded in said Registry of Deeds (the "Plan"), including the right to enter upon Grantor's property with people, machinery and equipment for the purposes of inspection, construction, maintenance, repair and replacement as necessary of such foundation drains and all equipment associated with such drains. The foregoing rights are intended to be descriptive and not in limitation of Grantee's rights for the purposes herein mentioned.

6.    The perpetual right and easement to use, inspect, install, maintain, repair and replace the "4 PVC" drain located southerly of the most southerly side of Grantee's property as shown on the Plan, including the right to enter upon Grantor's property with people, machinery and equipment for the purposes of inspection, construction, maintenance, repair and replacement as necessary of such PVC drain and all appurtenances associated with such PVC drain. The foregoing rights are intended to be descriptive and not in limitation of Grantee's rights for the purposes herein mentioned.

The above-described easements shall be for the benefit of the Grantee, its successors and assigns, including any employees, agents, invitees and vendors of Grantee, and shall be appurtenant to Grantee's property described above as shown on the Plan.

The above-described property is also conveyed together with the benefit of, subject to the rights of others, in and to:

NY:995404.1

Doc#:   50496 Bk:27181 Ps: 145

I.     Access Easement.

The perpetual right and easement for building construction and maintenance and for pedestrian and vehicular access, ingress and egress over and upon, the following described premises now owned by the City of Westbrook:

Beginning at a point at the intersection of the easterly sideline of Bridge Street with the southerly sideline of discontinued Dana Court;

(1)    Thence N 02°43'31" E, along said Bridge Street, a distance of Forty-Two and 56/100 (42.56) feet to a point;

(42) Thence N 28°13'51" W, along said Bridge Street, a distance of Twenty and 10/100 (20.10) feet to a point;

(43) Thence N 68°42'09" E a distance of One Hundred Forty-Eight and 10/100 (148.10) feet to a point;

(44) Thence S 83°39'38" E a distance of One Hundred Seventy-Four and 82/100 (174.82) feet to a point;

(45) Thence N 77°52'19" E a distance of Seventy-Six and 91/100 (76.91) feet to a point;

(46) Thence S 12°07'41" E a distance of Eight and 00/100 (8.00) feet to a point on the northerly line of land now or formerly of the City of Westbrook;

(47) Thence S 74°52'09" W, along said land of City of Westbrook, a distance of Five and 01/100 (5.01) feet to a point;

(48) Thence N 12°07'41" W a distance of Four and 40/100 (4.40) feet to a point;

(49) Thence S 77°52'19" W a distance of One Hundred Twenty-Two and 00/100 (122.00) feet to a point;

(50) Thence N 12°07'41" W a distance of Eighteen and 50/100 (18.50) feet to a point;

(51) Thence S 77°52'19" W a distance of Fifty and 00/100 (50.00) feet to a point;

(52) Thence N 12°07'41" W a distance of Three and 67/100 (3.67) feet to a point;

(53) Thence S 77°52'19" W a distance of Sixteen and 30/100 (16.30) feet to a point;

(54)   Thence S 00°11'18" E a distance of Twenty-Five and 51/100 (25.51) feet to a point;

(55) Thence S 89°30'01" W a distance of One Hundred Eighty-Two and 50/100 (182.50) feet to a point;

(56) Thence S 00°29'59" E a distance of One Hundred Eighty-Two and 001100 (182.00) feet to a point;

NY:995404.1

Doc#: 50496 Bk:27181 Pg: 146

(57) Thence N 89°30'01" E a distance of Ninety-Two and 00/100 (92.00) feet to a point;

(58) Thence S 00°29'59" E a distance of Nineteen and 00/100 (19.00) feet to a point on the northerly sideline of land now or formerly o S.D. Warren Company;

(59) Thence S 85°05'37" W, along said land of S.D. Warren Company, a distance of Forty-Nine and 02/100 (49.02) feet to a point;

(60) Thence N 65°06'23" W, along said land of S.D. Warren Company, a distance of Sixty and 33/100 (60.33) feet to a point on the easterly sideline of said Bridge Street; and

(61) Thence N 02°43'31" E, along said Bridge Street, a distance of One Hundred Eighteen and 07/100 (118.07) feet to the point of beginning.

Containing 10,778 square feet. Bearings are referenced to magnetic north, 2001.

Excepting from the Access Easement that portion that overlaps and falls within the fee parcel.

II.    Courtyard Easement.

The perpetual right and easement for building construction and maintenance and for pedestrian and vehicular access, ingress and egress over and upon the following described premises now owned by the City of Westbrook:

Beginning at a point at the intersection of the easterly sideline of Bridge Street and the southerly sideline of the proposed relocation of Dana Court; thence N 68°42'09" E, along the southerly sideline of the said proposed relocation of Dana Court, a distance of One Hundred Forty-Eight and 10/100 (148.10) feet to an angle point in said sideline; thence S 83°39'38" E, along the southerly sideline of the said proposed relocation of Dana Court, a distance of Fifty-Six and 39/100 (56.39) feet to a point; thence S 00°11'18" E a distance of Twenty-Seven and 84/100 (27.84) feet to the TRUE POINT OF BEGINNING;

(11) Thence S 12°07'40" E a distance of Two Hundred Twelve and 39/100 (212.39) feet to a point on the northerly line of land now or formerly of S.D. Warren Company;

(12) Thence S 85°05'37" W, along said land of S.D. Warren Company, a distance of One Hundred Thirty-Three and 80/100 (133.80) feet to a point;

(13) Thence N 00°29'59" W, a distance of One Hundred Nine and 00/100 (109.00) feet to a point;

(14) Thence N 89°30'01" E, a distance of Ninety and 00/100 (90.00) feet to a point; and

(15) Thence N 00° 11' 18" W a distance of One Hundred Nine and 311100 (109.31) feet to the true point of beginning.

Excepting from the Courtyard Easement that portion that overlaps and falls within the fee parcel herein conveyed.

NY:995404.1

Doc#:    50496 Bk:27181 Ps:   147

III.    Turnaround Easement.

The perpetual right and easement for vehicular and pedestrian ingress and egress for purposes turning and backing vehicles, including heavy equipment, providing deliveries, products and/or services, including waste and trash removal services to tenants or owners of the premises conveyed herewith, their successors and assigns, including all of such rights in connection with the exercise and use of the dumpster and oil tank easements also described herein, over and upon the following described premises now owned by the City of Westbrook:

Beginning at a point at a corner on the southerly line of land now or formerly of Philip E. Chayer and Gertrude E. Chayer; thence N 68°35'09" E, along the southerly line of said Chayer, a distance of Sixty-Three and 28/100 (63.28) feet to a point; thence S 21°24'51" E a distance of Ten and 79/100 (10.79) feet to the TRUE POINT OF BEGINNING,

(9)  Thence S 84°44'22" E a distance of Forty-Five and 00/100 (45.40) feet to a point;

(10) Thence S 05°15'38" W a distance of Twenty and 77/100 (20.77) feet to a point in the northerly sideline of the proposed relocation of Dana Court;

(11) Thence N 83°39'38" W a distance of Forty-Five and 38/100 (45.38) feet to a point along the northerly sideline of the proposed relocation of Dana Court; and

(12) Thence N 06°20'22" E a distance of Nineteen and 92/100 (19.92) feet to the true point of beginning.

IV.    Dumpster Easement

The perpetual right and easement to maintain, store, replace, upgrade, repair, install and utilize a trash dumpster for the purpose of collecting and removing waste, trash, debris (including construction debris) by vehicle or other mechanical means, generated in connection with the use by the owners or tenants (and their successors and assigns) of the buildings, improvements and appurtenances constructed or to be constructed on the premises herewith, over and upon the following described premises now owned by the City of Westbrook:

Beginning at a point at a corner on the southerly line of land now or formerly of Philip E. Chayer and Gertrude E. Chayer;

(9)  Thence N 68°35'09" E, along said land of Chayer, a distance of Sixty-Three and 28/100 (63.28) feet to a point;

(10) Thence S 21°24'51" E a distance of Ten and 79/100 (10.79) feet to a point;

(11) Thence S 06°20'22" W a distance of Nineteen and 92/100 (19.92) feet to a point on the northerly sideline of the proposed relocation of Dana Court; and

Doc#:   50496 Bk:27181 Ps:  148

(12)Thence N 83°39'38" W, along said proposed relocation of Dana Court, a distance of
Sixty-One and 03/100 (61.03) feet to the point of beginning.

V.     Oil Tank Easement.

The perpetual right and easement to maintain, store, replace, upgrade, repair, install
and utilize an above-ground oil tank for the purpose of providing oil service to the owners or
tenants (and their successors and assigns) of the buildings, improvements and
appurtenances constructed or to be constructed on the premises conveyed herewith, and in
connection with the use and enjoyment of such right and easement to gain access by foot
and by vehicle over and upon the following described premises now owned by the City of
Westbrook:

Beginning at a paint at the southwesterly corner of land now or formerly of
Lawrence A. Robinson and Lynne F. Robinson, thence N 70°37'09" E, along the southerly
line of said Robinson, a distance of Twenty-Two and 35/100 (22.35) feet to a point; thence
S 15°07'51" E a distance of Thirty-Eight and 23/100 (38.23) feet to the northerly line of the
proposed relocation of Dana Court; thence S 83°39' 38" E, along said proposed relocation
of Dana Court, a distance of Seven and 03/100 (7.03) feet to the TRUE POINT OF
BEGINNING;

(9)  Thence N 05°15'38" E a distance of Thirty and 00/100 (30.00) feet to a point;

(10)Thence S 84°44'22" E a distance of Thirty and 00/100 (30.00) feet to a point;

(11)Thence S 05°15'38" W a distance of Thirty and 56/100 (30.56) feet to the proposed
relocation of Dana Court; and

(12)Thence N 83°39'38" W, along the proposed relocation of Dana Court, a distance of
Thirty and 01/100 (30.01) feet to the trust point of beginning.

VI.    Oil Line Easement.

The perpetual right and easement to maintain, replace, upgrade, repair, install and
utilize a below-ground oil pipeline for the purpose of providing oil service to the owners or
tenants (and their successors and assigns) of the buildings, improvements and
appurtenances constructed or to be constructed on the premises conveyed herewith,, and in
connection with the use and enjoyment of such right and easement to gain access to such
pipeline, over and upon the following described premises now owned by the City of
Westbrook:

Beginning at a point at the southwesterly corner of land now or formerly of
Lawrence A. Robinson and Lynne F. Robinson, thence N 70°37'09" E, along the southerly
line of said Robinson, a distance of Twenty-Two and 35/100 (22.35) feet to a point; thence
S 15°07'51" E a distance of Thirty-Eight and 23/100 (38.23) feet to the northerly line of the
proposed relocation of Dana Court; thence S 83°39' 38" E, along said proposed relocation
of Dana Court, a distance of Twenty-Seven and 04/100 (27.04) feet to the TRUE POINT
OF BEGINNING and the center line of a Twenty (20) foot wide easement;

NY:995404.1

Doc#:   50496 Bk:27181 Pg: 149

(7) Thence S 05°15'38" W a distance of Thirteen and 48/100 (13.48) feet to a point;

(8) Thence S 72°58'55" W a distance of Fifty-One and 16/100 (51.16) feet to a point;

(9) Thence S 00°11'18" E a distance of plus/minus Fifty-Three and 00/100 (53.00)feet, more or less, to a point and being the northeasterly section of land described in a certain deed from the City of Westbrook to One Riverfront Plaza, LLC dated June 19, 2003 and recorded in said Registry of Deeds in Book 19592, Page 205.

Bearings are referenced to magnetic north, 2001.

Excepting from the Oil Line Easement that portion that overlaps and falls within the fee parcel herein conveyed.

VII.   Aerial Crosswalk Easement.

The perpetual right and easement to construct, install, repair, maintain, improve and replace from time to time a certain enclosed aerial crosswalk for the transmission of pedestrian traffic to and from the above-described premises to and from the property of Dana Warp Mill, LLC, as described in a Deed from Timothy A. Flannery and H. Roger Flannery, II, Trustees of CCK Realty Trust dated September 27, 1999 and recorded in the Cumberland County Registry of Deeds in Book 15076, Page 32, and to enter into the building on the said property of Dana Warp Mill, LLC, over and above Bridge Street in Westbrook, Maine as depicted on a plan entitled "Plan of Property, Dana Court, Westbrook, Maine made for Environmental Engineering and Remediation", prepared by Titcomb Associates, dated February 24, 2003" recorded in the Cumberland County Registry of Deeds in Plan Book 203, Page 311.

For a depiction of the foregoing perpetual rights and easements appurtenant to the above-described premises, reference is hereby made to a plan entitled "Plan of Property, Dana Court, Westbrook, Maine made for Environmental Engineering and Remediation", prepared by Titcomb Associates, dated February 24, 2003" recorded in the Cumberland County Registry of Deeds in Plan Book 203, Page 311.

The foregoing perpetual rights and easements are subject to all rights and easements of others of record over and upon any of the foregoing properties burdened by the particular easements described by metes and bounds descriptions herein.

The above-described parcel is conveyed subject to an aerial crosswalk easement as described in the Quitclaim Deed With Covenant from One Riverfront Plaza, LLC to Dana Warp Mill, LLC, dated June 19, 2003 and recorded in said Registry of Deeds in Book 19592, Page 210, as amended by the First Amendment of Aerial Crosswalk Easement and Dana Warp Mill Agreement by and between Dana Warp Mill, LLC and One Riverfront Plaza, LLC, dated of near or even date herewith, to be recorded in said Registry of Deeds.

Doc#:   50496 Bk:27181 Ps: 150

## PARCEL THREE

Tenant's interest in the parking spaces described in Parking Space Lease Agreement by and between the City of Westbrook (as Landlord) and One Riverfront Plaza, LLC (as Tenant) dated as of June 19, 2003 and recorded in the Cumberland County Registry of Deeds in Book 19592, Page 321, re-recorded in Book 19672, Page 261, Amended and Restated Parking Space Lease Agreement dated November ___, 200 and recorded in the Cumberland County Registry of Deeds in Book ___, Page ___, subject to the perms and provisions set forth in said Lease.

Received
Recorded Register of Deeds
Aus 14,2009 01:31:26P
Cumberland County
Pamela E. Lovley

NY:995404.1

11p-2 Anderson mccoy ccla.

# EXHIBIT H

DOC :3411  BK:32876  PG:32

THIS DOCUMENT PREPARED BY AND
UPON RECORDATION RETURN TO:
ANDERSON, MCCOY & ORTA, P.C.
100 North Broadway, Suite 2600
Oklahoma City, Oklahoma 73102
Telephone: 888-236-0007
AMO ID: 165.0252
Servicer Loan No.: 187-31
Cumberland County, Maine

## ASSIGNMENT OF FEE AND LEASEHOLD MORTGAGE
## AND SECURITY AGREEMENT

KNOW THAT

    **BANK OF AMERICA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22**, as predecessor trustee, having an address at 540 West Madison Street, Mail Code IL 4-540-18-04, Chicago, IL, 60661 ("Assignor"),

For valuable consideration given by:

    **U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, SUCCESSOR-IN-INTEREST TO BANK OF AMERICA, N.A., AS TRUSTEE, SUCCESSOR TO WELLS FARGO BANK, N.A., AS TRUSTEE, FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22**, as successor trustee, having an address at 190 S. LaSalle Street, 7th Floor, Mail Code MK-IL-SL7, Chicago, IL, 60603 ("Assignee"),

DOC :3411  BK:32876  PG:33

the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby grant, bargain, sell, convey, assign, transfer, and set over, without recourse, representation and warranty, all of Assignor's right, title and interest, of any kind whatsoever, in and to the subject note(s) and loan documents, and including that of mortgagee, beneficiary, payee, assignee or secured party (as the case may be), as the same may have been assigned, amended, supplemented, restated or modified, in and to the following:

FEE AND LEASEHOLD MORTGAGE AND SECURITY AGREEMENT (as same may have been amended) executed by PENDLETON WESTBROOK SPE, LLC, ZAK WESTBROOK SPE, LLC, SRA WESTBROOK SPE, LLC, SPC WESTBROOK SPE, LLC, and PARIS WESTBROOK SPE, LLC, each a Delaware limited liability company, jointly and severally, as tenants-in-common, to WACHOVIA BANK, NATIONAL ASSOCIATION, and recorded on November 23, 2005, as Document Number 86028, in Book 23420, Page 232, in the Real Estate Records pertaining to the land situated in the State of Maine, County of Cumberland ("Real Estate Records");

the foregoing instrument was assigned to WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22 by assignment instrument recorded on July 10, 2006, as Document Number 43311, in Book 24152, Page 98, in the Real Estate Records;

the foregoing instrument was further assigned to Assignor by assignment instrument recorded on August 14, 2009, as Document Number 50496, in Book 27181, Page 140, in the Real Estate Records;

TO HAVE AND TO HOLD the same unto the Assignee and to the successors, legal representatives and assigns of the Assignee forever.

THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

DOC :3411   BK:32876  PG:34
RECEIVED - RECORDED REGISTER OF DEEDS
01/26/2016, 08:56:43A
CUMBERLAND COUNTY, NANCY A. LANE

IN WITNESS WHEREOF, the Assignor has duly executed, acknowledged and delivered this Assignment dated as of the ___19___ day of January, 2016.

> BANK OF AMERICA, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF WACHOVIA BANK COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-C22
>
> By: _____
> Name: Edward W. Przybycien Jr.
> Title: Assistant Vice President of U.S. Bank National Association, as Trustee, Attorney-in-Fact

STATE OF ILLINOIS            §
                             §
COUNTY OF COOK               §

    This instrument was acknowledged before me, the undersigned Notary Public, on the 19th day of January, 2016, by Edward W. Przybycien Jr., who personally appeared and is known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity as Assistant Vice President of U.S. Bank National Association, the Attorney-in-Fact pursuant to that certain Limited Power of Attorney dated October 24, 2011, on behalf of Bank of America, N.A., as Trustee and that by his signature on the instrument, the entity upon behalf of which he acted, executed the instrument.

    WITNESS my hand and official seal.

My Commission Expires: April 17th, 2019

Signature: _____

> OFFICIAL SEAL
> VICKY EATON
> Notary Public - State of Illinois
> My Commission Expires Apr 17, 2019

# EXHIBIT I



**NIXON PEABODY**

NIXON PEABODY LLP
ATTORNEYS AT LAW

NIXONPEABODY.COM
@NIXONPEABODYLLP

Armando Batastini
*Partner*
T 401-454-1015
abatastini@nixonpeabody.com

Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903-1345
Phone: (401) 454-1000

**Certified Article Number**

9414 7266 9904 2008 8718 78

**SENDERS RECORD**

January 12, 2016

**VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED**

Pendleton Westbrook SPE, LLC
ZAK Westbrook SPE, LLC
SRA Westbrook SPE, LLC
SPC Westbrook SPE, LLC and
Paris Westbroook SPE, LLC
235 Moore Street
Suite 300
Hackensack, NJ 07601
Attn: Peter O. Hanson

**RE:** That certain loan (the "**Loan**") in the original principal amount of $20,000,000 as evidenced by a Promissory Note dated November 21, 2005 (the "**Note**") executed by Pendleton Westbrook SPE, LLC, ZAK Westbrook SPE, LLC, SRA Westbrook SPE, LLC, SPC Westbrook SPE, LLC and Paris Westbroook SPE, LLC, each a Delaware limited liability company (collectively, "**Borrower**") and made payable to Wachovia Bank, National Association ("**Original Lender**"), which Note is currently held by U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor to Wells Fargo Bank, N.A., as Trustee for the registered holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2005-C22 ("**Holder**" or the "**Trust**"). The Note is secured by a Fee and Leasehold Mortgage and Security Instrument, dated as of November 21, 2005, executed by Borrower for the benefit of Original Lender, and recorded with the Cumberland County Registry of Deeds (the "**Registry**"), at Book 23420, Page 232 (the "**Mortgage**"), which Mortgage is now held by Holder, as well as that certain Assignment of Leases and Rents, dated as of December 1, 2005 between Borrower and Original Lender and recorded with the Registry as Book 23420, Page 322 (the "**Assignment of Rents**"), which Assignment of Rents is now held by Holder. The Note, Mortgage, Assignment of Rents and all other documents executed in connection with the Loan, are collectively referred to herein as the "Loan Documents". The Mortgage is secured by, among other things, all of Borrower's

4845-5612-1132.1

Pendleton Westbrook SPE, LLC
ZAK Westbrook SPE, LLC
SRA Westbrook SPE, LLC
SPC Westbrook SPE, LLC and
Paris Westbroook SPE, LLC
January 12, 2016
Page 2

interest in the Property (which includes, without limitation, the Property, as defined in the Mortgage) which is located at Riverfront Plaza, Westbrook, Maine (the "**Property**").

## NOTICE OF DEFAULT, ACCELERATION AND DEMAND FOR PAYMENT

Dear Borrower:

Please be advised that CWCapital Asset Management LLC acts as "Special Servicer" for the Holder in connection with the Loan. Terms used but not defined herein shall have the meanings as set forth in the Loan Documents.

The undersigned hereby notifies you that an Event of Default has occurred under Section 2.1 of the Mortgage including without limitation, the Borrower's failure to make the full and punctual payments due on the Maturity Date.

Pursuant to the Mortgage, the Holder has the right to take such action, without notice or demand, as it deems advisable to protect and enforce its rights against the Borrower and the Property; including, but not limited to, declaring all indebtedness due on the Note immediately due and payable to Holder, and increasing the interest rate on the Note from the Note Rate (as defined in the Note) of 5.65% per annum to a Default Rate equal to four percent (4%) above the Note Rate (the "Default Interest Rate"). Accordingly, as a result of the Event of Default, the Holder hereby declares that the Debt shall be immediately due and payable and the Note Rate shall increase to the Default Interest Rate since the Event of Default.

Accordingly, as of December 11, 2015, the Borrower owes the Holder an outstanding principal balance on the Note of Sixteen Million Four Hundred and Forty-Three Thousand Three Hundred Eighty-One 07/100 Dollars ($16,443,381.07), plus interest (including, where applicable, interest at the Default Interest Rate), applicable consideration for prepayment, late fees, costs and expenses and all other charges which the Holder is entitled to or as may accrue under the Loan Documents.

Demand is hereby made upon the Borrower to pay to the Holder all amounts immediately due and payable to Holder pursuant to the terms of the Note and other Loan Documents. Any failure of the Borrower to immediately remit the outstanding balance of the Loan, including, without limitation, all interest accrued thereon and any other outstanding balances, amounts, penalties, charges, costs, expenses, attorneys' fees, demands or any other amounts owed to the Holder under the Loan Documents, may result in the Holder pursuing its remedies, including, but not limited to, any or all such remedies as provided under the Loan Documents. Please contact Hussain Burhani at 301.255.4752 or via email at hburhani@cwcapital.com with the date upon

1845-5612-1132 1

Pendleton Westbrook SPE, LLC
ZAK Westbrook SPE, LLC
SRA Westbrook SPE, LLC
SPC Westbrook SPE, LLC and
Paris Westbroook SPE, LLC
January 12, 2016
Page 3

which the Loan will be paid in full and you will be provided the exact amount due to Lender on that date.

Additionally, as a result of the Event of Default, the Assignment of Rents automatically terminates your license to Rents (as defined therein), so that Holder is entitled to all Rents after an Event of Default.

No failure by the Holder to exercise, nor any delay in the exercise of, any other right, power, privilege or remedy available to the Holder under the Loan Documents or at law shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof, nor the exercise of any other right, power or privilege available to the Holder at law or in equity. Neither the delivery of this letter nor any other notice or demand that may be given to the Borrower in any one instance shall entitle the Borrower to other or future notices or demands in similar or other circumstances, nor shall the same constitute a waiver of any of the Holder's aforementioned rights and remedies under the Loan Documents or applicable law, the same being expressly reserved by the Holder. The Holder hereby reserves all of its rights and remedies under the Loan Documents, at law or in equity, including without limitation, the right to exercise such rights or remedies, without further notice.

All future notices to Holder concerning the Loan Documents shall be given and addressed to CWCapital Asset Management LLC, 7501 Wisconsin Avenue, Suite 500 West, Bethesda, MD 20814, Attention: Hussain Burhani, with a copy to Nixon Peabody LLP, One Citizens Plaza, Suite 500, Providence, RI 02903-1345, Attention: Armando Batastini, Esq.

Pendleton Westbrook SPE, LLC
ZAK Westbrook SPE, LLC
SRA Westbrook SPE, LLC
SPC Westbrook SPE, LLC and
Paris Westbroook SPE, LLC
January 12, 2016
Page 4

Sincerely,

U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor to Wells Fargo Bank, N.A., as Trustee for the registered holders of Wachovia Bank Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2005-C22

By:     CWCapital Asset Management LLC,
solely in its capacity as Special Servicer for Holder

By its attorneys,

NIXON PEABODY LLP

By: Armando E. Batastini, Esq.

By: _Q E Bstt_
Armando E. Batastini


cc:     Daniel M. Eliades *(Via E-mail and Overnight Delivery)*
        Forman Holt Eliades & Youngman LLC
        80 Route 4 East, Suite 290
        Paramus, NJ 07652

1845-5612-1132.1